**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SUMMIT 6 LLC,** | § | |
| | § | |
| | § | |
| Plaintiff, | § | **CIVIL ACTION NO. 3:11-cv-00367-O** |
| | § | |
| v. | § | |
| | § | |
| **RESEARCH IN MOTION CORP.,** | § | |
| **RESEARCH IN MOTION LIMITED,** | § | |
| **SAMSUNG ELECTRONICS CO. LTD.,** | § | **JURY TRIAL DEMANDED** |
| **SAMSUNG TELECOMMUNICATIONS** | § | |
| **AMERICA LLC, MULTIPLY, INC.,** | § | |
| **FACEBOOK, INC., and** | § | |
| **PHOTOBUCKET CORP.,** | § | |
| | § | |
| Defendants. | § | |

**OPENING CLAIM CONSTRUCTION BRIEF**
**OF PLAINTIFF SUMMIT 6, LLC**

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  TECHNOLOGY OVERVIEW ............................................................................1

III. PRINCIPLES OF CLAIM CONSTRUCTION ..................................................4

IV.  DISPUTED CLAIM CONSTRUCTIONS ..........................................................7

    **A.**    "pre-processing" ..................................................................................7

          1.    Summit 6's Construction Accurately Captures the Scope of the Claims. ..............................................................7

          2.    Defendants' Constructions Improperly Read in Limitations Such as Web Browsers and Server Devices..........................................................................................9

                a.    The "Server Device" Limitations Are Improper....................................................................9

                b.    The "At The Browser" Limitation Is Improper..................................................................10

    B.    "pre-processing parameters" and "parameters used to control the pre-processing"..................................................12

    C.    "pre-processing the media object without [additional] user selection of the pre-processing"..................................................13

          1.    Summit 6's Proposal is Consistent with the Specification. ..........................................................................14

          2.    A Person of Ordinary Skill in the Art Would Not Read the Claim Term as Preventing Any User Selection that "Affects" Pre-Processing. ....................................15

          3.    The Prosecution History Supports Summit 6's Construction.........................................................................17

    D.    "pre-processing the media object . . . for the requirements of the third-party web site" .............................................18

          1.    The Claims Do Not Require a Standard Format for Publication. ............................................................................18

          2.    Defendants Improperly Add Another Party Into the Claims. ........................................................................20

ii

E.      "placement of . . . digital content into a specified form" ........................................21

F.      "pre-processing in accordance with one or more pre-processing parameters that have been stored in memory of said client device" and similar terms ...................................................22

      1.      The Underlying Terms are Being Construed So There is No Need to Construe the Phrases As a Whole. ......................................................................................22

      2.      Attempting to Give the Same Meaning to Different Unique Phrases Renders the Differences Between Claims Superfluous. ..................................................................24

G.      "remote device" and "device separate from said client device" ...............................................................................................24

H.      "information that enables identification of a user" and "user identifier" and "user information" .......................................26

I.      "publication" and "publishing" ...............................................................27

J.      "A computer implemented method of pre-processing digital content in a client device for subsequent electronic publishing" and similar terms ................................................28

K.      "receiving . . . from a remote device" and "received . . . from a device separate from a client device" and "provided to said client device by a device separate from said client device" ...............................................................................................29

V.      CONCLUSION.........................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acumed LLC v. Stryker Corporation,*
    483 F.3d 800 (Fed. Cir. 2007)..................................................................................11

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.,*
    55 F.3d 615 (Fed. Cir. 1995)....................................................................................4

*Biovail Corp. v. Andrx Pharms., Inc.,*
    239 F.3d 1297 (Fed. Cir. 2001)................................................................................6

*CCS Fitness, Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002)................................................................................21

*Comark Communs. v. Harris Corp.,*
    156 F.3d 1182 (Fed. Cir. 1998)................................................................................24

*ERBE Elektromedizin GmbH v. Canady Tech. LLC,*
    629 F.3d 1278 (Fed. Cir. 2010)................................................................................8

*GoLight, Inc. v. Wal-Mart Stores, Inc.,*
    355 F.3d 1327 (Fed. Cir. 2004)................................................................10, 13, 15

*i4i Ltd. P'ship v. Microsoft Corp.,*
    589 F.3d 1246 (Fed. Cir. 2009)................................................................................20

*Intirtool, Ltd. v. Texar Corp.,*
    369 F.3d 1289 (Fed. Cir. 2004)................................................................................28

*Johnson Worldwide Assocs. V. Zebco Corp.,*
    175 F.3d 985 (Fed. Cir. 1999)..................................................................................11

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004)..................................................................................19

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996)..........................4

*Nazomi Commc'ns., Inc. v. Arm Holdings, PLC,*
    403 F.3d 1364 (Fed. Cir. 2005)................................................................................5, 20

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
    521 F.3d 1351 (Fed. Cir. 2008)................................................................................12

*Orion IP, LLC v. Staples, Inc.,*
  406 F.Supp.2d 717 (E.D. Tex. 2005).......................................................................24

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005)...................................................................... passim

*SRI Int'l v. Matsushita Elec. Corp. of Am.,*
  775 F.2d 1107 (Fed. Cir. 1985)............................................................................20

*Superguide Corp. v. DirecTV Enters., Inc.,*
  358 F.3d 870 (Fed. Cir. 2004)...............................................................................10

*Texas Digital Systems, Inc. v. Telegenix, Inc.,*
  308 F.3d 1193 (Fed. Cir. 2002)................................................................................6

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996)...................................................................6, 26, 27

**STATUTES**

35 U.S.C. § 112...........................................................................................................10

## I.  INTRODUCTION

Plaintiff Summit 6, LLC ("Summit 6") respectfully submits its Opening Claim Construction Brief regarding U.S. Patent No. 6,895,557 (filed July 21, 1999) (the "'557 Patent") and its continuation, U.S. Patent No. 7,765,482 (filed Oct. 8, 2004) (the "'482 Patent") (collectively the "Patents-in-Suit").  This brief first introduces the technology of the Patents-in-Suit, summarizes the relevant case law, and then explains why the Court should adopt Summit 6's proposed constructions.

## II.   TECHNOLOGY OVERVIEW

The inventors of the Patents-in-Suit have been heavily involved in the digital imaging industry since its infancy.  The first digital cameras came to market in the U.S. in the early 1990s.  They were a far cry from the slim, sophisticated machines we see today.  The bulky Kodak DC50 from 1996 is shown to the right.  During this timeframe, the inventors worked at a company called PictureWorks.  The inventors and PictureWorks recognized that once the digital camera phenomenon took off, consumers would  need a quick and easy way to get digital pictures from their cameras onto their computers. PictureWorks' new mission was born.  They partnered with Kodak, Casio, Epson, Fuji, and others to provide image-transfer software that was bundled with digital cameras and scanners.

Although their camera-to-computer software was successful, the inventors recognized the next hurdle for most users: sharing images with others over a network such as the Internet. Image sharing proved challenging to most users in several respects.  As a first example, the recipient may expect or require the image to be in a different form than that provided by the sender (*e.g.*, the recipient may expect a .JPG file instead of a .BMP file, or she may expect an image with 640x480 resolution instead of 2048x1536 resolution).  One or both parties may not

have the technical expertise to reformat the images as required.  As a second example, the process of sending an image (or, worse, dozens of images) across a network might be painfully slow if the images were not in an appropriate form beforehand.  A 2048x1536 .BMP file might be over 3 megabytes, whereas a 640x480 .JPG file might only be 60 kilobytes—1/50[th] the size, requiring 1/50[th] the time to transmit.  As a third example, the recipient's image parameters might change from time-to-time, requiring that the sender be notified and, perhaps, reeducated on how to prepare the images.[1]

The inventors witnessed the problem first hand in the real estate industry.  Online realty listing services relied heavily on photos to interest other agents and their customers in properties.  The listing services expected these images to be in a certain form (*e.g.*, to have a certain resolution and file format) to ensure that they displayed correctly.  These requirements would cause Realtors to have to purchase and learn to use expensive image-editing software to modify their files to meet the specifications.  (Others would even mail in paper copies of the pictures and leave the digital imaging to someone else.)  To further complicate things, the image specifications were not consistent between listing services, so a realtor may have to create and manually edit multiple copies of the same image in order to meet differing requirements.  In short, electronically transmitting a properly formatted media file was not an easy process for most users in the mid-1990s.  The inventors devoted their expertise to developing a simple solution to this problem, one that should be no more difficult than sending text.

The solution the inventors ultimately patented allowed users to transmit properly formatted media with a few simple clicks—without using complex technologies or separate editing software.  In the simplest form of the invention, users merely select a photo, optionally

---

[1] Although this explanation is provided in the context of sharing images, the invention and the patents are also applicable to other forms of media, such as videos.

enter captions or text, and click "go." The patented technology takes care of the rest, properly formatting the media for the destination and typically reducing the size of the file that has to be transmitted. The inventions provide many benefits for both the user and the recipient: the ability to submit media to web servers or other devices without the need for technical know how; access to reliable media acquisition; access to contributed media that consistently meets the recipient's specifications; and faster transmission times and increased ease-of-use that enhance the user experience. The inventors recognized that their solutions were valuable inventions, and they filed a patent application on July 21, 1999.

The inventors knew their idea could be embodied in multiple ways and worked to claim different embodiments in two related patents. First, the inventors prosecuted claims covering the use of their invention in the limited context of a web page. This claim set issued as the '557 Patent on May 17, 2005. The claims in this patent cover, in a broad sense, the use of a media object identifier in a web page to process media as required by the destination web site.

On October 4, 2004, before the '557 Patent was issued, the inventors filed a continuation application. At first, this application again contained proposed claims limited to use in conjunction with web pages. However, in late 2008 the inventors dropped the web-limited claims from this pending application and began to prosecute claims more broadly directed to processing media in and transmitting media from one "device" (*e.g.*, a client device) to another "device" (*e.g.*, a remote device or server device). This claim set, which is very deliberately *not* limited to the web site/web page realm, issued as the '482 Patent on July 27, 2010.[2]

One of the first customers to purchase and adopt the patent-pending technology was eBay, the online auction site. eBay knew that auctions with pictures performed better than those

---

[2] The '482 "device" patent is the only patent asserted against device makers Samsung and RIM. Both patents are asserted against Facebook, Photobucket, and Multiply.

without, but adding pictures to the auctions was complicated for most users.  eBay partnered with the inventors to use this technology for its online auctions.  Over time, other well-known companies have licensed the patented technology from PictureWorks and its successor companies (including Summit 6).

## III.     PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction is an issue of law for courts to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996).  Claim construction is the process of giving proper meanings to the claim language thereby defining the scope of the right to exclude.  *See Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995) (internal citations omitted).

"The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation."  *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005).  This is "based on the well settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art."  *Id.*  Accordingly, claims are to be construed through the eyes of a person of ordinary skill in the field of the invention at the time of the invention.  *Id.*  The Federal Circuit has frequently stated that "the words of a claim are generally given their ordinary and customary meaning."  *Id.* at 1312-13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.  In other cases, however, determining the ordinary and

4

customary meaning of the claim "requires examination of terms that have a particular meaning in a field of art." *Id.*  "Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'"[3] *Id.*  Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.*

When construing disputed claim terms, the court should look first to the intrinsic record of the patent, including the claims and the specification, to determine the meaning of words in the claims.  *Nazomi Commc'ns., Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005).  Claim construction starts with the language of the claim itself since a patent's claims define the invention to which the patentee is entitled the right to exclude.  *Phillips*, 415 F.3d at 1312.  Oftentimes, "[t]he claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Id.* at 1314.  For example, differences among claims can be a useful guide in understanding the meaning of particular claim terms.  *Id.*

In addition to the claims, "[t]he specification is always highly relevant to the claim construction analysis.  Usually it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* at 1315.  "[T]he person of ordinary skill in the art is deemed to read the

---

[3] One of ordinary skill in the art in the July 1998 to July 1999 timeframe would have had (1) a Bachelors of Science in computer science or similar discipline and at least 2 years of experience in software design and development related to digital file manipulation, distribution, and/or storage, or (2) at least 5 to 7 years of experience in software design and development related to digital file manipulation, distribution, and/or storage.

claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

After analyzing the claims and the specification, courts should also look at the prosecution history, if it is in evidence, to determine the meaning of disputed claim terms. *Id.* at 1317. Like the specification, the prosecution history is part of the intrinsic record and consists of a complete record of the proceedings before the United States Patent and Trademark Office, including prior art cited during the examination of the patent, and express representations made by the applicant as to the scope of the claims. *Vitronics*, 90 F.3d at 1582. The prosecution history is highly relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582-83). Furthermore, when, as here, multiple patents derive from the same initial application, the prosecution history of the parent application may be considered in construing the claim terms of the other subsequently issued patents. *See Biovail Corp. v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001).

Although emphasizing the importance of intrinsic evidence in claim construction, the Federal Circuit has also stated that, in certain limited circumstances, district courts may "rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (internal quotations omitted). However, reliance on extrinsic evidence is limited and *Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. *Id.* at 1319-24 (condemning the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms

(through dictionaries or otherwise) before resorting to the specification for certain limited purposes).

## IV.   DISPUTED CLAIM CONSTRUCTIONS

### A.  "pre-processing"

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| pre-processing | in preparation for transmission, modifying the underlying data of the media object [digital content][4] in accordance with the requirements of another device | modifying the [media object data/data of the digital content][4] at the browser before transmitting to a server device [FB, PB, MX][5]<br><br>modifying the digital content at the client device before transmitting to a server device [RIM, SS][6] |
| '557 Claims: 1-2, 11, 14, 28-29, 31, 34, 45, 59-60, 74<br>'482 Claims: 1, 6, 7, 10, 12-18, 23, 25, 28, 35, 38, 41-42 | | |

Summit 6's construction precisely captures the scope of the invention described by the specification, and while the Defendants disagree amongst themselves what the proper construction is, both of their constructions inappropriately add narrowing limitations.  These narrowing limitations render other claim language superfluous and improperly read limitations into the claims from the specification in contradiction to the Federal Circuit case law.

### 1.   Summit 6's Construction Accurately Captures the Scope of the Claims.

The parties generally agree that pre-processing requires data modification prior to transmission, but the parties disagree about what data is pre-processed.  Summit 6's construction more accurately reflects the meaning of "pre-processing" because it is drawn directly from the

---

[4] The '557 and '482 Patents use different terms in the claims describing the items that are pre-processed (*i.e.*, "media object" and "digital content"), and the bracketed text indicates the substitution of these terms in their respective claims in the Patents-in-Suit.

[5] Denotes construction proposed by Facebook, Photobucket, and Multiply.

[6] Denotes construction proposed by RIM and Samsung.

prosecution history.  In explaining why the prior art Hui reference was different than the present

invention, the applicants made the following argument:

> The image correction process [of the Hui prior art] does not modify **the underlying image data** contained within the FlashPix file. The composition process of Hui also does not modify the image data contained within the FlashPix file. Rather, the composition process is designed to add or delete information (e.g., written captions) that is separate from the image data." (emphasis added).

Office Action Response, Mar. 26, 2010, at 22; Appx. at 0100.  In other words, the Hui prior art

was different than the claimed invention because it did not teach modifying the underlying data

of the media file, a requirement of the pending claims.  "[A]rguments made during prosecution

regarding the meaning of a claim term are relevant to the interpretation of that term in every

claim of the patent absent a clear indication to the contrary."  *See ERBE Elektromedizin GmbH v.*

*Canady Tech. LLC*, 629 F.3d 1278, 1286-87 (Fed. Cir. 2010).  Summit 6 requests a construction

consistent with the arguments made during prosecution demonstrating that the types of

processing claimed are modifications to the underlying media data.

Summit 6's construction should be adopted because it accurately defines pre-processing

in light of the specification.  The Federal Circuit stated in *Phillips* that "claims must be construed

so as to be consistent with the specification, of which they are a part."  415 F.3d at 1316.

Summit 6's construction embodies the concepts of processing the underlying data "in preparation

for transmission" and "in accordance with the requirements of another device," which are

abounding throughout the specification and prosecution history.  The specification makes clear,

and one of ordinary skill in the art would understand, that pre-processing does not happen in the

abstract, but instead happens to prepare media for transmission using the specifications of

another device.  Particularly, the specification describes the submission tool that performs "a

variable amount of intelligent preprocessing on media objects prior to upload" that "meets [the

imaging recipient's] specifications every time."  '557 Patent at col.2 ll.11-15, col.3 ll.2-3; Appx.

at 0008-9.  Further, the web site embodiment has "the ability to preprocess the media objects in

any number of ways prior to transporting to a second location." '557 Patent at col.4 l.67-col.5 l.2; Appx. at 0009-10.   That same embodiment will "prepare [the media] to meet the requirements of the second location." '557 Patent at col.5 ll.19-20; Appx. at 0010.   The '482 prosecution history also consistently describes these two concepts.   When overcoming a written description rejection (a rejection that alleges the specification does not disclose the claimed invention), the patentee showed that the invention was fully described by stating, "In general, the client device pre-processes digital content based on pre-processing parameters obtained from another device.   This pre-processing is performed prior to upload to a server device."   Office Action Response, Mar. 26, 2010, at 17; Appx. at 0095.   Summit 6's construction should be adopted because it accurately captures these concepts while Defendants' constructions do not.

### 2.   Defendants' Constructions Improperly Read in Limitations Such as Web Browsers and Server Devices.

The Defendants' proposed constructions are an attempt to narrow the asserted claims by reading in limitations not contained in the claims themselves.   First, all Defendants assert that the pre-processed media must be sent "to a server device."   Second, Facebook, Photobucket, and Multiply—*but not RIM and Samsung*—further contend that pre-processing must occur "at the browser" (*i.e.*, in conjunction with a web site viewed in a web browser).   It would be error to include these limitations in the construction of "pre-processing."

### a.   The "Server Device" Limitations Are Improper.

Defendants attempt to limit all of the claims of both Patents-in-Suit to require that the pre-processed media be sent "to a server device."   This is improper and conflicts with the claim language of various claims of the '482 Patent.   Specifically, claims 11, 12, 24, and 25 recite transmission to a "remote device," not a "server device."   In contrast, claims 1, 13, 26, and 35 do specifically recite transmission to a "server device."   When a claim requires a server, it says so by using the term "sever device."   When a claim simply requires transmission to a device at some other location, it uses the "remote device" and that device does not have to be a server.   Furthermore, claim 1 of the '482 Patent uses both "remote device" and "server device."   The

applicants clearly knew and intended there to be a difference between claims using "remote device" and "server device," and they deliberately avoided having "a server device" be a limitation of every claim.  The Defendants cannot circumvent this fact by adding in a "server device" limitation through the back door in the definition of "pre-processing."

Additionally, the preferred embodiment's reference to a "server device" is of no consequence because it is improper to limit the claims to a preferred embodiment when the claim language is broader than that embodiment.  *Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).  A patentee is required under 35 U.S.C. § 112 to provide a written description of what they believe to be the *preferred* way—but not *every* way—they know how to practice the invention.  *See GoLight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004).  Despite Defendants' frequent requests to do so, the Federal Circuit "[has] outright rejected the notion that disclosure of a single embodiment necessarily limits the claims." *Id.*  In fact, "absent a clear disclaimer of particular subject matter, the fact that the inventor anticipated that the invention may be used in a particular manner does not limit the scope to that narrow context." *Id.*  There are no expressions of manifest exclusion or disclaimer in the Patents-in-Suit; thus, limiting the claims of the Patents-in-Suit such that all transmissions are to a "server device" would be contrary to law and should be rejected by the Court.

### b. The "At The Browser" Limitation Is Improper.

Defendants Facebook, Photobucket, and Multiply (not RIM and Samsung) try to limit all the claims of both Patents-in-Suit to web browser embodiments through their construction of "pre-processing."  The "at the browser" limitation that they propose takes a description from the specification and reads it into the claims.  The Federal Circuit has made clear that using the specification to read limitations into the chosen claim language is a "cardinal sin" of claim construction. *See, e.g., Phillips*, 415 F.3d at 1320.  Summit 6 acknowledges that the preferred embodiment describes a web browser embodiment, but that embodiment is not a limitation of the claims. *Superguide*, 358 F.3d at 875.

The Federal Circuit's decision in *Acumed LLC v. Stryker Corporation*, 483 F.3d 800 (Fed. Cir. 2007), is also instructive here.  In *Acumed*, the defendant sought to construe the term "transverse holes" as being perpendicular holes, arguing that its construction was proper because "every description of the transverse holes in the '444 patent contemplates a perpendicular hole." *Id.* at 807.  The Court rejected this argument, holding that the plain meaning *of the claim* "covers more than the particular embodiment shown in the figures."  *Id.*  In fact, the Court reasoned that "the patentees knew how to restrict their claim coverage to holes passing through at right angles. They could have used the word 'perpendicular,' as they did in discussing their preferred embodiment.  Instead, they chose a different term that implies a broader scope."  *Id.*

Likewise, the "at the browser" limitation is not proper because the patentee knew how and when to inform the reader about activity specified for the "browser" by using that term in certain claims. For example, the applicants chose to use the term "browser" in claims 56 and 71 of the '557 Patent but not in any other claims.  Claim 56 of the '557 Patent reads, "The method of claim 45, wherein the local computer displays the web page using **a browser**."  '557 Patent at claim 56 (emphasis added); Appx. at 0014.  If the applicants wanted to limit all claims to a browser, they would have drafted them that way.[7]  To this same point, Summit 6 carefully crafted its patent claims such that the '557 Patent is directed to web sites, while the '482 Patent is not so limited.  None of the '482 Patent claims reference a web site or web page, nor do they otherwise suggest that the claims must be directed solely to a web-based implementation.  Thus the Defendants' attempt to limit all the claims to the web via the "pre-processing" term should be rejected by the Court.  Accordingly, Summit 6 respectfully requests that the Court adopt its proposed construction for "pre-processing."

---

[7] Defendants cannot force a patent to be web site-specific when its claims were not drafted that way.  *See Johnson Worldwide Assocs. V. Zebco Corp.*, 175 F.3d 985, 989-90 (Fed. Cir. 1999) ("claim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to those sources").

**B. "pre-processing parameters" and "parameters used to control the pre-processing"**

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| pre-processing parameters<br><br>parameters used to control the pre-processing | parameters for specifying the modification of the underlying data of the digital content [media object] to meet the requirements of another device | values contained in HTML text that are passed to and direct the code that performs the "pre-processing"*<br><br>*As this term is defined. |
| '557 Claims: 45, 60<br>'482 Claims: 1, 9, 12-13, 16-18, 22, 25-27, 30, 34-38, 51 | | |

The terms "pre-processing parameters" and "parameters used to control the pre-processing" are self-explanatory once the Court construes "pre-processing." As a result, Summit 6 believes that the Court should hold that these terms require no construction.[8] In the event the Court is inclined to construe these terms, Summit 6 has proposed a construction that is true to the intrinsic record of the patents and avoids the errors introduced by Defendants' proposal.

Summit 6 respectfully requests that "pre-processing parameters" ('482 claims) and "parameters used to control the pre-processing" ('557 claims 45 and 60), if construed, be defined as parameters for specifying the pre-processing. Embedding Summit 6's construction of "pre-processing," these terms mean "parameters for specifying the modification of the underlying data of the digital content [media object] to meet the requirements of another device."

In contrast to Summit 6's straightforward proposal, Defendants propose that the lone word "parameters" should be replaced by the 16 words "values contained in HTML text that are passed to and direct the code that performs the . . . ." While "pre-processing parameters" could fairly be said to be "values directing the pre-processing," the remainder of Defendants' construction is an additional, transparent attempt to limit all claims of the '482 "device" patent to the web site preferred embodiment through incorporation of "HTML" in their construction.

---

[8] "While it is the district court's duty to resolve the parties' disputes regarding the scope of a claim term, this does not require the court to construe every limitation present in the claim." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

HTML, or HyperText Markup Language, is a widely used computer language for programming web pages.  Summit 6 readily acknowledges that the preferred embodiment in the specification discloses the use of HTML to transmit some pre-processing parameters.  *See, e.g.*, '557 Patent at col.5 ll.22-62; Appx. at 0010.  However, the claims of the '482 Patent are quite plainly not limited to the web site embodiment as explained above, and it is absurd that "pre-processing parameters" referenced in those claims might only be values contained in HTML text.  Similarly, although claims 45 and 60 of the '557 Patent[9] are web site-related claims, they are not restricted to covering only those parameters transmitted using the particular language HTML referenced in the preferred embodiment.

Nothing in the specification or prosecution history trumps the default rule that the claims are not limited to the preferred embodiment.  *GoLight, Inc.*, 355 F.3d at 1331.  The Court should reject Defendants' additional attempt to read in unfounded web site limitations and, if it chooses to construe these terms, adopt Summit 6's ordinary and customary meaning construction.

**C.  "pre-processing the media object without [additional] user selection of the pre-processing"**

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| pre-processing the media object without [additional] user selection of the pre-processing | pre-processing the media object using pre-processing parameters obtained from another device and not pre-processing parameters provided by the user | "pre-processing"* the media object <u>without the pre-processing being affected by user-provided values or selections</u><br><br>*As this term is defined. |
| '557 Claims: 1, 28, 45, 60 | | |

This claim term appears only in the '557 Patent, in claims that *are* directed to web site and web page embodiments of the invention.  The dispute for this term centers on whether "without user selection" and "without additional user selection" mean, as the Defendants propose, that the user cannot make a single selection during use of the web site that somehow

---

[9] Claims 45 and 60 of the '557 Patent are the only two claims that include the term "parameters used to control the pre-processing."

affects the pre-processing. Defendants' construction should be rejected because it again introduces limitations not found in the claims and, in fact, contradicts a preferred embodiment disclosed in the Patents-in-Suit. Summit 6's proposed construction, by contrast, is true to the scope of the claims and is supported by the intrinsic record.

### 1.    Summit 6's Proposal is Consistent with the Specification.

The Court should adopt Summit 6's construction because it accurately reflects the meaning of this phrase as detailed in the specification, preferred embodiments, and the prosecution history. Summit 6's construction captures the concepts from the specification that (1) the pre-processing is controlled with parameters from another device[10] and (2) the user is not involved with the complex information contained in the pre-processing parameters.

Reading the '557 Patent claims in view of the specification makes clear the type of "user selection of pre-processing" that is to be avoided by the patents. It is the prior-art user selection of pre-processing that requires "technical sophistication"—the explicit manipulation of image data into a particular file format, resolution, file size, etc., necessary for another device. *See* '557 Patent at col.2 ll.52-63; Appx. at 0008; *see also* '557 Patent at col.3 ll.1-3; Appx. at 0009; '557 Patent at col.5 ll.16-20; Appx. at 0010. In fact, the inventors repeat this refrain several times throughout the specification. The specification states that prior art image sharing technology is "a cumbersome and daunting process." '557 Patent at col.1 ll.16-21; Appx. at 0008. It requires "sophistication that is beyond that of the ordinary user." '557 Patent at col.1 ll.21-23; Appx. at 0008. The Patents-in-Suit give examples of the pre-processing *not* selected by the user—the "DefaultImageHeight" and "DefaultImageWidth" parameters provided *to* the user behind the scenes. '557 Patent at col.5 ll.51-53; Appx. at 0010. In the Patents' example, the remote device assigns these parameters exemplary values of 640 and 480 pixels respectively. The user never has to select what pixel values would be appropriate for the destination system (and she may or

---

[10] For a discussion of pre-processing parameters reflecting the requirements of another device, see Section A.

may not even know what values are used).  *See id.* at Appx. A; Appx. at 0011-12.  In the prior art, users would not only have to know these values, but would also have to manually edit their photos to match these values.  '557 Patent at col.1 ll.16-30; Appx. at 0018.

The inventors sought to change all that.  With the patented technology, end users may submit images without requiring "technical sophistication" (*id.* at col.2 ll.53-54; Appx. at 0008); without having to "understand[] technical terms" (*id.* at col.2 ll.54-57); and "without needing to overcome technical obstacles" (*id.* at col.2 ll.59-61).  The user can still select how many photos he or she uploads (*id.* at col.4 ll.20-25; Appx. at 0009), what text or captions to include with the photos (*id.* at col.3 ll.60-66, col.4 ll.48-52), and a desired photo size (*id.* at col.4 ll.25-26)—all without the user being faced with the "technical obstacles" of determining the proper file format, compression, resolution, and transfer protocol required to upload the photos to a particular web site.  '557 Patent at col.2 ll.58-61; Appx at 0008.  Therefore, a proper construction allows for simple user selections, while prohibiting complicated, technological input of pre-processing parameters.  Summit 6 proposes such a construction, which reflects how a person of ordinary skill in the art would interpret this claim term.

### 2.      A Person of Ordinary Skill in the Art Would Not Read the Claim Term as Preventing Any User Selection that "Affects" Pre-Processing.

Defendants propose that the disputed term be construed as "pre-processing . . . without the pre-processing being affected by user-provided values or selections."  The result of such a construction would mean that this claim element precludes the simple selection between uploading a "large photo" or a "small photo," or choosing between a "main photo" and a "surround view animation."  This is incorrect.  A person of ordinary skill in the art would conclude that the claims *do* cover a simple mouse click that sets in motion the use of one set of pre-processing parameters over another.  The specification even illustrates how user selections may affect pre-processing consistent with the invention, which directly contradicts Defendants' construction.

For example, in Figure 2 the user makes selections that will affect how the images are pre-processed.  A user may choose between (1) uploading one main photo (the "Picture? PIC" option) and (2) uploading a series of smaller photos (the "SurroundView?" option) that will be combined together as one animated presentation.  '557 Patent at fig.2; Appx. at 0004; '557 Patent col.4 ll.20-26; Appx. at 0009.



FIG. 2

Thus, the specification allows a user to make multiple selections that result in "pre-processing being affected"—such as choosing whether an image is used for the main photo or the surround view, or deciding how many images to include in the surround view—resulting in the oddity that a preferred embodiment and the natural application of the '557 Patent claims is actually carved out of the patent's scope by the Defendants' construction.

In contrast, the type of user selection precluded by the phrase "without user selection of pre-processing" is the complicated, technology-intensive processing in the prior art discussed above.  Summit 6's proposed construction recognizes this concept and follows what a person of ordinary skill in the art would understand.  "Without user selection of the pre-processing" means precisely what the specification describes—without the complex manipulation of image data by a user detailed in previous Section C.1.  In other words, a user does not provide the particular encoding or compression algorithms, or manipulate the actual pre-processing parameters (*i.e.*, thresholds for image height, width, or overall size) involved in the complicated prior-art processes noted above.  Summit 6's proposal is consistent with the written description of the Patents and should, therefore, be adopted by the Court.

### 3.       The Prosecution History Supports Summit 6's Construction.

Finally, Summit 6's proposed construction is consistent with the prosecution history.  The phrase "without additional user input" is only mentioned briefly among a much broader discussion of how the media object identifier claim element is not equivalent to a prior art "picture album or another type of media container using a media authoring program."[11]  Office Action Response, Mar. 6, 2003, at 18; Appx. at 0059.  In context, the applicants explained to the patent examiner that the user is not having to select the pre-processing because the pre-processing occurs "automatically . . . for the requirements of the third-party web site."  Office Action Response, Mar. 6, 2003, at 19; Appx. at 0060.  In the claims, the specific values/parameters governing the pre-processing are supplied by the other party; thus, the user does not have to select them.  That the other party might push to the user more than one set of preconfigured pre-processing specifications is of no moment.  This is precisely what is shown in the Figure 2 example in the Patents-in-Suit.  And although the user has flexibility to use more than one set of pre-processing specifications from the other party, the user still did not have to supply those parameters.  As a result, Summit 6 requests that the Court adopt its proposed construction.

---

[11] For the sake of completeness, a similar non-limiting discussion of "without user selection of the pre-processing" occurs at Office Action Response, Mar. 6, 2003, at 21; Appx. at 0062.  The applicants provided a fleeting mention of the claim phrase in a broad discussion of acquiring a media object with a web page.

**D.  "pre-processing the media object . . . for the requirements of the third-party web site"**

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| pre-processing the media object . . . for the requirements of the third-party web site | pre-processing the media object into a format specified for the third-party web site<br><br>The Defendants seek construction of the term "third party web site" within the construction of this term.  Summit 6 believes this term should be given its plain meaning, but if the Court determines a construction is necessary Summit 6 proposes the following:<br><br>a web site that is not stored at or hosted by the user | "pre-processing"* the media into the standard format required for publication by the "third-party web site"<br><br>"third-party web site:" a web site operated by a party other than the party that authored the media object identifier<br><br>*As this term is defined. |
| '557 Claims: 1, 28 ||||

Summit 6 believes that "pre-processing the media object . . . for the requirements of the third-party web site" merely means "pre-processing the media object into a format specified for the third-party web site."  Summit 6 disputes the Defendants' position that (1) the word "requirements of" mandates "a standard format for publication,"[12] and (2) whether it is proper to inject another party (*i.e.*, the party that authored the media object identifier) into claims that never even mention a media object identifier author.

    **1.    The Claims Do Not Require a Standard Format for Publication.**

Defendants' proposal requires that the media be pre-processed "into the standard format required for publication."  In other words, the pre-processing on the user's computer must be into the one and only final format for publication—no additional processing may be done after upload

---

[12] Presumably Defendants are trying to bake the word "publication" into this construction so that "publication" becomes a limitation of claims where it does not otherwise appear and so that Defendants' overly narrow construction of "publication" (discussed below) gets baked in too. The thinking appears to be that (1) *if* the Court narrows non-publication claims to require publication, and (2) *if* the Court buys into the narrow definition of the word "publication," (3) *then* the Defendants have created a non-infringement argument for claims 1 and 28.

to the server.  First, Defendants' interpretation violates the doctrine of claim differentiation.  The additional limitation that the "requirements" specifically correlate to the ultimate presentation requirements of the web site is specifically covered by dependent claim 36 (which depends from and further narrows independent claim 28), such that claim 36 is rendered entirely superfluous.  Claim differentiation gives rise to the presumption that independent claims are not intended to require the presence of a limitation found specifically in a dependent claim.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).  In these circumstances, "the doctrine of claim differentiation is at its strongest."  *Id.*  As in *Liebel-Flarsheim*, Defendants here seek to import a limitation from dependent claim 36 into a phrase contained in independent claim 28 (from which claim 36 depends).  Dependent claim 36 states that the "requirements relate to presentation requirements of the third party web site."  This concept is precisely what Defendants seek to introduce by construing "requirements" as "the standard format required for publication by the third-party web site."  Because their construction would violate the doctrine of claim differentiation, it should be rejected.

Second, Defendants seek to introduce a publication requirement into the two independent claims—claims 1 and 28—that specifically do ***not*** require publication. When the inventors desired to claim publication, display, or distribution of the uploaded media, they knew how to do so.  For example, '557 Patent dependent claim 14 adds to claim 1 the further step of "the pre-processed media object [being] uploaded to a remote server which enables the media object to be displayed on the web site."  It would be error to create and add in the requirement of "the standard format required for publication" in claims that plainly have no such requirement.

Third, the disputed claim phrase does not mandate a single, standard format.[13] Rather it is flexible so that web site operators can tailor the requirements to their needs. For example, the '557 Patent notes that image upload "is configurable to perform a variable amount of intelligent preprocessing on media objects prior to upload." '557 Patent at col.2 ll.11-13; Appx. at 0008. The media object identifier allows for "the ability to preprocess the media objects in any number of ways prior to transporting to a second location." '557 Patent at col.4 l.65-col.5 l.2; Appx. at 0009-10. The media object identifiers can be fixed in number or generated dynamically. '557 Patent at col.4 ll.20-25; Appx. at 0009. And they can contain configurable parameters. '557 Patent at col.5 ll.42-63; Appx. at 0010. In short, there is no evidence that a single, standard format is important, much less required for, the claimed invention. For all these reasons, the Court should adopt Summit 6's proposal.

### 2.    Defendants Improperly Add Another Party Into the Claims.

Defendants' proposal introduces another party to the claim language that is never mentioned in the claims: a media object identifier author. In other words, Defendants would rewrite the claims to require a user, a web site operator, and another party that authored the media object identifier. First, the claims do not require or even mention an author of the media object identifier. Nor do the claims restrict who the author of the media object identifier may be—the web site operator, or a completely separate party as Defendants would suggest. As noted above, the claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification." *Nazomi Communic'ns, Inc.*, 403 F.3d at 1369; *see also SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("If everything in

---

[13] In *i4i Ltd. P'ship v. Microsoft Corp.*, 589 F.3d 1246, 1259 (Fed. Cir. 2009), the Federal Circuit held that "not every benefit flowing from an invention is a claim limitation." Although the invention could be beneficially used to place images in the single, final display form, that benefit is not required by the claims.

Presumably, Defendants want their construction to exclude a situation where, for example, the a user's 2000x2000 image is pre-processed on the client device down to 1000x1000, and then reduced a second time to 500x500 once the image is at the server after upload. Neither failing to use all benefits of the invention nor performing extra steps on the server negates infringement.

the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims."). As a result, Defendants should not be allowed to inject another party (the author of the media object identifier) when it is not required by the claim language.

Second, a "patentee need not describe in the specification every conceivable and possible future embodiment of his invention." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Similarly, although the inventors recognized and described a preferred scenario where a vendor creates the media object identifier as a turnkey offering for web sites, it is conceivable—and quite natural—for the web site operator to create the identifier itself. In fact, the web site operator is creating the web site that includes the media object identifier; therefore why not also create the media object identifier? Defendants' construction should be rejected.

### E. "placement of . . . digital content into a specified form"

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| placement of . . . digital content into a specified form | Summit 6 believes this term should be given its plain meaning, but if the Court determines a construction is necessary Summit 6 proposes the following:<br><br>modifying the underlying data of the digital content to meet certain specifications | filling a field in a webpage with the digital content |
| '482 Claims: 1, 9, 13, 22, 26, 34-38, 51 | | |

This dispute again focuses on whether it is appropriate for Defendants to construe terms solely in the '482 Patent to be web site-specific. This continues to be inappropriate.

Although the generic "devices" of the '482 Patent certainly *could be* met by web servers or user computers accessing web sites, there is no requirement that they are. As before, it would be error to make the preferred web site embodiment a limitation on these deliberately broader claims. As in the '557 Patent claims, Summit 6 knew how to claim a web site-specific embodiment when they so desired. But the claims of the '482 Patent were not limited to web sites and, therefore, Defendants' limiting construction should be rejected.

21

Moreover, Defendants' construction essentially equates "placing digital content into a specified form" to the user's act of dragging and dropping digital media into a field on a webpage.  This is not the meaning of "placing content into a form" in the claims.  When the claim language is read in context, it states that the "pre-processing parameters control[] said client device in a placement of said digital content into a specified form . . ."  '482 Patent at claim 13; Appx. at 0028-29.  The act of placing the media in a specified form is that actual act of modifying the digital media to have a certain resolution, use a certain file format, be encoded with a particular compression algorithm, etc.  *See* '557 Patent at col.4 l.65-col.5 l.14; Appx. at 0009-10; *see also* '482 Patent claims 14, 15 (dependent claims where the pre-processing parameters define the "placement in a specified form" to be "reducing a file size or compressing" or "changing a quality"); Appx. at 0029.  In sum, the specified form is the particular size, file format, encoding, etc.—it is not a field on a web page.  Placement in that specified form is the act of pre-processing the media as dictated by the pre-processing parameters precisely as spelled out in the claims.  Defendants' construction should be rejected.

**F.  "pre-processing in accordance with one or more pre-processing parameters that have been stored in memory of said client device" and similar terms**

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| pre-processing in accordance with one or more pre-processing parameters that have been stored in memory of said client device<br><br>and similar terms | Defendants seek to construe seven different claim phrases to have the same construction.  Summit 6 proposes that these different phrases will be readily understood by incorporating the definitions of the constituent terms addressed above and below and giving the unique phrases their plain meaning. | "pre-processing"* the identified digital content at the client device, the "pre-processing" being controlled by the received "pre-processing parameters," and not by the user, <u>during the interaction of the client and "remote devices</u>" [ FB, PB, MX]<br><br>the "remote device"* directs the "pre-processing" <u>during interaction with the client device,</u> based on the "pre-processing parameters" [RIM, SS]<br><br>*As these terms are defined |
| '482 Claims: 1, 12, 13, 16-18, 25, 26, 35, 36, 37, 38, 51 |||

The dispute with these terms is that the Defendants inappropriately seek to construe six unique phrases to mean the exact same thing, and the single construction they propose is wrong.

> 1.    **The Underlying Terms are Being Construed So There is No Need to Construe the Phrases As a Whole.**

In the *Grantley Patent Holdings, Ltd. v. Clear Channel Communs., Inc.* case, Judge Clark in the Eastern District of Texas clearly articulated the problem the Defendants have created by proposing these large phrases for construction:

> A troubling aspect of this case is the submission by [Defendant] of entire paragraphs of certain claims for construction when there was really no dispute over the meaning of any particular word or term. The court expects the parties and their attorneys to limit the terms they ultimately submit for construction to those that might be unfamiliar or confusing to the jury, or which are unclear or ambiguous in light of the specification and patent history. *See United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *Orion IP, LLC v. Staples, Inc.*, 406 F.Supp.2d 717, 738 (E.D. Tex. 2005) ("although every word used in a claim has a meaning, not every word requires a construction."). One hopes this was not merely an effort to pollinate the record with alleged error. Claim interpretation does not consist of defining a step in a claim by restating other limitations that are spelled out elsewhere in the claim. In spite of protestations of "confusion" from one side or the other, the court construes a claim from the point of view of the artisan of ordinary skill, not from the vantage point of the hyper-technical grammarian, who can not quite grasp the meaning of "is" in a particular context.

No. 9:06CV259, 2008 U.S. Dist. LEXIS 1588, at *12-13 (E.D. Tex. Jan. 8, 2008). Similarly, the six distinct phrases in this case are not "claim terms," but just a second attempt by Defendants to import limitations into the claims and create error.

It is not necessary to construe these six claim phrases because they all boil down to the use of terms such as "pre-processing" and "pre-processing parameters," which are already being construed by the Court, and other simple terms like "in," "accordance," "with," "stored," and "memory"—none of which are actually defined for the jury by Defendants' new narrative. "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify

and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." *Orion IP, LLC*, 406 F. Supp. 2d at 738.   The Court should not indulge Defendants' attempt to wholesale rewrite—identically—entire clauses from thirteen different claims.

### 2. Attempting to Give the Same Meaning to Different Unique Phrases Renders the Differences Between Claims Superfluous.

Defendants lumped-together construction is improper under Federal Circuit law because, "[t]here is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).   As the Court can see from the Joint Claim Construction Statement, each of the six phrases is unique and uses different words to capture different concepts.   For example, claim 18's "pre-processing in accordance with one or more pre-processing parameters that have been *stored in memory* of said client device" differs from claim 16's "pre-processing in accordance with one or more pre-processing parameters that have been *downloaded to* said client device" because claim 16 requires additional proof of "downloading" not required by claim 18. Likewise, claim 18 requires parameters "stored in memory."   It would be improper and contrary to case law to attempt to shoehorn one definition into the six long, distinct phrases that the Defendants propose need construction.

### G.  "remote device" and "device separate from said client device"

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| remote device<br><br>device separate from said client device | remote device = device not co-located with the client device<br><br>device separate from said client device = device other than the client device | web server [FB, PB, MX]<br><br>web server that contains the "pre-processing parameters"* [RIM, SS]<br><br>*As this term is defined. |
| '482 Claims: 1, 12, 13, 25, 35, 38 | | |

24

Defendants propose a construction that complicates straightforward terms, again attempting to import unsupported "web server" limitations into broad "device" claims. Defendants' constructions confuse terms that identify the location of devices with terms that describe devices, ignore the patentee's intended scope, and would again limit the '482 Patent to a web-site specific embodiment.

First, Defendants improperly replace spatial terms ("remote" and "separate from") with the description of a functional role ("web server"). "[T]he context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. The claims of the '482 Patent include more than one usage of the word "device," naming (depending on which claim) a "remote device," "client device," "one or more devices," and a "server device." In context, "remote" and "separate from said client device" are terms that identify the location/separateness of the referred-to device, included to differentiate the remote device from the client device. Defendants confuse those location terms with the descriptive term "*server* device" (describing the function of the device). "Remote devices" or "devices separate from said client device" do not inherently perform server roles.

Additionally, a "server device," as used in example claims 35 and 38, certainly *may be* a "web" server, but even that term is not necessarily constrained to *web* servers (and the Defendants are not even seeking to construe "server device" as such). Not every "remote device" or "device separate from the client device" has to be a *web* server.

Finally, for the RIM- and Samsung-only construction, there is no across-the-board requirement that the "remote device" or "device separate" necessarily "contains the pre-processing parameters." Even their co-defendants do not make that argument. As a result, the Court should reject Defendants' proposed constructions of these terms and adopt the plain meaning definitions proposed by Summit 6.

**H. "information that enables identification of a user" and "user identifier" and "user information"**

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| information that enables identification of a user <br><br> user identifier <br><br> user information | information related to a person | information related to a person, <u>as opposed to a device</u> |
| '482 Claims: 13, 19, 49 | | |

The parties agree that the three terms "information that enables identification of a user," "user identifier," and "user information" are synonymous and mean "information related to a person." But Defendants inappropriately add an "as opposed to a device" limitation. First, the Court is not construing a term like "user, *but not device*, information." Defendants' additional limitation is simply not part of the claim. Second, Defendants' construction excludes a preferred embodiment, which is "rarely, if ever, correct." *See Vitronics*, 90 F.3d at 1583. The specification contemplates broad information being used in connection with images in the preferred embodiment when it states, "Information may be image-specific, user-specific or both." '482 Patent at col.4 ll.31-32; Appx. at 0025. One common piece of user information that is specifically referenced in the specification is a user ID and password. '482 Patent at col.4 ll.42-45; Appx. at 0025. A user ID and password are typically pieces of information related to a person and at the same time related to a device for purposes of protecting information on the device or identifying the computer on a network. The Defendants' attempt to add a limitation that changes the claim and excludes a preferred embodiment should be rejected.

26

**I.   "publication" and "publishing"**

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| publication<br><br>publishing | Summit 6 believes this term should be given its plain meaning, but if the Court determines a construction is necessary Summit 6 proposes:<br><br>sharing | making the digital content <u>publicly available</u> (e.g., posting the digital content <u>on a web page</u>) |
| '482 Claims: 1, 13, 38 ||| 

Summit 6 believes that the terms "publication" and "publishing" have their plain meanings and do not require construction.  Alternatively, if the Court is inclined to construe them, "sharing" best represents the meanings conveyed by the "publication" and "publishing" terms.  Defendants' proposed construction, which arbitrarily adds the limitation of making the digital content *publicly* available, must be rejected, as it excludes preferred and claimed embodiments and again attempts to limit the '482 Patent to websites.  First, an interpretation of a claim that excludes a preferred embodiment "is rarely, if ever, correct."  *Vitronics*, 90 F.3d at 1583.  One preferred embodiment described in the specification is a realty web page associated with an MLS listing number.  At the time of the invention, it was common for realty multiple listing service (MLS) sites to restrict access to property information, including photos of the property, and only allow access to registered Realtors.  As a result, images were "published" to a small community of realtors with access to a restricted service.

Second, other claims demonstrate how broadly "publishing" is interpreted in the context of the patents.  For example, '482 claim 36 says its "computer implemented method of *publishing*" is achieved by "distributing . . . *to one or more devices*."  '482 Patent at claim 36; Appx. at 0030.  "Publishing" does not require that the content be *publicly* available or available on a web site.

Third, Defendants again seek to construe a term of the '482 Patent in an effort to limit the patent to cover only web-based embodiments, suggesting, for example, that posting digital

content on a webpage is a way to make it publicly available.  This attempt to nudge the jury toward viewing the invention as applicable only to web sites should be rejected.

### J.   "A computer implemented method of pre-processing digital content in a client device for subsequent electronic publishing" and similar terms

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| A computer implemented method of pre-processing digital content in a client device for subsequent electronic publishing<br><br>and similar terms | Summit 6 believes no construction of the preamble is necessary. | the steps of the claim performed on the client device are performed during the execution of <u>one computer program</u> |
| '482 Claims: 1, 13, 38 | | |

The dispute regarding this term centers on whether the preamble is a limitation of the claims and whether a "one computer program" limitation is proper.  The answer to both is no.

First, because the "computer implemented method…" terms are the preambles to the claims, no construction is necessary. By default, claim preambles are not actual limitations on the claims.  *See Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1295 (Fed. Cir. 2004) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)) (explaining that a claim preamble may be regarded as a "claim element" only "if it recites essential structure or steps, or if it is necessary to give 'life, meaning, and vitality' to the claim").  In this case, the preambles of the asserted claims are not needed to give live, meaning, and vitality to the claims. Rather, each is just a general introduction to what follows—the descriptive limitations that bound the claims.  Further, nothing about the preambles is unclear and would even require construction. Unsurprisingly, Defendants' proposal does not even undertake to define the actual activity recited in the preamble (*e.g.*, "pre-processing digital content in a client device for subsequent electronic publishing"); it really just adds that the "computer implemented method" must occur only "during the execution of *one* computer program."   This is improper, as the claims are agnostic as to how many programs are involved in performing the computer implemented steps.

The plain meaning of each of these preambles conveys, obviously, that the method is "computer implemented." A four-step method performed half in Program X and half in Program Y is still "computer implemented." Thus, Defendants' definition for these terms is a transparent attempt to rewrite the preamble of each impacted claim as "a computer implemented, one-program method . . . ." The claim language does not support this, and nothing in the intrinsic record disavows the broad scope of the claim in the way Defendants suggest.

Even the narrow web site embodiment that Defendants rely upon contradicts their "one computer program" limitation. In the web preferred embodiment, the client-side activity is specifically described as taking place in more than one program, such as a web browser (*e.g.*, a browser from Microsoft or Netscape) and in a plug-in program (*e.g.*, Active X controls or Java Applets). '482 Patent at col.6 ll.33-40; Appx. at 0026. Additionally, the claims recite steps that would be understood to involve more than one program. For example, '482 claim 13 recites a "pre-processing" step that would likely involve the Java Applet in a web embodiment. The "retrieving information" step very well may involve the same applet, the browser, and the memory functions of the operating system. The "transmitting a message" step might reasonably involve the networking components of the operating system. In short, Defendants' contention that all client-side steps must occur in one computer program makes no sense and is incorrect.

### K. "receiving . . . from a remote device" and "received . . . from a device separate from a client device" and "provided to said client device by a device separate from said client device"

| Claim Term(s) | Summit 6's Proposal | Defendants' Proposal |
|---|---|---|
| receiving . . . from a remote device<br><br>received . . . from a device separate from a client device<br><br>provided to said client device by a device separate from said client device | Summit 6 believes no construction is necessary. | the "pre-processing parameters"* are received by the client device <u>as part of the "computer implemented method</u> of pre-processing digital content in a client device . . ."*<br><br>*As these terms are defined. |
| '482 Claims: 1, 13, 38 |||

These three phrases do not require construction, especially since Defendants have already asked the Court to separately construe "remote device" and "device separate from said client device."  It appears that Defendants are trying to make the act of receiving the pre-processing parameters an actual step of each claimed method, regardless of whether such a method step actually exists.  Then, conveniently, the receiving step plus all other steps would have to occur during execution of one, and only one, computer program under Defendants' proposal addressed above in Section J.  This proposal is fraught with error.

First, the "all steps happen in one program" aspect is wrong for the reasons described above.  Second, each of the affected claims is written differently, resulting in slightly different coverage.  If the claims were meant to require that the pre-processing parameters are received as part of (or during) the claimed method, they would say so.  *See* '482 Patent claim 1, for example. Claim 1 *does* include the actual step of "receiving pre-processing parameters from a remote device . . . ."  '482 Patent at col.9 ll.23-24; Appx. at 0028.  By contrast, '482 Patent claims 13 and 38 do not include such a step—they are very flexible with regard to when the parameters might have been provided.  In fact, even claim 16 of the '482 Patent, which depends on and is more limited than claim 13, can be met when pre-processing parameters merely "have been previously downloaded to said client device."  '482 Patent at col.11 ll.13-15; Appx. at 0029.  The Court should reject Defendants' attempt to rewrite the distinct requirements of claims 1, 13, and 38 identically and slide in their "one program" requirement where none exists.

## V.   CONCLUSION

For the foregoing reasons, Summit 6 respectfully requests that the Court reject each and every of Defendants' improper proposals for the disputed claim terms, and—as appropriate depending on the term at issue—either adopt Summit 6's proposed construction or hold that the disputed term will have its plain and ordinary meaning.

Dated:  December 22, 2011           Respectfully submitted,

**McKool Smith P.C.**

*/s/ Bradley W. Caldwell*
Douglas A. Cawley, Lead Attorney
Texas State Bar No. 04035500
dcawley@mckoolsmith.com
Theodore Stevenson III
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
Bradley W. Caldwell
Texas State Bar No. 24040630
bcaldwell@mckoolsmith.com
Ashley N. Moore
Texas State Bar No. 24074748
amoore@mckoolsmith.com
Phillip Aurentz
Texas State Bar 24059404
paurentz@mckoolsmith.com
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

**ATTORNEYS FOR PLAINTIFF
SUMMIT 6 LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this the 22nd day of December 2011.  Any other counsel of record will be served with a true and correct copy of the foregoing by mail or facsimile.

*/s/ Bradley W. Caldwell*