**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SUMMIT 6 LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | **CASE NO. 3:11-cv-00367-O** |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| RESEARCH IN MOTION CORP., et al. | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

**FACEBOOK, INC., PHOTOBUCKET CORP., AND MULTIPLY, INC.'s**
**OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

A. The Asserted Patents Attempted To Simplify Processing and Uploading Media Objects by Using a Webpage Applet that Operated Without User Selection or Control ..... 2

B. During Prosecution, the Patentees Confirmed the Narrow Scope of the Patents-in-Suit ..... 5

III. LEGAL BACKGROUND ..... 9

IV. DISPUTED TERMS FOR CONSTRUCTION ..... 10

A. Terms from Both the ‘557 and ‘482 Patents ..... 10

1. “pre-processing” ..... 10

2. “pre-processing parameters” and similar terms ..... 15

B. Terms from Only the ‘557 Patent ..... 17

1. “pre-processing the media object without user selection of the pre-processing” and similar terms ..... 17

2. “pre-processing the media object ... for the requirements of the third-party web-site” ..... 20

C. Terms from Only the ‘482 Patent ..... 23

1. “pre-processing said identified digital content at said client device in accordance with one or more pre-processing parameters that are received from a device separate from said client device to produce pre-processed digital content” and similar terms ..... 23

2. “placement of ... digital content into a specified form” and similar terms ..... 27

3. “displaying a preview image of said selected digital content” ..... 28

4. “remote device” and similar terms ..... 29

V. UNDISPUTED TERMS ..... 30

VI. CONCLUSION ..... 30

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
651 F.3d 1318 (Fed. Cir. 2011)....................22

*Biodex Corp. v. Loredan Biomedical, Inc.*,
946 F.2d 850 (Fed. Cir. 1991)....................15

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
438 F.3d 1374 (Fed. Cir. 2006)....................13

*E-Pass Techs., Inc. v. 3Com Corp.*,
473 F.3d 1213 (Fed. Cir. 2007)....................28

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009)....................12

*Gillespie v. Dywidag Sys. Int'l, USA*,
501 F.3d 1285 (Fed. Cir. 2007)....................10, 13, 14, 25

*Honeywell Int'l, Inc. v. United States*,
609 F.3d 1292 (Fed. Cir. 2010)....................18

*iLOR, LLC v. Google, Inc.*,
550 F.3d 1067 (Fed. Cir. 2008)....................26

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999)....................18

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
545 F.3d 1340 (Fed. Cir. 2008)....................11

*Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*,
152 F.3d 1368 (Fed. Cir. 1998)....................28

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ....................9

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004)....................13, 20

*Nystrom v. Trex Co.*,
424 F.3d 1136 (Fed. Cir. 2005)....................................................................16, 22, 28, 30

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)..........................................................................................9

*On Demand Machine Corp. v. Ingram Indus., Inc.*,
442 F.3d 1331 (Fed. Cir. 2006)........................................................................................16

*Ormco Corp. v. Align Tech., Inc.*,
498 F.3d 1307 (Fed. Cir. 2007)...................................................................................18, 20

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................................................10, 11, 15

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
653 F.3d 1296 (Fed. Cir. 2011)........................................................................................10

*SRAM Corp. v. AD-II Eng'g, Inc.*,
465 F.3d 1351 (Fed. Cir. 2006)........................................................................................18

Pursuant to the Court's Scheduling Order, Defendants Facebook, Inc.; Photobucket Corp.; and Multiply, Inc. (collectively, "Defendants") respectfully submit this claim construction brief regarding the asserted claims of U.S. Patent Nos. 6,895,557 ("'557 patent") and 7,765,482 ("'482 patent").

## I. INTRODUCTION

The two patents-in-suit are directed to programs embedded in webpages that "pre-process" files, such as images, on a user's computer before sending the files to a web server. In the face of extensive prior art, the patents attempted to claim only a narrow implementation of such pre-processing. For example, the patentees emphasized during prosecution that their alleged invention precluded user selection or control of the pre-processing. By removing user control over pre-processing, the patentees allegedly simplified uploading.

Despite the clear intrinsic record, Summit 6 now seeks to expand the claims far beyond what the patentees allegedly invented and argued to the Patent Office. The law, however, forbids Summit 6 from rewriting the claims, divorcing the claim scope from the alleged invention actually described in the specification, and pursuing litigation-inspired infringement theories contrary to the representations the patentees made to the Patent Office. In contrast to Summit 6, Defendants' constructions are firmly grounded in the intrinsic record and should be adopted.

//

//

//

## II. FACTUAL BACKGROUND

### A. The Asserted Patents Attempted To Simplify Processing and Uploading Media Objects by Using a Webpage Applet that Operated Without User Selection or Control.

The alleged invention of the patents-in-suit relates to processing and sending ("uploading") files such as images from a user's computer to a webpage.[1] (Ex.[2] A, '557 patent, 1:65-67.[3]) The patents acknowledged the existence of prior art computer programs that allowed users to upload media files like digital images to a webpage. (*Id.*, 1:42-63.) The patents identify, for example, the prior art Active-Upload tool that allowed users to easily drag a media file onto a specific section of the screen to "contribute pictures, documents, zip files, etc., without having to leave the web page and use an FTP [file transfer protocol] program." (*Id.*, 1:47-55.)

The patents' purported improvement was to further simplify processing and uploading files using "Prepare and Post tools." (*Id.*, 2:40-44.) The Prepare and Post tools worked through "browser-side components" running on a user's computer known as Java applets or ActiveX controls.[4] (*Id.*, 2:48-49, 6:43-50.) Similar to the prior art Active-Upload tool, the Prepare and

---

[1] The term "webpage" refers to information sent from a device known as a "web server" to a user's computer for display by a program known as a "web browser." A webpage is written in a computer language known as HyperText Markup Language ("HTML"), which provides a series of instructions that cause the user's web browser to perform certain operations. For example, HTML instructions can cause the web browser to display text in a certain font and size at a specific location on the screen. HTML instructions can also tell the web browser to retrieve files, such as images, and display them on the screen at specific sizes and locations.

[2] "Ex." refers to the corresponding exhibits of the Declaration of Benjamin Damstedt in Support of Facebook, Inc., Photobucket Corp., and Multiply, Inc.'s Opening Claim Construction Brief.

[3] All citations in the format of "xx:yy-zz" refer to column and line numbers of the patent specification. Because the '557 and '482 patents share a common specification, and for consistency, the citations in the brief refer to the '557 patent.

[4] An "applet" is a computer program that may be "embedded" within a webpage. The webpage's HTML text includes a location from which the browser can download the applet program and a

Post tools included a visible field on a webpage to which the user could drag a file for uploading. (*Id.*, 3:9-49, 6:15-16.) The patents referred to this field as the "media object identifier," an example of which is shown below from the patents' Figure 1. (*Id.*, 3:9-11, 6:15-16.)



The patents assert that, unlike the prior art, "[a] key differentiator of the Prepare and Post tools is the browser, or client-side intelligence built into the tools." (*Id.*, 4:58-60.) "The submission tool is configurable to perform a variable amount of intellegent [sic] preprocessing on media objects prior to upload. In the case of digital images, the tool can perform sizing and formatting, for example." (*Id.*, abstract.)

The configurability of this browser processing came from the use of parameters passed from the webpage's HTML text to the Prepare and Post tools. (*See generally id.*, 5:23-6:42, App. A.) The HTML text included an "Initialization Section," which "consist[ed] of a few lines of JavaScript code that will download all of the needed Prepare and Post submission components" for processing images on the user's computer. (*Id.*, 5:39-41.) Next, in the "Configuration Section," the website creator sets the parameters that controlled the image

---

set of values known as "parameters" used to customize the applet's functionality. Before applets, webpages were often limited to displaying images, text, and links to other webpages. By providing executable programs, applets greatly expanded webpage functionality. The patents-in-suit did not invent applets. Sun introduced the Java applet technology in the 1990s for use with the Netscape web browser. Microsoft followed soon afterwards with ActiveX controls for use with the Internet Explorer browser. The patents-in-suit expressly refer to Java and ActiveX as suitable for use with the alleged invention. (Ex. A, '557 patent, 6:45-50.)

processing by defining specific values in the HTML code. (*Id.*, 5:42-6:14.) For example, the parameters "DefaultImageWidth" and "DefaultImageHeight" were defined by the website creator to "specify the default width and height of the images after they are compressed for transmission" by the downloaded components.[5] (*Id.*, 5:51-55.) Finally, the webpage also included a "Submission Code Section" that "contain[ed] HTML code that create[d] the button" used to submit the web form (*id.*, 6:23-25) and an "ImageUpload Control Section" that included the code "that perform[ed] the transfer of images from the user's machine" (*id.*, 6:37-42).

"Parameterizing"[6] the tools allegedly simplified uploading for both the user and the website creator. (*Id.*, 2:49-3:8.) Because the website creator used parameters to define the processing, the user could "submit media objects to web pages 'as is' without making modifications to the media objects prior to sending." (*Id.*, 2:62-64.) "[U]nderstanding technical terms such as JPEG, resolution, pixel, kilobyte, transfer protocol, IP address, FTP etc., is not required since *the Prepare and Post tools handles all of these tasks for the user*." (*Id.*, 2:53-57 (emphasis added).) The tools also simplified the process for website creators, who no longer needed to process files after uploading (or even know how to perform any file processing whatsoever). Instead, the Prepare and Post tools performed all the processing on the user's

[5] In the sample HTML code provided in the patents' Appendix A, the parameters were defined (using the equals sign) as 640 pixels and 480 pixels: "PWT.DefaultImageWidth = 640" and "PWT.DefaultImageHeight = 480." ('557 patent, col. 7 (near middle).) As another example, the parameter "Quality" was defined in the Appendix A code as 93. (*Id.* ("PWT.Quality = 93").)

[6] Using parameters to customize the functionality of applets was commonplace before the patents were filed. (*E.g.*, Ex. C, Tyma et al. at 45, FB-APPX035 ("This applet is a simple example of parameterizing the data that it needs to run. The applet gets the name of the images, the number of images, and timing parameters all from <PARAM> tags in the HTML page. The neat thing about this is that you can use this applet without ever doing any Java programming; all you need to do is pass the right parameters to run your animation.").)

computer, providing the operators with a "made to order" stream of files they could immediately publish. (*Id.*, 3:1-3.)

This purportedly simple way of processing and uploading files was incorporated into the patents' asserted claims. For example, claim 1 of the '557 patent recites:

> 1. A method comprising the steps of:
>
> accessing at least one media object identifier, the media object identifier being embedded within a third-party web site, the media object identifier including a graphical user interface for acquiring media objects;
>
> associating a media object with the media object identifier; and
>
> pre-processing the media object by the media object identifier for the requirements of the third-party web site, the pre-processing being done without additional user selection of the pre-processing.

(Ex. A, '557 patent, claim 1.)

### B. During Prosecution, the Patentees Confirmed the Narrow Scope of the Patents-in-Suit.

The patentees spent many years prosecuting the patents-in-suit, suffering repeated rejections from the Patent Office, including four office actions during the '557 prosecution and five office actions during the '482 prosecution. In responding to these rejections, the patentees made repeated arguments describing the narrow scope of their purported invention.

Three prosecution exchanges between the patentees and the Patent Office are representative. First, the Patent Office rejected the claims based on U.S. Patent No. 6,035,323 to Shantanu Narayen et al. ("Narayen") on several occasions, during both the '557 and '482 prosecutions. (Ex. D, '557 File History, 03/06/03 Remarks at 19, FB-APPX055.) Narayen describes a computer photo album product; the user could place images in a photo album, modify the images, and upload the album to a website. (*E.g.*, Ex. E, Narayen at 14:57-16:10.) Figure

14A from Narayen is shown below.

FIG. 14A

In response to the Patent Office's rejections, Summit 6 attempted to distinguish its alleged invention from Narayen. The patentee argued that, in Narayen, user input controlled the processing on the user's computer, whereas, in their purported invention, the processing was done without user input. They argued:

> None of the preprocessing described in Narayen is done in response to the acquisition of the media object *without additional user input* as claimed .… The modifications of the picture album described in Narayen is done *in response to user input arranging the picture album*."

(Ex. D, '557 File History, 03/06/03 Remarks at 19, FB-APPX055 (emphasis added).)

Second, the Patent Office rejected the then-pending claims based on U.S. Patent No. 5,666,215 to John Fredlund et al. ("Fredlund"). Fredlund taught a system in which a user sent

film to a photo lab for development. (Ex. F, Fredlund at 3:19-35.) The photo lab digitally scanned the film, producing a high-resolution image and a low-resolution image. (*Id.*) After scanning, the Fredlund system offered an image editor. (*Id.*, 5:14-18.) To use the editor, the user downloaded a low-resolution copy of the image from the photofinishing server, decided what modifications to make, and sent the "coordinates and parameters" specifying those modifications (but not a modified image) back to the photofinishing server. (*Id.*, 5:16-18, 5:52-6:6.) Figure 3 of Fredlund shows the photo editor.

FIG. 3

In attempting to distinguish this reference, the patentees argued that because their alleged invention required "pre-processing of the media object ... *prior to upload at the local device*," Fredlund's server-side post-processing did not anticipate. (Ex. G, '482 File History, 4/17/09 Remarks at 16, FB-APPX127 (emphasis added).) Indeed, they emphasized the importance of

this distinction between browser-side and server-side image processing, arguing that image processing on the user's device "obviates the need for such processing to occur" on the server. (*Id.*)

Third, in response to an office action rejection based on U.S. Patent No. 6,237,010 to Jonathan Hui et al. ("Hui"), the patentees again reiterated the narrow scope of their claims. Hui taught a file format that separately stored image data from values that could be changed to alter how the image would be displayed to the user ("display values"). (Ex. H, Hui, abstract.) Hui offered an image editor that allowed the user to modify the display values, such as color and tone, without modifying the image data itself. (*Id.*, 10:43-14:39.) Figure 12 of Hui is shown below.



In response, the patentees argued that their alleged invention was distinguishable,

because their invention did not allow for user selection or control over how the processing would occur: "Hui does not describe a remote device directing an application of specific coloring to an image," but "[i]nstead, *the user controls the specific coloring using the correction process tools* made available to the user." (Ex. I, '482 File History, 03/26/10 Remarks at 22-23, FB-APPX204-05 (emphasis added).) The patentees also argued that Hui was distinguishable, because their invention required changing the "underlying image data" but Hui changed only the display values. (*Id*. ("[T]he correction and composition processes of Hui cannot be said to pre-process the digital content .... At best, Hui processes information associated with the digital content.").)

In sum, the patentees obtained their claims only after repeatedly emphasizing the narrow scope of those claims. The patentees' representations to the Patent Office preclude Summit 6 from seeking broader claim coverage through litigation.

## III. LEGAL BACKGROUND

Resolving disputes over patent claim scope is a question of law for the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[C]laim construction is a matter of resolution of disputed meanings and technical scope ....") (internal quotation omitted).

To construe claims, courts principally rely on the intrinsic record, *i.e.*, the claim language, patent specification, and prosecution history. *Markman*, 52 F.3d at 979-80. "In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than ... allow the claim language to become divorced from what the

specification conveys is the invention." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).  Patent claims are construed from the perspective of "a person of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).

In construing the claims, the patent specification is "always highly relevant to the claim construction analysis."  *Id.* at 1315 (internal quotation omitted).  "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* (internal quotation omitted).  Claim terms are thus examined "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313.

The prosecution history is also critical.  *Id.* at 1317.  In seeking claims from the Patent Office, the patentee often makes arguments describing the alleged invention and attempting to distinguish it from the prior art.  *Id.*  The patentee "is held to what he declares during the prosecution of his patent."  *Gillespie v. Dywidag Sys. Int'l, USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007).

## IV.   DISPUTED TERMS FOR CONSTRUCTION

### A.   Terms from Both the '557 and '482 Patents

#### 1.   "pre-processing"

The term "pre-processing" appears throughout the asserted claims of the '557 and '482 patents.  For example, claim 1 of the '557 patent recites "pre-processing the media object," and claim 1 of the '482 patent recites "pre-processing ... one or more items of digital content."  The parties' constructions are shown below, with bracketed text reflecting the use of the terms "media object" and "digital content" in the '557 and '482 claims, respectively.

| Defendants' Construction | Plaintiff's Construction |
| --- | --- |
| modifying the [media object data/data of the digital content] at the browser before transmitting to a server device | in preparation for transmission, modifying the underlying data of the media object [digital content] in accordance with the requirements of another device |

The competing proposed constructions for this term present two disputes. The first dispute is whether "pre-processing" must occur *before* uploading from the browser in the user's device or whether it can occur on a server *after* upload from the user but before transmission to another server. The second dispute relates to whether "pre-processing" requires modifications to image or sound data in a file or whether modifications to other information within, or related to, the file suffice.

**a. The term "pre-processing" requires the processing to occur before upload from the browser in the user's device.**

The claim language, written description, and prosecution history all confirm Defendants' proposed construction for this term. The claim language itself shows that "pre-processing" occurs at the user's browser, not on a server. *Phillips*, 415 F.3d at 1314 ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning ....") (internal quotation omitted); *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) (construing term "different" based on context of claim as a whole).

For example, claim 1 of the '557 patent indicates that the claimed "pre-processing" is done at the web browser—where a graphical interface is presented to the user—before upload from the user's device to a server. Claim 1 states that the image is chosen by "accessing at least one media object identifier, the media object identifier being embedded within a third-party web

site." ('557 patent, claim 1.)  The media object identifier includes a "graphical user interface" that acquires user-identified files for upload.  (*Id.*)  Without any further user selection, the media object identifier then "pre-process[es] the media object" at the browser before upload from the user's device to a server.  (*Id.*)

The '482 claims likewise require pre-processing to occur in the browser on the user's device.  Although the '482 claims do not use the term "webpage" or "website," they also require that the pre-processing occur on the device where the user identifies the image for upload, referring to that device as the "local computer" or "client device."  (*E.g.*, Ex. B, '482 patent, claim 1 ("A computer implemented method of pre-processing digital content in a client device ... receiving an identification of a group of one or more items of digital content ... pre-processing said identified group of one or more items of digital content"); Ex. A, '557 patent, claim 45 ("acquiring a media object with a web page displayed at a local computer ... pre-processing the media object at the local computer").)

The written description further confirms that "pre-processing" refers to processing at the browser before the media object is uploaded from the user's device.  (*E.g.*, Ex. A, '557 patent, 2:40-44 ("Prepare and Post tools ... prepares and submits media objects from *inside a standard browser*") (emphasis added); *id.*, 2:48-51 ("The Prepare and Post tools refers to *browser-side* components ....") (emphasis added).)  Indeed, the patentees asserted that the "browser, or client-side intelligence" was a key distinction over the prior art.  (*Id.*, 4:58-60 ("A key differentiator of the Prepare and Post tools is the browser, or client-side intelligence built into the tools.").)  *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1332-33 (Fed. Cir. 2009) (holding that where the specification "describes a feature of the invention ... and criticizes other products ...

that lack that same feature, this operates as a clear disavowal of these other products") (internal quotation omitted); *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1379 (Fed. Cir. 2006) (patentee describing alleged distinction over the prior art as a "critical aspect of the present invention" demonstrated limited claim scope).

Finally, during prosecution of the patents, the patentees expressly distinguished the Fredlund prior art reference by arguing that processing there occurred on the server-side, whereas processing in the purported invention here occurred on the browser-side:

> *In Applicants' invention*, the media object originates at the local device and is desired to be uploaded to the remote device.  In this context, *pre-processing of the media object occurs prior to upload at the local device*.... In Fredlund, on the other hand ... [t]he processing of the high-resolution version of the digital image data at the photofinisher obviates the need by Fredlund to transmit any pre-processed digital image data from the consumer's computer system to the photofinisher.

(Ex. G, '482 File History, 4/17/09 Remarks at 16-18, FB-APPX127-29 (emphasis added); *see also* Ex. J, '557 File History, 2/27/03 Interview Summary, FB-APPX219 ("[T]he present invention embeds objects in web sites that enable client-side pre-processing.").)  *Gillespie*, 501 F.3d at 1291; *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) ("We cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO.").  Accordingly, the intrinsic record establishes that "pre-processing" refers to processing performed at the browser on the user's device before upload, not to processing performed on a server device after upload by the user.

**b. "Pre-processing" requires modifying the image or sound data in the media file.**

The second dispute centers around an argument the patentees made in response to the Hui rejection described above. Hui disclosed processing images in a FlashPix file, which included raw image data as well as display values that could be altered to change how the image would be viewed by the user. (Ex. I, '482 File History, 03/26/10 Remarks at 22, FB-APPX204 ("Hui's image correction and composition processes do not modify the image data contained within the FlashPix file. Specifically, the image correction process is designed to modify the viewing parameters (e.g., color, tone, etc.) that control how the image data is to be displayed.").) The patentees argued that Hui did not meet the "pre-processing" limitation, because it did "not modify the *underlying image data* contained within the FlashPix file." (*Id.* (emphasis added) ("Applicants submit that the image correction and composition processes of Hui are both directed to separate information that is associated with the image data, not to the image data itself. Accordingly, the correction and composition processes of Hui cannot be said to pre-process the digital content ....").) *See Gillespie*, 501 F.3d at 1291.

Summit 6 appears to agree that this argument shows the limited scope of the claims; indeed, Summit 6 incorporated the term "underlying data" directly into its proposed construction. Summit 6's mere recitation of the term "underlying data," however, does not resolve the parties' dispute regarding which types of modifications fall within the ambit of "pre-processing." Indeed, as Summit 6's infringement contentions show, Summit 6 seeks to use its proposed construction to capture modifications to data other than the image or sound data of a media object, contrary to the prosecution history. For example, Summit 6's contentions assert that attaching a textual comment to an image is "pre-processing" even though such comment does not

change the underlying image data – much the way physically attaching a "Post-It" note to a document does not change its content. Accordingly, the Court should adopt Defendants' construction and hold that "pre-processing" requires modification of the image or sound data itself and is not satisfied by merely associating other data with the image data, such as a comment, tag, or filename.

### 2. "pre-processing parameters" and similar terms[7]

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| values contained in HTML text that are passed to and direct the code that performs the "pre-processing" | parameters for specifying the modification of the underlying data of the digital content [media object] to meet the requirements of another device |

Defendants' proposed construction for this term accurately recites the art-specific meaning of the term "parameter" as used in these patents. In contrast, Summit 6's proposed construction ignores the dispute, attempting to define "pre-processing parameters" as "parameters for specifying the pre-processing." Summit 6's proposed construction would not resolve the parties' dispute and would not aid the jury in addressing the factual issues associated with Summit 6's infringement allegations.

The Federal Circuit has made clear that "claims are drafted to be read by those skilled in the art, rather than lay persons." *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 862 (Fed. Cir. 1991); *Phillips*, 415 F.3d at 1313 ("[C]laim terms are examined through the viewing glass of a person skilled in the art ....") (internal quotation omitted). As used by persons of skill in HTML programming, the term "parameters" refers to values contained in HTML text that are

[7] The full list of related terms for "pre-processing parameters" and other terms that list "and similar terms" is provided in the Parties' Joint Claim Construction and Prehearing Statement. (Dkt. 103, Exhibit A.)

passed to an applet.  (*E.g.*, Ex. K, Gulbransen et al. at 240 ("parameter (HTML) A name and value pair identified by the Name and Value attributes of the <PARAM> tag used inside an <APPLET> tag.").)   Using parameters external to the applet allows the website creator to customize the applet without the need to examine and modify the applet's source code used to process the image:

- "Applets have parameters that you can specify in an HTML file.  You can customize an applet by using these parameters and never have to program a line of Java code. A well-written Java applet will have a comprehensive set of parameters that'll let you change most of its important aspects."  (Ex. L, van Hoff et al. at 25-26, FB-APPX228-29.)

- "Enabling your applets to accept parameters allows them to be customized at run-time by the HTML author, without providing the source code.  This provides greater flexibility on the Web without requiring any recoding."  (Ex. M, Zukowski at 472-73, FB-APPX233-34.)

- "This applet is a simple example of parameterizing the data that it needs to run. The applet gets the name of the images, the number of images, and timing parameters all from <PARAM> tags in the HTML page.  The neat thing about this is that you can use this applet without ever doing any Java programming; all you need to do is pass the right parameters to run your animation."  (Ex. C, Tyma et al. at 45-46, FB-APPX035.)

The patents use this art-specific meaning of "configurable parameters."  (Ex. A, '557 patent, 5:46-63.)  *Nystrom v. Trex Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005) (rejecting effort to construe term "divorced from the context of the written description and prosecution history"); *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1344 (Fed. Cir. 2006).  For example, the patents describe the use of "DefaultImageWidth" and "DefaultImageHeight" as configurable parameters that set the "width and height of the images after they have been compressed for transmission."  (Ex. A, '557 patent, 5:46-63.)  These parameters are defined in the example HTML code using the standard name-and-value pair for parameters:

"PWT.DefaultImageWidth = 640" and "PWT.DefaultImageHeight = 480." (*Id.*, col. 7 (near middle).) The notes for the sample HTML code further state: "This section defines data values needed by the image wells. You can modify these values to suit your needs." (*Id.*) Because Defendants' proposed construction properly defines what the pre-processing parameters are—values contained in HTML text that are passed to and direct the code that performs the "pre-processing"—Defendants request that the Court adopt their construction.

### B. Terms from Only the '557 Patent

#### 1. "pre-processing the media object without user selection of the pre-processing" and similar terms

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "pre-processing" the media object without the pre-processing being affected by user provided values or selections | pre-processing the media object using preprocessing parameters obtained from another device and not pre-processing parameters provided by the user |

Summit 6's proposed construction of this term improperly seeks to rewrite the plain claim language. The plain language of this term requires that the pre-processing occur "*without user selection* of the pre-processing."[8] Summit 6's proposed construction, however, attempts to rewrite the phrase "without user *selection* of the pre-processing" to "without using 'pre-processing *parameters* provided by the user.'" Through this change, Summit 6 apparently seeks to capture systems in which the user actively selects the pre-processing, if any, performed on an image so long as the user does not provide the specific pre-processing parameters (e.g., by inputting a resizing value of 480 pixels). Claim construction law, however, forbids rewriting the

[8] Some claims include the phrase "without additional user selection of the pre-processing." The word "additional" does not change the scope of those claims but instead only makes clear that, apart from identifying which media object will be pre-processed, the user has no "additional" involvement in selecting what pre-processing will take place.

claims to suit a patent owner's litigation theories. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."). The claims make clear that the pre-processing must be done "without user selection of the pre-processing," and the Court is without authority to rewrite this claim language inconsistent with its plain meaning. *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1359 (Fed. Cir. 2006).

Summit 6's proposed construction also conflicts with the specification. The alleged invention was intended to provide a simple, "transparent" way for unsophisticated users to upload media files "as is," i.e., without selecting how to process their images before upload. (Ex. A, '557 patent, 2:58-3:6 (benefits of tool include, "to the image submitter, the ability to submit media objects to web pages 'as is' without making modifications to the media objects prior to sending"); *id.*, 2:52-57 (understanding technical terms not required, because claimed tool "handles all of these tasks for the user"); *id.*, 4:65-5:20 (tool "will automatically prepare [media objects] to meet the requirements of the second location").) Eliminating user selection over pre-processing also allegedly benefited the website creator by providing an "error free" stream of "uniform" and "standardized" media objects. (*Id.*, 2:58-3:6.) *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1315 (Fed. Cir. 2007) (construing term "determining treatment positions" as precluding user input based in part on specification statements that prior art's use of semi-automated systems led "to human error"); *Honeywell Int'l, Inc. v. United States*, 609 F.3d 1292, 1298-99 (Fed. Cir. 2010) (rejecting proposed construction that would not provide the benefits described in the specification regarding warning crew members).

The patentees also made clear during prosecution that user selection of pre-processing

was excluded from the scope of the patentees' alleged invention without qualification. The intrinsic record, including the patentees' statements distinguishing Narayen, lacks any statement or suggestion that, as Summit 6 now argues, the exclusion was limited to users typing in specific pre-processing values. The Examiner rejected then-pending claims based on the Narayen patent on the Pictra photo album software. (Ex. N, '557 File History, 11/07/02 Office Action at 3-5, FB-APPX238-40.) Narayen—a reference related to Pictra's photo album software—allowed the user to rearrange the style and format of the photo album and to perform various photo-editing functions, such as "panning, zooming and rotating" images. (Ex. E, Narayen '323 patent, 9:13-14, 9:55-58; Ex. N, Office Action at FB-APPX240 (citing Ex. E, Narayen '323 patent, 8:60-9:64).) The interface for performing those actions was a series of user-selectable buttons on the right-hand side of the screen, as shown below. (*E.g.*, Ex. E, Narayen '323 patent, Fig. 14A.)



FIG. 14A

In response to the Examiner's rejection based on Narayen, the patentees distinguished Narayen's user selection of pre-processing from their alleged invention, arguing: "None of the

preprocessing described in Narayen is done in response to the acquisition of the media object without additional user input as claimed .... The modifications of the picture album described in Narayen is [sic] done in response to user input arranging the picture album."[9] (Ex. D, '557 File History, 03/06/03 Remarks at 19, FB-APPX055; Ex. N, '557 File History, 11/07/02 Office Action at 3-5, FB-APPX238-40.) The patentees reiterated this fundamental limitation of their purported invention in their arguments during the '482 patent regarding the Hui patent. (*E.g.*, Ex. I, '482 File History, 03/26/10 Remarks at 22-23, FB-APPX204-05 ("Hui does not describe a remote device directing an application of specific coloring to an image. Instead, the user controls the specific coloring using the correction process tools made available to the user.").)

The patentees' prosecution argument that user selections of tools with pre-programmed functionality were outside the claim scope directly contradicts Summit 6's litigation efforts to capture systems where users select the pre-processing. *Ormco*, 498 F.3d at 1315-16 (construing asserted claims as precluding human input based on arguments during prosecution); *Microsoft*, 357 F.3d at 1349. Defendants' construction, in contrast, follows the plain meaning of the claim language and the claim scope described during the prosecution history and should, therefore, be adopted.

**2. "pre-processing the media object ... for the requirements of the third-party web-site"**

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "pre-processing" the media object into the standard format required for publication by the "third-party web site" | pre-processing the media object into a format specified for the third-party web site<br>"third party website" = plain meaning - OR - |

[9] In the same response as it made these comments, the patentees amended the relevant claims to recite "without [additional] user selection" rather than "without [additional] user input." (Ex. D, '557 File History, 03/06/03 Remarks at 3-4, FB-APPX039-40.)

| | |
|---|---|
| "third-party website:" a website operated by a party other than the party that authored the media object identifier | "a website that is not stored at or hosted by the user" |

The parties' constructions for this term present two disputes: whether a "third-party" may be the author of the media object identifier and whether "requirements" refers to requirements for receiving images or requirements for publishing images.

**a. "Third-party web-sites" refer to websites operated by someone other than the user and the author of the media object identifier.**

Defendants' construction properly recognizes that the claim language involves three different parties: (1) the user, (2) the author of the applet or media object identifier, and (3) the third-party website creator who customized the applet using HTML parameters. In contrast, Summit 6's proposed construction attempts to confuse the "third-party" concept by recognizing only two parties: (1) the user and (2) a website creator who also authored the applet or media object identifier.

Defendant's construction also most naturally aligns with the patentees' description of their alleged invention throughout the specification. The specification makes clear that the term "third-party" refers to a "customer" or "partner" of the party that wrote the applet, who can easily customize the applet's functionality by changing a parameter in the HTML code. (Ex. A, '557 patent, 5:23-27 ("The Prepare and Post tools are available to customers to integrate into their own web pages. The Prepare and Post tools are easily integrated into web sites (customers) to allow those sites to accept media objects from web site visitors (users)."); *id.*, 5:42-60 ("The Configuration Section overrides various configurable default settings that the customer can control."); *id.*, 3:1-11 (referring to customers as "PictureWorks web site partner[s]").) These

repeated descriptions of the invention demonstrate the limited scope of the claims. *Nystrom*, 424 F.3d at 1144 ("consistent use of term" in specification shows limited claim scope); *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1336-38 (Fed. Cir. 2011).

The prosecution history also emphasizes the ability of the patents' purported invention to allow the third-party website creators to customize the code written by the applet author. (Ex. O, '557 File History, 9/24/02 Remarks at 10, FB-APPX254 ("The claimed ability to embed the media object identifier within a third-party web site allows the third-party web site to use a media object identifier but still have control of the construction and operation of the web page. This allows the third-party web page to keep control of and modify the display elements of web pages."); Ex. D, '557 File History,03/06/03 Remarks at 17-18, FB-APPX053-54 ("In this example, the 'prepare and post tools' are integrated into customer web sites .... The sample code of Appendix A includes comments that extensively explain how to insert the code into a third party web site. These comments indicate that cutting and pasting the code of Appendix A into code for a third party web site will embed a media object identifier onto the web site.").)

The claim language, specification, and prosecution history demonstrate that a "third-party" is identified from the standpoint of the applet creator, not the user. Accordingly, Defendants' construction should be adopted.

**b. This term does not cover systems in which the third-party website is required to perform additional image processing before publishing uploaded files.**

The intrinsic record also supports Defendants' construction of the "requirements" term as requiring that the processing on the user's device put the media object into a format that is ready to publish on a third-party website. The patents' written description emphasizes that the alleged

invention provides a "made to order" stream of media objects. (Ex. A, '557 patent, 3:1-3.) These media objects can be published without requiring additional processing on the server side. Moreover, the prosecution history of the '557 and '482 patents show that the patentees viewed their alleged invention as eliminating the need for any processing on the server side before publication. During the '557 prosecution, the patentees argued that the term "requirements of the web site" was an important distinction over the prior art and "advantageous for a number of web sites" because it processed the images into the form in which they would be published from the websites and downloaded by their users. (Ex. O, '557 File History, 9/24/02 Remarks at 12, FB-APPX256 ("[O]n the eBay web site, it is important that the digital images have a file size below a certain maximum size to aid in the *downloading* of web pages by bidders.") (emphasis added).) Likewise, during prosecution, the patentees argued that processing on the user's computer in their claims "obviates the need for such processing to occur at the remote device" before publication. (Ex. G, '482 File History, 4/17/09 Remarks at 16-18, FB-APPX127-29.)

### C. Terms from Only the '482 Patent

#### 1. "pre-processing said identified digital content at said client device in accordance with one or more pre-processing parameters that are received from a device separate from said client device to produce pre-processed digital content" and similar terms

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "pre-processing" the identified digital content at the client device, the "preprocessing" being controlled by the received "pre-processing parameters," and not by the user, during the interaction of the client and "remote devices" | plain meaning (incorporating the definitions of constituent terms addressed above and below) |

This set of terms presents a similar dispute as the "without user selection" term from the '557 patent: whether the asserted claims cover systems in which user selections control what pre-

processing occurs.  Defendants properly construe the terms as precluding user selections from controlling the pre-processing; Summit 6's purported "plain meaning" construction tries once again to ignore the dispute.

The claim language itself requires adoption of Defendants' construction.  The claim language recites, for example, "pre-processing said identified group of one or more items of digital content using said received pre-processing parameters, said received pre-processing parameters *controlling* said client device ...."  (Ex. B, '482 patent, claim 1 (emphasis added).)  The requirement that the parameters "control[]" the pre-processing excludes systems in which user selections control the pre-processing.

Indeed, the patentees recognized this limitation on the claim scope during the '482 prosecution.  The Examiner rejected the patentees' claims based on the Hui reference, which used a FlashPix image file that allowed users to modify various image characteristics.  (*See generally* Hui, As depicted below in Figure 12, Hui allowed the user to change the level of red, blue, green displayed by the image using sliding bar selection tools.  These sliding bars did not require the user to input specific values.  Instead, the user dragged the bar along a spectrum from low to high, and the program then determined how much to change the displayed image based on parameters pre-programmed into the sliding bars.  The Hui patent also disclosed using similar selection tools to change the image's hue and magnification (Fig. 12); saturation, contrast, and brightness (Fig. 13); sharpness (Fig. 14); and orientation (Fig. 15).



The patentees argued that Hui's user controls were outside the scope of their purported invention, distinguishing Hui based on the same claim language at-issue for this dispute:

> Hui does not process digital content using pre-processing parameters received from a remote device, the pre-processing parameters controlling a placement of the digital content into a specified form for publication. More specifically, any image correction or composition processes disclosed by Hui are directed solely by the user. Control is not effected by a remote device. For example, ***Hui does not describe a remote device directing an application of specific coloring to an image. Instead, the user controls the specific coloring using the correction process tools made available to the user.***

(Ex. I, '482 File History, 03/26/10 Remarks at 22-23, FB-APPX204-05 (emphasis added).)

The patentees' argument during prosecution requires adoption of Defendants' proposed construction. *Gillespie*, 501 F.3d at 1291 ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.") (internal quotation omitted). Specifically, by requiring that pre-processing be

performed "in accordance with" or "using" pre-processing parameters that "control[]" the pre-processing, the asserted claims exclude systems in which user selections control what pre-processing occurs.  Such excluded user selections may consist of a user inputting specific values used to control the pre-processing.  Such excluded user selections may also consist of using "tools made available to the user"[10] with parameters pre-programmed into the tool to make selections—such as sliding bars or buttons allowing the user to select between uploading low or high-resolution images.  In either situation, the user has the control of the system, and such a system is outside the claim scope.[11]  *iLOR, LLC v. Google, Inc.*, 550 F.3d 1067, 1073-74 (Fed. Cir. 2008) (construing term "the toolbar being displayable based on a location of a cursor ..." as requiring that the toolbar be "automatically displayed based on the location of the cursor without further user action," because patentee distinguished prior art that displayed tools in response to user input).

In addition, because the selection of pre-processing occurs through the use of parameters in the HTML code, the pre-processing of files "in accordance with" or "using" pre-processing parameters refers to pre-processing "during the interaction" between the user's device and the remote web server, not at times when the server is not interacting with the user's device.  (*See infra* § IV.A.2.)  Accordingly, the Court should adopt Defendants' proposed construction for these related terms.

---

[10] Ex. I, '482 File History, 03/26/10 Remarks at 22-23, FB-APPX204-05.

[11] Further support for Defendants' construction of this term can be found in the written description and prosecution history evidence cited above with respect to the "without user selection" term from the '557 patent.

**2. "placement of ... digital content into a specified form" and similar terms**

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| filling a field in a webpage with the digital content | plain meaning OR modifying the underlying data of the digital content to meet specifications |

The parties have starkly different views about what the term "placement ... into a specified form" refers to. As proposed by Defendants, "form" refers to an HTML form and "placement ... into a specified form" refers to dragging-and-dropping an image to a specific field. Summit 6, in contrast, construes the term "form" essentially to mean "format," arguing that the term refers to changing the image itself rather than placing the image into the web form.

The intrinsic record shows that Defendants' construction is correct. The written description repeatedly uses the term "form" to refer to an HTML form that contains the "media object identifier" allowing the user to identify which files to upload. (Ex. A, '557 patent, 6:15-16 ("All media object identifiers on a web page must be contained within an HTML form."); *id.*, col. 7 ("This section of code must appear ... before the ... <FORM> that contains the image wells."); *id.* ("This code creates an image well on the web page.... Copy this code into your web page anywhere within your <FORM> where you want an image well to appear.").[12]) The specification further describes the "media object identifier" as "a graphical interface for *placing* and associating a media object from a user's desktop onto a web page." (Ex. A, '557 patent, 3:12-14 (emphasis added); *id.*, 3:44-46 ("Using the browse dialog, the user selects the desired

[12] The patentees' use of the term "form" is thus consistent with the use by persons of skill at the time. (Ex. P, Musciano et al. at 33, FB-APPX260 ("HTML provides better, more extensive support for collecting user input through forms. You create one or more special form sections in your HTML document, bounded with the <form> and </form> tags.").)

media object, which is then *placed* in the media object identifier.") (emphasis added); *id.*, 4:10-11 ("If a mistake is made such that the wrong image is *placed* in a media object identifier, the correct image may be *placed* in the media object identifier.") (emphasis added).) The plain and ordinary meaning of the claim language, along with the patents' consistent use of the terms "place" and "form" fully supports Defendants' construction.[13] *E.g.*, *Nystrom*, 424 F.3d at 1144.

**3. "displaying a preview image of said selected digital content"**

| **Defendants' Construction** | **Plaintiff's Construction** |
| --- | --- |
| displaying a preview image after the digital content has been selected for uploading | plain meaning OR displaying a preview image of the selected digital content |

The plain claim language of this term requires adoption of Defendants' construction. By using the past tense of "selected," the claim language requires that a preview image of the digital content be displayed after the content has been selected. *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1216, 1222 (Fed. Cir. 2007) (requiring claim steps including "displaying ... the data of said *selected* data set" to be "performed in order" based on claim language) (emphasis added); *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1998) (same for "*acidified groundwater*") (emphasis in original). This claim language is supported by the description of the purported invention in the specification, which states that, "[u]nlike existing tools, the tool provides the user an opportunity to *confirm* the submission, for example by generating a thumbnail image of an image file that *has been* dragged and dropped." (Ex. A, '557

[13] Even assuming that interpreting "form" as referring to the underlying data of the image were correct (which it is not), Summit 6's proposed construction would still be inappropriate because it fails to account for the requirement that the digital content must conform to the standard format required for publication or distribution by the server device. As detailed above in section IV.B.2, the alleged invention of these patents refers to changing the image into a format that is ready for publication by the server.

patent, abstract (emphasis added); *id.*, 4:7-13 ("The opportunity for *user confirmation* is again provided, e.g., by displaying a visual representation of the images in the batch. If a mistake is made such that the wrong image is placed in a media object identifier, the correct image may be placed in the media object identifier. The correct image will replace the mistaken image.") (emphasis added).)

Although Summit 6's proposed plain meaning and alternative constructions may not appear to contradict Defendants' proposed construction, its infringement contentions accuse functionality that displays a preview image only before the image is selected. Accordingly, the parties have a substantive dispute over this term, and Defendants' proposed construction should be adopted.

**4. "remote device" and similar terms**

| Defendants' Construction | Plaintiff's Construction |
| --- | --- |
| web server | a device not co-located with the client device |

Defendants' proposed construction for this term best captures the meaning of "remote device" consistent with the claim scope and the description of that device in the patents themselves. The claim language itself recites various functions for the "remote device," such as (1) "publishing to said one or more devices that are remote from a said server device and said client device"; (2) "receiving pre-processing parameters from a remote device;" and (3) "transmitting ... from said local device to said remote device." (Ex. B, '482 patent, claims 1, 12, and 25.) These functions are associated specifically with a web server.

Moreover, the specification uniformly describes the invention as using a web server. The specification describes the alleged invention as directed to "submit[ting] media objects from

inside a standard browser, referred to as the first location, to a second location *or server*." (*E.g.*, Ex. A, '557 patent, 2:45-47) (emphasis added).) The specification also describes its alleged invention as relating to "upload[ing] to the web server" and being an "improved web-based media submission tool." (Ex. A, '557 patent, 1:42-63, 1:65-67.) These consistent, uniform descriptions show that the patents use the term "remote device" to refer to a web server. *Nystrom*, 424 F.3d at 1144. Indeed, Summit 6's attempt to broaden the term "remote device" to include any possible device other than the client computer itself would "divorc[e]" the claim construction "from the context of the written description," contrary to the law. *Id.* at 1144-45. Defendants' construction properly flows from the context given to the term in the patents and should be adopted.

## V. UNDISPUTED TERMS

Facebook, Photobucket, and Multiply and Summit 6 have agreed on the following constructions:

- "combining (including stitching) of multiple media objects" ('557, claims 2, 29): combining media objects into one media object, not simply associating one media object with another media object.

- "adding text or other annotation to the media object" ('557, claims 2, 29): modifying the media object data to include text or other annotation, not simply associating separate text or other annotation with the media object.

## VI. CONCLUSION

For the foregoing reasons, Facebook, Photobucket, and Multiply respectfully request that their proposed constructions be adopted.

//

//

Dated: December 22, 2011

By: */s/ Benjamin G. Damstedt*
Deron R. Dacus

Deron R. Dacus
State Bar No. 00790553
Ramey & Flock
100 East Ferguson, Suite 500
Tyler, TX 75702
Phone: (903) 597-3301
Fax: (903) 597-2413
derond@rameyflock.com

*Attorneys for Defendant Facebook, Inc.*

OF COUNSEL:

Michael G. Rhodes
COOLEY LLP
101 California St., 5th Floor
San Francisco, California 94111
Tel: (415) 693-2000
mrhodes@cooley.com

Heidi L. Keefe
Mark R. Weinstein
Benjamin G. Damstedt
Sudhir A. Pala
COOLEY LLP
Five Palo Alto Square
Palo Alto, CA 94306
Phone: (650) 843-5000
hkeefe@cooley.com
mweinstein@cooley.com
bdamstedt@cooley.com
spala@cooley.com

By: */s/ Dan D. Davison*
Dan D. Davison (TX Bar No. 05590900)
Miriam L. Quinn (TX Bar No. 24037313)
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784

T:  214-855-8000
F:  214-855-8200
ddavision@fulbright.com
mquinn@fulbright.com

Richard S. Zembek (TX Bar No.
00797726)
FULBRIGHT & JAWORSKI L.L.P.
1301 McKinney, Suite 5100
Houston, TX  77010-3095
T: 713-651-5151
F:  713-651-5246
rzembek@fulbright.com

*Attorneys for Defendant Photobucket
Corp.*


By:  */s/ Eric H. Findlay*
Eric H. Findlay
State Bar No. 00789886
efindlay@findlaycraft.com
Brian Craft
State Bar No. 04972020
bcraft@findlaycraft.com
FINDLAY CRAFT, LLP
Principal Office:
6760 Old Jacksonville Hwy, Suite 101
Tyler, Texas  75703
Tel:  (903) 534-1100
Fax:  (903) 534-1137

*Attorneys for Defendant Multiply, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this the 22nd day of December 2011. Any other counsel of record will be served with a true and correct copy of the foregoing by mail or facsimile.

*/s/ Benjamin G. Damstedt*

992924/HN