**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **SUMMIT 6 LLC,** | |
|    **Plaintiff,** | |
| **v.** | **Civil Action No. 3:11-CV-367-O** |
| **RESEARCH IN MOTION CORPORATION, et al.,** | |
|    **Defendants.** | |

**OPENING CLAIM CONSTRUCTION BRIEF**
**BY MOBILE PHONE DEFENDANTS**

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ...............................................................................................1

II.  THE FACTUAL BACKGROUND .....................................................................1

III.  THE LAW GOVERNING CLAIM CONSTRUCTION ....................................4

IV.  CLAIM CONSTRUCTIONS FOR U.S. PATENT NO. 7,765,482................................6

    A.  "placement of . . . digital content into a specified form" / "to place . . . digital content into a specified form" ...................................6

    B.  "publishing" / "publication" ...........................................................10

    C.  "pre-processing" ..............................................................................13

    D.  "pre-processing parameters".............................................................15

    E.  "remote device" / "device separate from said client device"..............................16

    F.  "pre-processing . . . using said received pre-processing parameters, said received preprocessing parameters controlling said client device" / "pre-processing . . . at said client device in accordance with one or more preprocessing parameters . . . said one or more pre-processing parameters controlling said client device" ...............................................18

    G.  "A computer implemented method of pre-processing digital content in a client device for subsequent electronic [publishing / distribution]"...............................................................20

    H.  "receiving . . . from a remote device" / "received . . . from a device separate from a client device" / "provided to said client device by a device separate from said client device" ..........................................24

    I.  "information that enables identification of a user" / "user identifier" / "user information"...............................................26

V.  CONCLUSION...................................................................................28

# TABLE OF AUTHORITIES

CASES

*Abbott Labs. V. Sandoz, Inc.*,
566 F.3d 1282, 1289-90 (Fed. Cir. 2009) ...........................................................17

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336, 1351 (Fed. Cir. 2010)...................................................................5

*BAE Sys. Elecs. Ltd. v. Rockwell Collins, Inc.*,
No. 03-CV-0694-K, 2004 WL 1809812, at *2 (N.D. Tex. Aug. 12, 2004) (Kinkeade,
J.) (*Markman* opinion and order) .........................................................................4

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945, 950 (Fed. Cir. 2006)................................................................10, 20

*C.R. Bard, Inc. v. M3 Systems, Inc.*,
157 F.3d 1340, 1350 (Fed. Cir. 1998)............................................................20, 23

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
388 F.3d 858, 862 (Fed. Cir. 2004)........................................................................5

*Cat Tech LLC v. TubeMaster, Inc.*,
528 F.3d 871, 885 (Fed. Cir. 2008).......................................................................9

*Catalina Mktg. Int'l. Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801, 810-11 (Fed. Cir. 2002) ................................................................20

*Civix-DDI, LLC v. Hotels.com, L.P., et al.*,
Case No. 1:05-cv-06869, 2011 WL 3678689, at *2 (N.D. Ill. Aug. 19, 2011),
Memorandum Opinion and Order.........................................................................26

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*,
214 F.3d 1302 (Fed. Cir. 2000)........................................................................5, 9

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*,
279 F.3d 1022, 1029 (Fed. Cir. 2002)..................................................................21

*Exigent Tech., Inc. v. Atrana Solutions, Inc.*,
442 F.3d 1301, 1310 n. 10 (Fed. Cir. 2006)........................................................12

*Goldenberg v. Cytogen, Inc.*,
373 F.3d 1158, 1164 (Fed. Cir. 2004)..................................................................21

*Kimberly-Clark Corp. v. Tyco Int'l (US), Inc.*,
4 Fed. Appx. 946, 951 .........................................................................................14

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
481 F.3d 1371 ...................................................................................................5

*LogicLink, Inc. v. Keylink Service Solutions, Inc., et al.*,
Case No. 8:07-cv-1056-DOC, 2009 WL 764526, at *8 (C.D. Cal. Mar. 19, 2009),
Order Findings of Fact And Conclusions of Law ..................................................26

*Markman v. Westview Instr., Inc.*,
52 F.3d 967, 977 (Fed. Cir. 1995) (en banc)..........................................................4

*Netcraft Corp. v. eBay, Inc.*,
549 F.3d 1394, 1396-1397 (Fed. Cir. 2008) ...........................................................4

*Phillips v. AWH Corp.*,
415 F.3d 1303, 1319 (Fed. Cir. 2005) (en banc)....................................................5

*PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*,
355 F.3d 1353, 1359 (Fed. Cir. 2004)..................................................................15

*Rhine v. Casio, Inc.*,
183 F.3d 1342, 1345 (Fed. Cir. 1999).....................................................................5

*Soverain Software, Inc. v. CDW Corp., et al.*,
Case No. 6:07-cv-511-LED, 2010 WL 1038731, at *4 (E.D. Tex. May 28, 2009),
Claim Construction Order ....................................................................................26

*Textron Innovations, Inc. v. American Eurocopter, LLC*,
773 F.Supp. 2d 650, 659-60 (N.D. Tex.) ...............................................................22

*Timecertain, LLC v. Authentidate Holding Corp., et al*,
Case No. 8:05-cv-1559-SDM-EAJ, 2006 WL 3804830, at *16 (M.D. Fla. Dec. 22,
2006), Order...........................................................................................................26

**OTHER AUTHORITIES**

37 C.F.R. § 1.111 .........................................................................................................11

John December & Mark Ginsburg, <u>HTML 3.2 & CGI Unleashed</u>, p. 317 (1996) .........8

U.S. Patent No. 6,895,557...............................................................................................3

U.S. Patent No. 7,765,482...............................................................................................1

## I.       INTRODUCTION

Defendants Research In Motion Corporation; Research In Motion Limited; Samsung Electronics Co. Ltd.; and Samsung Telecommunications America LLC (collectively referred to herein as "Mobile Phone Defendants") submit this Opening Claim Construction Brief for U.S. Patent No. 7,765,482 (the "'482 patent") for a "Web-based Media Submission Tool" ('482 patent, Title).[1]

## II.      THE FACTUAL BACKGROUND

As a threshold matter, the '482 patent – like its parent '557 patent – discloses in the "Field of the Invention" section that "the present invention relates . . . particularly to the transportation and Internet publishing of digital content, particularly image media objects and rich media."[2]  According to the '482 patent, this purported web-based publishing invention was developed to solve difficulties "the average technology user (the 'imaging civilian')" encountered when "manipulating and sharing digital images over the Internet."[3]

Specifically, although admitted prior art "simplifies the user experience, it does little toward furthering 'backend' automation in the handling and distribution of media objects and has no built in 'intelligence' to streamline the process of handling and transporting rich media objects from the front end."[4]  The '482 patent also describes the admitted prior art as "piecemeal solutions" that "require a level of sophistication that is beyond that of the ordinary user."[5]

The '482 patent describes the functionality of one such prior art web-based tool in the same field as "allow[ing] users to, without leaving a web page, transfer files to a server (Internet or intranet) by selecting the files on the user's desktop that the user wants to transfer, then

---

[1] Defendants' proposed constructions for the terms addressed herein are attached at Def. App. No. 1.
[2] The '482 patent at 1:11-14 (Def. App. 11).
[3] *Id.* at 1:21-24 (Def. App. 11).
[4] *Id.* at 1:62-67 (Def. App. 11).
[5] *Id.* at 1:25-27 (Def. App. 11).

dragging them onto the web page. For example, a user, having visited a web page, can contribute pictures, documents, zip files, etc., without having to leave the web page and use an FTP program."[6]

Conversely, the '482 patent highlights that its allegedly improved "web-based media submission tool [] allows for submission of media objects in a convenient, intuitive manner."[7] Once submitted, the web-based tool will "transport media objects over the web to be stored and served,"[8] which makes the media available to the broader Internet public. This Internet publishing tool makes "images readily available with a minimal amount of effort," which is helpful for websites where "'[c]urb appeal' is of great importance . . . and can only be judged by 'drive-bys.'"[9]

The process described in the '482 patent for using a web browser to submit digital media requires interaction and integration between the so-called "intelligent" web browser client device and a web server, as "web page integration is designed to facilitate automatic server-side integration of media content."[10] The process flow of information between the client and server devices in the purported invention is as follows:

1.  A user directs a web browser (called a "client device" in the claims) to visit a website (*e.g.*, www.XYZ.com) available over the Internet to request a web page form to submit a digital photo, thereby initiating a client/server relationship between the web browser and a web server hosting the visited website (called the "remote device" or "device separate from said client device" in the claims).[11]

---

[6] *Id.* at 1:53-59 (Def. App. 11).
[7] *Id.* at 1:46-48 (Def. App. 11).
[8] *Id.* at 2:52-54. (Def. App. 11).
[9] *Id.* at 3:49-54 (Def. App. 12).
[10] *Id.* at 6:41-48 (Def. App. 13).
[11] *Id.* at Fig. 1 (Def. App. 6), Fig. 2 (Def. App. 7), 2:52-54 (Def. Ap. 11), 5:7-22 (Def. App. 13).

2.      The web server receives the web browser's request, and responds by passing the requested web page form to the user's web browser over the Internet.  The web page form is made up of HTML text and includes a field into which the user's digital photo file can be placed (called "image wells" and "media object identifiers" in the specification).[12]

3.      The web browser dynamically receives the requested web page form, including values (called "pre-processing parameters" in the claims) that the computer code in the web browser can use to modify the digital photo.[13]

4.      The user identifies the digital photo file to be uploaded by the web browser (*e.g.*, by dragging and dropping a picture into the appropriate field on the web page form).[14]

5.      The web server interacts with the web browser over the Internet to direct the modification (called "pre-processing" in the claims) of the digital photo in order to properly place it into the appropriate field in the web page form based on the values passed to the web browser.[15]

6.      The user transmits the completed web page form to the web server, including modified digital photo placed into the appropriate field therein.[16]

7.      The web server makes the modified photo publicly available, *e.g.*, by posting it on a web page available on the Internet (this is called "publication" and "publishing" in the claims).[17]

---

[12] *Id.* at 5:7-22 (Def. App. 13), Appendix A (Def. App. 13-14); *see also* Feb. 27, 2003 Interview Summary in the file history of parent U.S. Patent No. 6,895,557 (the "'557 patent") ("[T]he present invention embeds objects in web sites that enable client-side pre-processing.") (Def. App. 18).

[13] The '482 patent at Figs. 1 and 2 (Def. App. 6-7); 5:7-30 (Def. App. 13); and Appendix A (Def. App. 13-14).

[14] *Id.* at Figs. 1 and 2 (Def. App. 6-7); and 2:20-48 (Def. App. 11).

[15] *Id.* at 4:46-56 (Def. App. 12); *see also* '482 file history at Mar. 26, 2010 Amendment at 22-23 (Def. App. 43-44).

[16] The '482 patent at 6:15-17 and 6:27-32 (Def. App. 13).

This flow, and its purported advantages, is the only embodiment described in the specification, and it is described through reference to an actual product.  Specifically, PictureWorks Technology, Inc. ("PWT") – the original owner – developed and, according to materials disclosed during the prosecution of the '482 patent, marketed the only embodiment of the purported invention that is described in the specification of the '482 patent, "the Prepare and Post[TM] tools, which prepares and submits media objects from inside a standard browser, referred to as the first location, to a second location or server."[18]  To accomplish this, the '482 patent notes that a "key differentiator of the Prepare and Post tools is the browser, or client-side intelligence built into the tools."[19]  Indeed, the '482 patent proclaims that the Prepare and Post tools support "multiple browsers and dynamically adjust their behavior according to the type of browser that is currently running . . . .  This multiple browser support is completely automatic."[20]

## III.    THE LAW GOVERNING CLAIM CONSTRUCTION

It is well settled that any infringement analysis begins with the Court's construction of the claims.[21]  In order to determine the meaning of claims, courts first examine the patent's intrinsic evidence, including the claim language, specification and prosecution history.[22]  The intrinsic and any extrinsic evidence must be viewed through the eyes of a person of ordinary skill in the art.[23]  In this case, the '482 patent describes such a person as "a web-site creator."[24]

---

[17] *Id.* at 1:10-14 and 3:1-9 (Def. App. 11-12).

[18] *Id.* at 2:44-47 (Def. App. 11).

[19] *Id.* at 4:46-47 (Def. App. 12).

[20]  *Id.* at 6:33-40 (Def. App. 13).

[21] *See Markman v. Westview Instr., Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996).

[22] *BAE Sys. Elecs. Ltd. v. Rockwell Collins, Inc.*, No. 03-CV-0694-K, 2004 WL 1809812, at *2 (N.D. Tex. Aug. 12, 2004) (Kinkeade, J.) (*Markman* opinion and order).

[23] *Netcraft Corp. v. eBay, Inc.,* 549 F.3d 1394, 1396-1397 (Fed. Cir. 2008).

[24] The '482 patent at 1:19-25 (Def. App. 11).

While intrinsic evidence is certainly given greater weight, extrinsic evidence, such as technical dictionaries and inventor testimony, can also be useful in confirming claim scope.[25] The Federal Circuit held that "judges are free to consult dictionaries and technical treatises … so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."[26]

Moreover, there are additional considerations when construing claims, such as claim validity. Patent claims should, if possible, be construed to maintain their validity.[27] For a patent claim to be valid, the specification of that patent must contain a sufficient written description of the invention to make it clear to persons of ordinary skill in the art what the purported invention is directed to, and must include enough details as to enable those persons to make and use the claimed invention.[28] If a claim term is construed in a manner that enlarges the scope of claims containing that term beyond the specification's written description, or to ways of performing the claimed invention that are not enabled, this necessarily results in the invalidity of those claims under 35 U.S.C. § 112.[29]

---

[25] *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005) (en banc).

[26] *Phillips*, 415 F.3d at 1322–23 (citation omitted).

[27] *See Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) (discussing "the axiom that claims should be so construed, if possible, as to sustain their validity.") (internal citations omitted).

[28] 35 U.S.C. § 112; *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).

[29] *Rhine*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) ("if the only claim construction that is consistent with the claim's language and the written description renders the claim invalid, then the axiom [that claims should be so construed, if possible, as to sustain their validity] does not apply and the claim is simply invalid"); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302 (Fed. Cir. 2000) ("having concluded that the amended claim is susceptible of only one reasonable construction, we cannot construe the claim differently from its plain meaning in order to preserve its validity"); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371 ("The irony of this situation is that Liebel successfully pressed to have its claims include a jacketless system, but, having won that battle, it then had to show that such a claim was fully enabled, a challenge it could not meet. The motto, 'beware of what one asks for,' might be applicable here.").

IV.     **CLAIM CONSTRUCTIONS FOR U.S. PATENT NO. 7,765,482**

A.     **"placement of . . . digital content into a specified form" / "to place . . . digital content into a specified form"**

| ALL DEFENDANTS' CONSTRUCTION | PLAINTIFF'S CONSTRUCTION |
|---|---|
| filling a field in a webpage with the digital content | plain meaning<br>OR<br>modifying the underlying data of the digital content to meet specifications |

The word "form" is used repeatedly – and consistently – in the specification of the '482 patent to refer to a specific type of electronic "form": a "web page form" (also called "web form" or "HTML form") containing "fields" (referred to as "image wells," "media object identifiers," "text fields," and "hidden fields") into which digital content (*e.g.*, a digital picture) can be "placed" prior to the web page form being submitted by transmitting to a web server.[30]  Below are two examples:

- "All media object identifiers on a web page must be contained within an HTML *form*.  A single line of JavaScript code is inserted into the web page (within the HTML *form*) in each place where a media object identifier is desired."[31]

- "This code creates an image well on the web page.  While this template only contains a single image well, you can use as many as you like.  Copy this code into your web page *<FORM>* where you want an image well to appear."[32]

The specification also describes how the digital content is "placed" into a field, called a "media object identifier," on a web page form:

- "In general, the media object identifier functions to provide a graphical interface for *placing* and associating a media object from a user's desktop onto a web page."[33]

- "If a mistake is made such that the wrong image is *placed* in an [*sic*]media object identifier, the correct image may be *placed* in the media object identifier.  The correct image will replace the mistaken image.  Alternatively, the user may

---

[30] *See* the '482 patent at 3:15-17; 3:40-47; 4:4-10; 5:54-6:26; 4:37-45; col. 7; and Appendix A (Def. App. 12-14).
[31] *Id.* at 6:7-10 (emphasis added) (Def. App. 13).
[32] *Id.* col. 7 and Appendix A (Def. App. 13-14).
[33] *Id.* at 3:15-17 (emphasis added) (Def. App. 12).

remove an image from a media object identifier by right-clicking on the media object identifier and selecting Remove within a resulting popup menu."[34]

The specification of the '482 patent only depicts web page forms as embodying the purported invention, as shown in Figures 1 and 2.  Consistent with the understanding of relevant persons of ordinary skill in the art (*i.e.*, the disclosed "web site creators"), the depicted web page forms are graphical user interfaces containing multiple "fields" waiting to be filled with digital content—in this case, digital photos—to complete the form prior to submission.



*FIG. 1*

Figure 1, in addition to depicting four "image well"/"media object identifier" fields labeled "Drag Photo Here," also includes four drop-down list box fields labeled "Front View," a text box field labeled "Listing Name," and a command button labeled "Send Photos."  The web page form depicted in Figure 2, in addition to containing multiple "image well"/"media object identifier" fields labeled "Click Here to Select Images," contains another feature commonly found on web page forms, option buttons:

---

[34] *Id.* at 4:4-10 (emphasis added) (Def. App. 12).

☐ ($.25 charge) (optional)          ☐ ($2.00 charge) (optional)
Adding a photo of your item       Adding a SurroundView

Because the purported "invention, generally speaking, provides an improved *web-based media submission tool*," it is not surprising the specification uses the claimed terms "*form*" and "*placing*" consistently with their ordinary usage in the context of filling fields in a web page by relevant persons of ordinary skill in the art (*i.e.*, the disclosed "web-site creators") in the late 1990s.  For example, a reference from the time provides the following explanation of a web page "form":

> Forms are used to present an interface consisting of fill-in-the blank boxes, checklists, radio buttons, or other features to gather input from a user.  The FORM element brackets an input data form, the elements INPUT, SELECT, OPTION, and TEXT AREA are used to set up areas within the form for input.[35]

As demonstrated above, Mobile Phone Defendants' proposed construction, "filling a field in a web page with the digital content," conveys the meaning of these terms as understood by persons of ordinary skill in the art in 1999, in light of the intrinsic evidence.  There is nothing in the specification of the '482 patent that suggests a different meaning.  Mobile Phone Defendants' proposed construction will be readily understood by the jury when applying the claims using this Court's rulings.

Plaintiff's proposed construction, on the other hand, would give these terms either no ascertainable meaning, or would improperly give these terms the same or a similar meaning as the "pre-processing" limitations appearing in the same claims, thereby confusing the jury.  In addition to proposing that this term be construed in accordance with some vague "plain meaning," Plaintiff proposes an alternative construction bearing no relation to these terms.  Instead, Plaintiff's alternative construction for the "form" limitations largely parallels its

---

[35] John December & Mark Ginsburg, HTML 3.2 & CGI Unleashed, p. 317 (1996) (Def. App. No. 86-88).

proposed construction of the "pre-processing" term, relying on the ambiguous and undefined concept of meeting "certain specifications" with respect to a "modification" step, in addition to making modifications "in accordance with the requirements of another device" that Plaintiff seeks to add with its proposed construction for the "pre-processing" limitation, as shown below:

| CLAIM TERM | PLAINTIFF'S PROPOSED CONSTRUCTION |
|---|---|
| "pre-processing" | in preparation for transmission, <u>modifying the underlying data of the digital content</u> in accordance with the requirements of another device |
| "placement of . . . digital content into a specified form"<br><br>"to place . . . digital content into a specified form" | <u>modifying the underlying data of the digital content</u> to meet certain specifications |

Thus, under Plaintiff's proposed constructions, the "pre-processing" limitation is a modification performed to in accordance with the unidentified "requirements" of some unidentified "device," and the "placement . . . into a specified form" and "to place . . . digital content into a specified form" limitations are modifications to meet some unidentified "certain specifications." It is not clear whether these are two different unidentified modification processes, or whether Plaintiff is simply trying to erase the "placement" limitations entirely by making them duplicative of the "pre-processing" limitation.

If it is the latter, Plaintiff's proposed constructions for two different claim requirements would result in only one actual construction, and only one element of infringement proof by Plaintiff. Any such "two for the price of one" approach is expressly forbidden by the Federal Circuit. *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction which would render a claim limitation meaningless); *Elekta*

*Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1305-07 (Fed. Cir. 2000) (refusing to adopt a claim construction which would render claim language superfluous).[36]

Additionally, the "form" limitations should not be confused with the "pre-processing" limitation, because the separate "pre-processing" limitation is further limited by various dependent claims (*e.g.*, claims 14, 15, and 43), including those related to changing a file "format." The "form" limitations are never modified by the dependent claims.

Unsurprisingly, Plaintiff's identification of intrinsic evidence for its construction carefully avoids the numerous references throughout the specification to the "web site forms" required by the purported invention, and similarly steers clear of references to how digital content is "placed" into the fields on those web site forms.

**B.      "publishing" / "publication"**

| MOBILE PHONE DEFENDANTS' CONSTRUCTION | PLAINTIFF'S CONSTRUCTION |
|---|---|
| making the digital content publicly available (e.g., posting the digital content on a web page) | plain meaning<br>OR<br>sharing |

As used through the '482 patent, "publishing" – or "publication" –means "making the digital content publicly available," which is different than mere transportation or transmission of the digital content to one or more other devices. For example, the "Field of the Invention" section of the '482 patent states that "*The present invention relates* to the handling, manipulation and processing of digital content and *more particularly to the <u>transportation</u> and <u>Internet</u> <u>publishing</u> of digital content*." Indeed, this statement about the "present invention" distinguishing "transportation" from "publishing" is reflected in individual asserted claims of the

---

[36] *See also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("Allowing a patentee to argue that [limitations] specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration. For that reason, claims are interpreted with an eye toward giving effect to all terms in the claim.").

'482 patent, which recite "<u>transmitting</u> a message from said client device to said server device *for subsequent* <u>publishing</u>."[37]   As such, the clear meaning of "publishing," as that term is used in the claimed inventions, must be different than mere transportation or transmission.   Similarly, some claims, like claim 36, claim "distributing" as opposed to "publishing," which further implies that "publishing" means something different than mere distribution.

The distinction between transporting and transmitting digital content to select devices, on the one hand, and publishing digital content to the broader public, on the other, is further evidenced through a series of claim amendments altering application claim preambles from 1) "<u>transporting</u> a media object from a first location to a second location," to 2) "pre-processing media objects in a local device for subsequent <u>transmission</u> to a remote device," to 3) "pre-processing digital content in a client device for subsequent electronic <u>publishing</u>."[38] Interestingly, when the Patent Examiner objected to the "publishing" amendment for lacking adequate support in the specification under 35 U.S.C .§ 112, the Applicants responded by citing to Figure 1 and page 4, lines 13-15, which deal exclusively with public web pages.[39]   The Applicants then used a website listing as an express example of such *public* distribution in the Response to the Office Action.[40]   In short, the intrinsic evidence makes clear that "publishing" involves making the digital content available to the broader public, such as by posting it on a website.

---

[37] This example is from claim 13 of the '482 patent at 11:7-10 (Def. App. 16).  Claim 1 similarly recites "transmitting said pre-processed group of one or more items of digital content to said server device for subsequent publishing."  *Id.* at 9:41-44 (Def. App. 15).

[38] *See* the '482 patent file history at Oct. 8, 2004 Amendment at 3 (Def. App. 97); Dec. 7, 2009 Amendment at 2 (Def. App. 99).

[39] In fact, in the '557 patent file history of the priority patent application to which the '482 patent claims priority, the Applicants differentiated "publishing" to the general public from using drop boxes for transporting to specific addresses.  *See* Mar. 6, 2003 Amendment to Office Action Under 37 C.F.R. § 1.111 at 19-20 (Def. App. 20-21).

[40] *Id.* (Def. App. 19-21).

This intrinsic usage is confirmed by extrinsic evidence as well, including the plain usage by those of ordinary skill in the art. For example, "publishing" and "publication" are each based on the root word that means "to make public."[41] This root basis results in numerous dictionary definitions that prove that "publishing" involves the broader public, including i) "to make generally known; to disseminate to the public;" ii) "to make available to the public;" *etc.*[42] Indeed, as an aside, the '482 patent file history is full of Patent Office forms that use the word "publication" to mean "publically available."[43] Thus, the extrinsic evidence reinforces the plain language of the claim and specification, which require "publishing" and "publication" to involve the broader public.

Finally, the Court should be aware that Plaintiff's improper attempt to rewrite "publication" and "publishing" as "sharing" arises in the context of Plaintiff's attempt to cast all communications, even private communications, as publications.[44] All successful communications are inherently "shared" by the sender with the recipient. For example, even a privileged email from a client to her attorney is "shared" by the client with the attorney. But it is in no way "publishing" the email, and sending such an email is in no way a "publication." There is no support in the intrinsic record for rewriting this limitation in a way that might implicate such private transmissions.

---

[41] *See, e.g.*, DEF_CCE000046 ("from *publicar* 'make public'") (Def. App. 77); DEF_CCE000047 ("late 14c., 'the act of making publicly known,' from O.Fr. publicacion (14c.), from L. publicationem (nom. publicatio) "a making public") (Def. App. 78); DEF_CCE000064-66 "from Latin *pūblicāre* to make public") (Def. App. 79-81).

[42] *See also* extrinsic evidence dictionary definitions at DEF_CCE000045, 48, 50, 52, 53, 55, 58, and 60 (Def. App.89-96).

[43] *See, e.g.*, Patent Office form "SB/08," the "Substitute for Form 1449B/PTO" used by the applicant to disclose prior art (Def. App. 82-85).

[44] *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1310 n. 10 (Fed. Cir. 2006) ("[I]t is appropriate for a court to consider the accused device when determining what aspect of the claim should be construed.").

For these reasons, Mobile Phone Defendants respectfully request that "publishing" and "publication" be construed, consistent with the intrinsic and extrinsic evidence, to mean "making the digital content publicly available."

C.    **"pre-processing"**

| MOBILE PHONE DEFENDANTS' CONSTRUCTION | REMAINING DEFENDANTS' CONSTRUCTION | PLAINTIFF'S CONSTRUCTION |
|---|---|---|
| modifying the digital content at the client device before transmitting to a server device | modifying the [media object data/data of the digital content] at the browser before transmitting to a server device | in preparation for transmission, modifying the underlying data of the media object [digital content] in accordance with the requirements of another device |

Mobile Phone Defendants' proposed construction for "pre-processing" is consistent with and supported by the intrinsic evidence, as well as unambiguous and easy to understand and apply.[45]   For example, Plaintiff told the Patent Office the following about where, when, what, and how digital content is "pre-processed" in its purported invention:

> "In Applicants' invention, the media object originates at the local device and is desired to be uploaded to the remote device.   In this context, pre-processing of the media object occurs prior to upload at the local device. . . .   Pre-processing of the media object prior to upload obviates the need for such processing to occur at the remote device."[46]

Mobile Phone Defendants' construction for "pre-processing" is closest to Plaintiff's above explanation to the Patent Office about the limitations on the "pre-processing" as claimed in the purported invention.

---

[45] Mobile Phone Defendants do not oppose the construction for "pre-processing" proposed by Facebook, Inc.; Photobucket Corp.; and Multiply, Inc., and agree with the rationale expressed by those Defendants in their opening brief on claim construction for this term.

[46] The '482 patent file history, Apr. 17, 2009 Remarks at 16-17 (Def. App. 59-60).

Plaintiff's proposed construction, on the other hand, unnecessarily introduces multiple layers of ambiguity into the meaning and scope of every claim, and runs far afield of the description and statements about the purported invention within the intrinsic evidence.

First, Plaintiff's proposed construction requires that the "underlying data" is the data being modified during the "pre-processing."   To the extent that "underlying" has an understandable meaning, it would mean the actual digital content, as opposed to metadata associated with the digital content (*e.g.*, a geotag added to an image, or written captions separate from the actual image data).

Second, Plaintiff's proposed construction adds the limitation that the "pre-processing" be performed "in accordance with the requirements of another device."   It is unclear whether this proposed construction should be understood to mean the same thing as Plaintiff's statements to the Patent Office last year about the claimed "pre-processing" and its alleged differences from processing in the prior art, such as whether "control is [] effected by a remote device" or whether "a remote device direct[s]" the "pre-processing."[47]

It is also unclear which, if any, of the claimed "devices" required to be involved in the performance of the claimed method is implicated when Plaintiff's construction ambiguously refers to "the requirements of *another device*."   It is further unclear whether under Plaintiff's tangled web of proposed constructions, the claimed "pre-processing parameters" used during the claimed step of "pre-processing" must be "requirements of another device," or whether those parameters are simply a desired or optional value.

"The public notice function of patents is defeated if a patentee can subsequently and substantially alter the meaning of his claims by a post-hoc, litigation-driven 'definition' unsupported by the specification."   *Kimberly-Clark Corp. v. Tyco Int'l (US), Inc.*, 4 Fed. Appx.

---

[47] *See* the '482 patent file history, Mar. 26, 2010 Amendment at 22-23 (Def. App. 43-44).

946, 951.   Construing the "pre-processing" term in a manner requiring the public to ascertain

what may be the relevant "another device," what may be the relevant "requirements of" such a

"device," and whether *any* data processing functions may "modify" data "in accordance with"

*any* such requirements of any such "device" would defeat the public notice function of the

asserted claims, leaving both the jury and every person of ordinary skill in the art perplexed as to

what is or is not claimed as part of the purported invention.[48]

 For these reasons, Mobile Phone Defendants' proposed construction for "pre-processing"

should be adopted.

  **D.** **"pre-processing parameters"**

| ALL DEFENDANTS' CONSTRUCTION | PLAINTIFF'S CONSTRUCTION |
| --- | --- |
| values contained in HTML text that are passed to and direct the code that performs the "pre-processing"*<br><br>*As this term is defined. | parameters for specifying the modification of the underlying data of the digital content [media object] to meet the requirements of another device |

 Mobile Phone Defendants have proposed the same construction as the remaining

Defendants in this case (Facebook, Inc.; Photobucket Corp.; and Multiply, Inc.), and hereby

incorporate the arguments made by those Defendants in their opening brief on claim construction

for this term.   Additionally, Plaintiff's proposed construction for this term, like its proposed

construction for "pre-processing," unnecessarily introduces the ambiguous concept of meeting

"the requirements of another device," and should be rejected for the same reasons provided

above by Mobile Phone Defendants in addressing the "pre-processing" term.

---

[48] *See also PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.,* 355 F.3d 1353, 1359 (Fed. Cir. 2004) ("The ability to discern both what has been disclosed and what has been claimed is the essence of public notice.  It tells the public which products or processes would infringe the patent and which would not.").

E.       "remote device" / "device separate from said client device"

| MOBILE PHONE DEFENDANTS' CONSTRUCTION | REMAINING DEFENDANTS' CONSTRUCTION | PLAINTIFF'S CONSTRUCTION |
|---|---|---|
| web server that contains the "pre-processing parameters"*  *As this term is defined. | web server | a device not co-located with the client device |

The words and phrases "remote," "remote device," and "device separate from said client device" are not found in the specification of the '482 patent, requiring an examination of the remaining intrinsic evidence for additional information about how this term should be construed. During prosecution of the '482 patent, Plaintiff equated the claimed "remote device" with the destination to which the digital content is uploaded after being "pre-processed" by the "client device" (the local device):

> "In Applicants' invention, the media object originates at the local device and is desired to be *uploaded to the remote device*.  In this context, pre-processing of the media object occurs prior to upload at the local device. . . .  Preprocessing of the media object *prior to upload obviates the need for such processing to occur at the remote device*."[49]

As shown by the following passages, the only computing device of any type that is described within the specification that is "remote" or "separate" from the "browser side" client devices and to which the pre-processed digital content is uploaded is a "web server":

> ActiveUpload allows an arbitrary file to be dragged and dropped onto a web page control *for upload to the web server*.  An ActiveUpload control allows users to, without leaving a web page, *transfer files to a server* (Internet or intranet) by selecting the files on the user's desktop that the user wants to transfer, then dragging them onto the web page.[50]

> From the foregoing description, it will be appreciated that the present media submission tool, besides offering convenience to the end user, offers convenience and flexibility to technology partners.  Web page integration is designed to facilitate automatic *server-side integration* of media content.[51]

---

[49] The '482 patent file history, Apr. 17, 2009 Remarks at 16 (emphasis added) (Def. App. 59).
[50] The '482 patent at 1:51-56 (emphasis added) (Def. App. 11).
[51] *Id.* at 6:43-48 (emphasis added) (Def. App. 13).

The Federal Circuit has held it is appropriate to construe a claim term to be limited to the sole described embodiment when, as in the '482 patent, a patent applicant makes consistently-limiting statements throughout the intrinsic evidence evincing a clear intention to limit the patent to the described embodiment.[52]  As noted above, in the '482 patent, the sole described "remote device" to which digital content is uploaded after "pre-processing" is a web server, and the remainder of the specification is riddled with statements and evidence about the totality of the purported "invention" (as opposed to any "embodiment" thereof) evincing the applicant's clear intention to limit the '482 patent to "web-based" methods involving a web server, including:

- The Title ("*Web-Based* Media Submission Tool");

- The Abstract ("The present invention . . . provides an improved *web-based* . . .");

- The Field of the Invention ("The present invention relates to . . . *Internet publishing* of digital content . . .")[53]

- The Summary of the Invention ("The present invention . . . provides an improved *web-based* . . .")[54]

Finally, as required by the asserted claims, the "client device" must receive "pre-processing parameters" from the "remote device" / "device separate from said client device." Thus it is necessary that the "remote device" / "device separate from said client device" contain the "pre-processing parameters" in order to provide them to the client device.  A "web server," consistent with how it is described in the specification, contains HTML text, and can contain and pass down parameter values to browser-side client devices over the Internet.

Accordingly, Mobile Phone Defendants' proposed construction for these terms is supported by the intrinsic evidence, will help the jury apply the claims, and should be adopted.

---

[52] *Abbott Labs. V. Sandoz, Inc.*, 566 F.3d 1282, 1289-90 (Fed. Cir. 2009).
[53] The '482 patent at 1:10-14 (Def. App. 11).
[54] *Id.* at 2:1-4 (Def. App. 11).

F.    "pre-processing . . . using said received pre-processing parameters, said received preprocessing parameters controlling said client device" / "pre-processing . . . at said client device in accordance with one or more preprocessing parameters . . . said one or more pre-processing parameters controlling said client device"

| MOBILE PHONE DEFENDANTS' CONSTRUCTION | REMAINING DEFENDANTS' CONSTRUCTION | PLAINTIFF'S CONSTRUCTION |
|---|---|---|
| The "remote device"* directs the "preprocessing"* during interaction with the client device, based on the "pre-processing parameters"*<br><br>*As these terms are defined. | "pre-processing"* the identified digital content at the client device, the "preprocessing"* being controlled by the received "pre-processing parameters,"* and not by the user, during the interaction of the client and "remote devices"*<br><br>*As these terms are defined. | plain meaning (incorporating the definitions of constituent terms addressed above and below) |

The claim limitations regarding the "controlling" of the client device were first added in March 2010, nearly eleven years after the first patent application in this patent family was filed, to narrow and clarify the scope of the asserted claims.[55]   These changes, like many others that had been made earlier to these and other claims to the purported invention, were made in the face of prior art showing the inventors had not invented much of what they thought they had.

To explain the importance of these newly added claim elements, and how they purport to make the scope of the asserted claims different from the description contained in U.S. Patent No. 6,237,010 to Hui, Plaintiff made the following admission to the Patent Office:

Even assuming that Hui can be said to disclose some form of processing digital content, Hui does not *process digital content using pre-processing parameters* received from a remote device, *the pre-processing parameters controlling* a placement of the digital content into a specified form for publication.   More specifically, any [] processes disclosed by Hui are directed solely by the user.   Control is not effected by a remote device.   For example, Hui does not describe a remote device directing [processing of

---

[55] *See* the '482 patent file history, Mar. 26, 2010 Amendment at 2, 5-6, and 13-14 (Def. App. 23, 26-27, and 34-35, respectively).

digital content].  Instead, the user controls the [processing] using the correction process tools made available to the user.[56]

The distinction drawn between the scope of the claimed invention and the Hui prior art emphasized the importance of the claimed "controlling" of the client device that is "effected by a remote device" while it is "directing" the claimed "pre-processing."  Such directing of the "pre-processing" executed by the client device can only be "effected by a remote device" during the remote device's interaction with the client device, as part of a client-server relationship between the recited devices.

The intrinsic evidence makes it clear that the Patent Office understood the importance of this client-server relationship to the purported invention, and that the scope of the purported invention was limited to situations where the client device performs the pre-processing of the digital content "during communication with [the] server."[57]

If the claimed pre-processing performed by the client device were not required to be directed by the remote device during its interaction with the client device based on the pre-processing parameters, as Plaintiff argued to the Patent Office, there would be nothing left to distinguish the asserted claims from the Hui prior art.

Plaintiff's proposed "plain meaning" construction, once assembled "incorporating the definitions of constituent terms" would read as follows:

> ["In preparation for transmission, modifying the underlying data of the digital content in accordance with the requirements of another device"] . . . using said received ["parameters for specifying the modification of the underlying data of the digital content to meet the requirements of another device,"] said received ["parameters for specifying the modification of the underlying data of the digital content to meet the requirements of another device"] controlling said client device.

---

[56] *Id.* at 22-23 (emphasis added) (Def. App. 43-44).
[57] The '482 patent file history, Jul. 10, 2009 Office Action at 7 (Def. App. 62); *see also id.* at 9 ("during communications between client computer 1 and image server, . . .") (Def. App. 63).

Such a construction gives no meaning to the statements about the scope of the claimed invention that Plaintiff made to the Patent Office, is circular, and would render the claims impossible for a jury to understand and apply.  Again, while Mobile Phone Defendants' proposed construction is rooted in the intrinsic evidence, Plaintiff's proposed construction only seeks to blur the boundaries of the claims, and would remove the distinction Plaintiff drew between its purported invention and the Hui prior art.

### G.    "A computer implemented method of pre-processing digital content in a client device for subsequent electronic [publishing / distribution]"

| MOBILE PHONE DEFENDANTS' CONSTRUCTION | PLAINTIFF'S CONSTRUCTION |
|---|---|
| the steps of the claim performed on the client device are performed during the execution of one computer program | no construction necessary |

When the preamble "recites essential structure that is important to the invention or necessary to give meaning to the claim," it is limiting.  *See Bicon, Inc. v. Staumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006).  That is, when the preamble of a claim does not "simply state[] the intended use or purpose of the invention," but rather "contributes to the definition of the claimed invention," or "provides antecedents for ensuing claim terms and limits the claim accordingly" such that "patentability depends on limitations stated in the preamble," it may limit the claim.  *See C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998); *Catalina Mktg. Int'l. Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 810-11 (Fed. Cir. 2002).

Here, it is important to note that Plaintiff repeatedly amended the preambles of the asserted claims during prosecution of the '482 patent.  For example, original claim 1 used the following preamble: "A method of transporting a *media object* from a *first location* to a *second*

*location*, comprising the steps of:".[58]   After that claim was rejected, the assignee narrowed the claims to a "A computer-implemented method, comprising:".[59]   After that claim was rejected, Plaintiff yet again narrowed the claims to "A computer implemented method of pre-processing media objects in a local device for subsequent transmission to a remote device, comprising:".[60]   And after that claim was also rejected, Plaintiff finally further narrowed the claims to "A computer implemented method of pre-processing digital content in a client device for subsequent electronic publishing:".[61]   Indeed, these preamble amendments were reflected in amendments to the subsequent limitations, which found antecedent basis in the preamble.

For example, the preambles provide antecedent basis for the claimed "said client device," and thus are limiting because they breathe life into the claims.  *See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) (holding that because "intracellular marker substance" appears in the preamble of claim 1, it provides an antecedent basis for "said marker substance" appearing in the body of the claim, thus "indicating a reliance on both the preamble and claim body to define the claimed invention") (internal citations omitted).

And, beyond providing antecedent basis for subsequent limitations, these extensive amendments indicate Plaintiff's heavy reliance on the preambles during prosecution to seek to distinguish its purported invention from the prior art, transforming the preambles into claim limitations.  The explanations given for the amendments to the preambles add to that clarity.  The addition of these words to the preambles helps define the scope of the purported invention, *see Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1029 (Fed. Cir. 2002), and,

---

[58] The '482 patent file history, Oct. 8, 2004 Application at 15 (emphasis in original) (Def. App. 68).
[59] The '482 patent file history, Mar. 25, 2008 Amendment at 2 (Def. App. 70).
[60] The '482 patent file history, Nov. 21, 2008 Amendment at 2 (formatting omitted) (Def. App. 73).
[61] The '482 patent file history, Dec. 7, 2009 Amendment at 2 (formatting omitted) (Def. App. 65).

thus, they are limitations on the independent claims.[62]  Specifically, the '482 patent describes the claimed "computer implemented method" as "an improved web-based media submission tool."[63] The specification identifies the tool as the "Prepare and Post tools" that operate from "inside a standard browser."[64]  This improved web-based tool allows the alleged invention to "handle[] all of the[] tasks for the user."[65]  In fact, the '482 patent states that the Prepare and Post tools are implemented as ActiveX and Java Applets that are designed to adjust dynamically and work automatically within any web browser.[66]  Thus, every disclosed embodiment is a computer implemented method, *i.e.*, running within one program.

In contrast, the '482 patent distinguishes both FTP and ActiveUpload prior art (the only prior art discussed) on the basis that they were "piecemeal solutions," *i.e.*, not computer implemented methods.[67]  The specification explains that an FTP program must first be downloaded, then installed and finally executed to perform the claimed steps.[68]  The '482 patent describes this as a "daunting" process.[69]  The specification similarly distinguishes the ActiveUpload program because it relies on separate "[s]tandard web authoring tools."[70]  Because ActiveUpload used separate programs for the various steps, it lacked "built in 'intelligence' to streamline the process."[71]

Accordingly, the <u>only</u> point of novelty addressed in the '482 patent itself over prior art "piecemeal solutions" that "lacked built in intelligence" was to integrate all of the steps of the

---

[62] *See also, Textron Innovations, Inc. v. American Eurocopter, LLC*, 773 F.Supp. 2d 650, 659-60 (N.D. Tex.) (holding that "replacement" in preamble was a limitation).
[63] The '482 patent at 2:3-4 (Def. App. 11).
[64] *Id.* at 2:44-60 (Def. App. 11).
[65] *Id.* at 2:60 (Def. App. 11).
[66] *Id.* at 6:33-40 (Def. App. 13).
[67] *Id.* at 1:25 (Def. App. 11).
[68] *Id.* at 1:26-32 (Def. App. 11).
[69] *Id.* at 1:34 (Def. App. 11).
[70] *Id.* at 1:50-60 (Def. App. 11).
[71] *Id.* at 1:65 (Def. App. 11).

claimed process into one computer program that makes up the computer implemented method. This integration allowed the submission of content "immediately without needing to overcome technical obstacles."[72]   The only portion of the asserted claims that requires this integration into a computer implemented method is the preamble.  Thus, under these circumstances, "patentability depends on limitations stated in the preamble" and it limits the claim.  *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998).

More importantly, it is immediately apparent that the preamble is necessary to provide a meaningful relationship between all of the recited steps.  In claim 1, for example, the body of the claim does not specify what device does the receiving in steps (a) or (b) or what does the transmitting in step (d).  Indeed, if not for the preamble, the different steps could be performed by different devices.  Nevertheless, in distinguishing the prior art '983 patent, Plaintiff argued that the transmitting in step (d) was "by a client device," stating, the "'983 Patent does not disclose transmitting, by a client device, pre-processed digital content to a server device."[73]  The only support for transmitting "by a client device" is the requirement in the preamble that all of the claimed steps (including transmitting) are part of a computer implemented method "in a client" device.  As such, all of the steps recited in the bodies of the asserted claims must be performed as part of a computer implemented method, *i.e.*, one computer program, in a client device as stated in the preamble of every claim.

For the reasons given above, the Court should hold that "a computer implemented method of pre-processing digital content in a client device for subsequent electronic publishing" and the other similar preambles are limitations on the asserted claims and construe these claims

---

[72] *Id.* at 2:63-64 (Def. App. 11).
[73] The '482 patent file history, Dec. 7, 2009 Amendment at 22 (Def. App. 66).

to require "the steps of the claim performed on the client device [be] performed during the execution of one computer program."

**H.** **"receiving . . . from a remote device" / "received . . . from a device separate from a client device" / "provided to said client device by a device separate from said client device"**

| MOBILE PHONE DEFENDANTS' CONSTRUCTION | PLAINTIFF'S CONSTRUCTION |
|---|---|
| the "pre-processing parameters"* are received by the client device as part of the "computer implemented method of preprocessing digital content in a client device . . ."* <br><br> *As these terms are defined. | no construction necessary |

The parties dispute whether the claimed reception of parameters must be performed as part of the same computer implemented method, *i.e.*, the same computer program, as the remaining steps claimed in the computer implemented method. For the reasons given above, the preamble requires that all of the claimed steps be performed as part of the same process carried out by executing one computer program. The '482 patent file history confirms that it is particularly inappropriate to sever the reception of parameters steps from the other steps because the asserted claims were amended or added with language responsive to rejections by the Patent Office to require reception of parameters as part of the claimed computer implemented method.

Prior to Plaintiff's March 26, 2010 amendments to the claims, the pending claims were broad enough to include the use of parameters received at some earlier time as part of a different computer implemented method. For example, asserted claim 1 (then pending as claim 16) claimed a "computer implemented method" but only required pre-processing "with previously received pre-processing parameters." Thus, prior to the amendment, the pre-processing parameters might have been received some time earlier as part of some unidentified and

unrelated process.  The Patent Office properly rejected claim 16 on the basis that "previously received pre-processing parameters" was indefinite under 35 U.S.C. §112, second paragraph.[74] In response, Plaintiff amended pending claim 16 and changed the indefinite "previously received pre-processing parameters" to require the active step of "receiving pre-processing parameters" in the body of the claim.[75]  In other words, Plaintiff narrowed the scope of the claims to specify that the pre-processing parameters were received as part of the claimed "computer implemented method of pre-processing digital content in a client device . . . ."

Similarly, asserted claim 13 (then pending as claim 28), claimed a "computer implemented method" but only required pre-processing with "parameters that are available to said local device."  Thus, prior to the amendment, the pre-processing parameters might have been received earlier as part of some other process, as long as they were "available" during the claimed computer implemented method.  That claim was properly rejected as well.[76]  Plaintiff then amended the claim to require that the parameters "are received from a device separate from said client device."[77]  Thus, Plaintiff narrowed this claim as well to specify the receipt of the parameters as part of the claimed "computer implemented method of pre-processing digital content in a client device . . . ."

Asserted claim 38 was added (then pending as claim 86) in the same amendment, similarly requiring the parameters "being provided to said client device" as part of the claimed "computer implemented method of pre-processing digital content in a client device . . . ."[78]

Thus, for each of the independent claims asserted against Mobile Phone Defendants, the claims were narrowed (or, for claim 38, added) to require the active receipt of the claimed

---

[74] The '482 patent file history, Jan. 22, 2010 Rejection at 4 (Def. App. 76).
[75] The '482 patent file history, Mar. 26, 2010 Amendment at 2 (Def. App. 23).
[76] The '482 patent file history, Jan. 22, 2010 Rejection at 4 (Def. App. 76).
[77] The '482 patent file history, Mar. 26, 2010 Amendment at 5 (Def. App. 26).
[78] *Id.* at 14 (Def. App. 35).

parameters as part of the claimed "computer implemented method of pre-processing digital content in a client device . . . ." The Patent Office properly refused to give Plaintiff claims to a computer implemented method that used "previously received" parameters. Plaintiff should not be allowed to recapture that subject matter by arguing that the receiving step need not be part of the same computer implemented method as the rest of the claim.

I.    "information that enables identification of a user" / "user identifier" / "user information"

| MOBILE PHONE DEFENDANTS' CONSTRUCTION | PLAINTIFF'S CONSTRUCTION |
|---|---|
| information related to a person, as opposed to a device | information related to a person |

The parties dispute whether these limitations require "user" information as claimed, or whether they can be rewritten to cover mere "device" information, regardless of the actual user. By specifically referring to a "user," the claims require information that identifies the person using a device, as opposed to the device itself.[79]

The parties agree that this term means "related to a person" but Plaintiff indicated during the meet and confer process its proposed construction would include mere device-identifying information. Thus, regardless of the words used in the adopted construction, the Court's ruling must resolve whether mere device-identifying information is within the scope of the user-identifying claim limitations.

---

[79] *See Timecertain, LLC v. Authentidate Holding Corp., et al,* Case No. 8:05-cv-1559-SDM-EAJ, 2006 WL 3804830, at *16 (M.D. Fla. Dec. 22, 2006), Order (Dkt. 103), p. 16 (M.D. FL Dec. 22, 2006) (holding "user" means person as opposed to machine); *Civix-DDI, LLC v. Hotels.com, L.P., et al.,* Case No. 1:05-cv-06869, 2011 WL 3678689, at *2 (N.D. Ill. Aug. 19, 2011), Memorandum Opinion and Order (Dkt. 650), p. 2 (N.D. IL Oct. 25, 2010) ("'user' means 'a human being'"); *LogicLink, Inc. v. Keylink Service Solutions, Inc., et al.,* Case No. 8:07-cv-1056-DOC (MLGx), 2009 WL 764526, at *8 (C.D. Cal. Mar. 19, 2009), Order Findings of Fact And Conclusions of Law (Dkt. 53), p. 8 (C.D. CA Mar. 19, 2009) ("user identification information" means "'a user's given name or a system user name specially coined by the user that is used to identify the user in each transaction'"); *Soverain Software, Inc. v. CDW Corp., et al.,* Case No. 6:07-cv-511-LED, 2010 WL 1038731, at *4 (E.D. Tex. May 28, 2009), Claim Construction Order (Dkt. 214), p. 4 (E.D. TX May 28, 2009) ("user identifier" means "a text string that identifies a user").

Plaintiff cannot be permitted to rewrite the claims to cover mere device-identifying information.  This is most clear in claim 13, which expressly requires "information that enables identification of a user."  Thus, information that merely enables identification of a "device" is insufficient.  Claim 13 separately claims a client device, remote device, and server device, but never claims information that identifies any claimed device.  In fact, no claim in the '482 patent is directed to device-identifying information, but many claims are directed specifically to other types of information.  *See e.g.*, claim 13 ("information that enables identification of a user"); claim 13 ("an identification of digital content"); claim 19 ("user identifier"); claim 20 ("password"); claim 46 ("file name"); claim 47 ("location information"); claim 48 ("zip code information"); claim 49 ("user information"); and claim 50 ("information describing said digital content").  These claims specify exactly what type of information is required, and Plaintiff should not be permitted to rewrite them.

Other claim limitations also require this conclusion.  For example, claim 13 requires "retrieving" the user information and dependent claim 19 further requires "retrieving in a manner that is transparent to said user."  The specification describes this feature as the client device retrieving the user's user ID and/or password without the user observing that retrieval.[80]  Plaintiff's improper attempt to equate a "user" with a "device" in these claims would result in the claimed client device "retrieving" information about itself in a manner that is "transparent" to itself.  Such a ridiculous result is an additional reason why Plaintiff's attempt to confuse these concepts should be rejected.

Like the claims, the specification and file history properly distinguish between different types of information.  The only pieces of information identified in the specification sufficient to

---

[80] *See* the '482 patent at 4:42-45 (Def. App. 12).

identify the user of a device are the user's user ID and password.[81]  These pieces of information identify the user, but not the device.  The claimed user information is never confused with mere device-identifying information and the specification clearly delineates between user information and other types of information.[82]

Finally, the prosecution history also makes clear that mere device information is not sufficient.  For example, Plaintiff admitted the Hui prior art reference disclosed "information relating to creation and/or capture of the image, such as the type of hardware device used to capture the image and/or settings on the device," but then argued that "Hui does not disclose retrieving information that enables identification of a user."[83]Since Plaintiff argued the device-identifying information in Hui was not user-identifying information during prosecution, it cannot now argue device-identifying is within the scope of the proper construction for the user-identifying terms in this litigation.

The Court should adopt Mobile Phone Defendants' construction, including the phrase "as opposed to a device" to enforce the distinction between the person using the device (*i.e.*, the claimed "user"), and the device itself (*e.g.*, the separately claimed "client device").  Plaintiff's attempt to include mere device-identifying information within the scope of its proposed construction should be rejected.

## V.     CONCLUSION

For the reasons stated herein, Mobile Phone Defendants' intrinsic evidence-based constructions should be adopted, and Plaintiff's obfuscatory constructions should be rejected.

---

[81] *Id.* at 4:42-45 (Def. App. 12).
[82] *See, e.g., id.* at Abstract; 2:20-25 (both distinguishing between user information and media object information)
(Def. App. 3 and 11, respectively).
[83] The '482 patent file history, Mar. 26, 2010 Amendment at 21, 30, 32 (emphasis in original) (Def. App. 42,51, and
53 respectively).

Dated:  December 23, 2011

Respectfully submitted,

FISH & RICHARDSON P.C.


By:  */s/ Robert C. Earle*
     Thomas M. Melsheimer
     Texas Bar No. 13922550
     melsheimer@fr.com
     Thomas H. Reger II
     Texas Bar No. 24032992
     reger@fr.com
     Robert C. Earle
     Texas Bar No. 24002029
     earle@fr.com
     1717 Main Street, Suite 5000
     Dallas, Texas 75201
     (214) 747-5070 (Telephone)
     (214) 747-2091 (Facsimile)

     HAYNES and BOONE LLP
     John R. Emerson
     State Bar No. 24002053
     2323 Victory Avenue, Suite 700
     Dallas, Texas 75219
     Telephone: (214) 651-5000
     Facsimile: (214) 651-5940
     russ.emerson@haynesboone.com

     COUNSEL FOR DEFENDANTS
     **RESEARCH IN MOTION CORPORATION**
     AND **RESEARCH IN MOTION LIMITED**

*/s/ Robert C. Earle, with permission*
*On behalf of the following Defendant*
Robert W. Kantner
robert.kantner@dlapiper.com
State Bar No. 11093900
DLA PIPER LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201-4629
Phone: 214.743.4544
Fax: 972.813.6256

Brian K. Erickson
brian.erickson@dlapiper.com
State Bar No. 24012594
Todd S. Patterson
todd.patterson@dlapiper.com
State Bar No. 24060396
DLA PIPER LLP (US)
401 Congress Avenue, Suite 2500
Austin, TX 78701-3799
Tel: 512.457.7000
Fax: 512.457.7001

OF COUNSEL:

Mark Fowler (pro hac vice)
mark.fowler@dlapiper.com
Chang Kim (pro hac vice)
changu.kim@dlapiper.com
DLA PIPER LLP (US)
2000 University Avenue
East Palo Alto, CA 94303
Tel: 650.833.2000
Fax: 650.833.2001

**COUNSEL FOR DEFENDANTS**
**SAMSUNG ELECTRONICS CO., LTD.**
**AND**
**SAMSUNG TELECOMMUNICATIONS**
**AMERICA LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 23, 2011, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5.1.

*/s/ Robert C. Earle*
Robert C. Earle