IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SUMMIT 6 LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:11-cv-367-O |
| | § | |
| RESEARCH IN MOTION | § | |
| CORPORATION, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## CLAIM CONSTRUCTION ORDER

Before the Court are Plaintiff Summit 6 LLC's ("Plaintiff") Opening Claim Construction Brief, with appendix in support (ECF Nos. 106, 113); Defendants Facebook, Inc., Photobucket Corp., and Multiply, Inc.'s (collectively, the "Web Defendants") Responsive Claim Construction Brief (ECF No. 117); and Defendants Research in Motion Corporation, Research in Motion Limited, Samsung Electronics Co. Ltd., and Samsung Telecommunications America LLC's (collectively, the "Mobile Phone Defendants") Responsive Claim Construction Brief, with appendix in support (ECF Nos. 118-19). Also before the Court are the Web Defendants' Opening Claim Construction Brief, with appendix in support (ECF Nos. 108, 114), and Plaintiff's response thereto (ECF No. 120). Finally before the Court are the Mobile Phone Defendants' Opening Claim Construction Brief, with appendix in support (ECF Nos. 115-16), and Plaintiff's response thereto (ECF No. 122).

## I.      BACKGROUND

Plaintiff is the current owner of two Patents-in-Suit: (1) United States Patent Number 6,895,557 (the "'557 Patent"), filed on July 21, 1999 and issued on May 17, 2005; and (2) United

States Patent Number 7,765,482 (the "'482 Patent"), a continuation of the '557 Patent application filed on October 8, 2004 and issued on July 27, 2010.  The parties seek construction of twelve sets of terms appearing in one or both of the '557 and '482 patents: (1) "pre-processing"; (2) "pre-processing parameters" and "parameters used to control the pre-processing"; (3) "pre-processing the media object by the media object identifier for the requirements of the third-party website, the pre-processing being done without [additional] user selection of the pre-processing"; (4) "pre-processing the media object . . . for the requirements of the third-party web site"; (5) "placement of . . . digital content into a specified form" or "to place . . . digital content in a specified form"; (6) "remote device" or "device separate from said client device"; (7) "information that enables identification of a user" or "user identifier" or "user information"; (8) "publishing" or "publication"; (9) "a computer implemented method of pre-processing digital content in a client device for subsequent electronic [publishing / distribution]"; (10) "receiving . . . from a remote device" or "received . . . from a device separate from a client device" or "provided to said client device by a device separate from said client device"; (11) "displaying a preview image of said selected digital content"; and (12) "pre-processing in accordance with one or more pre-processing parameters that have been stored in memory of said client device" and similar terms.  The parties have agreed on the construction of two additional terms: (13) "combining (including stitching) of multiple media objects," and (14) "adding text or other annotation to the media object."

## II.    LEGAL STANDARDS – PATENT CLAIM CONSTRUCTION

Patent infringement is the unauthorized making, using, selling, offering to sell, or importing into the United States of any patented invention during the term of the patent.  35 U.S.C. § 271(a).  In a patent infringement case, a court first determines the proper construction of the patent claims

by establishing, as a matter of law, the scope and boundaries of the subject-matter of the patent. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 384-85 (1996). Second, the trier of fact compares the properly construed claims to the allegedly infringing devices and determines whether there has been an infringement. *Id.* Here, the issue currently before the Court is the proper construction of certain disputed claims in the '557 Patent and the '482 Patent.

A.     Rules of Claim Construction

The claims of a patent are the numbered paragraphs at the end of the patent that define the scope of the invention, and thus the scope of the patentee's right to exclude others from making, using, or selling the patented invention. *See Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1335-36 (Fed. Cir. 2004). Claim construction is the process of giving proper meanings to the claim language thereby defining the scope of the protection. *See Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995) (internal citations omitted).

Claim construction starts with the language of the claim itself since a patent's claims define the invention to which the patentee is entitled the right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. Moreover, claim terms should be given their ordinary and customary meaning as understood by a person of ordinary skill in the art as of the effective filing date of the patent application. *Id.* at 1313. This is because a patent is addressed to, and intended to be read by, others skilled in the particular art. *Id.* However, the patentee is free to define his own terms, so long as any special definition given to a term is clearly defined in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).

When construing disputed claim terms the court should look first to the intrinsic record of the patent, including the claims and the specification, to determine the meaning of words in the claims. *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005). "[T]he specification is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted). The specification acts as a dictionary when it expressly or implicitly defines terms. *Id.* at 1321. Courts should also refer to the prosecution history if it is in evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The prosecution history is part of the intrinsic record and consists of a complete record of all proceedings before the United States Patent and Trademark Office, including prior art cited during the examination of the patent, and express representations made by the applicant as to the scope of the claims. *Id.*

The Federal Circuit has also stated that district courts may "rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Philips, 415 F.3d at 1317 (internal quotation marks omitted). Dictionaries and treatises can be "useful in claim construction[,]" particularly technical dictionaries which may help the court "to better understand the underlying technology and the way in which one of skill in the art might use the claim terms." *Id.* at 1318 (internal quotation marks omitted). As to expert testimony, the Federal Circuit has stated:

> [E]xtrinsic evidence in the form of expert testimony can be useful to
> a court for a variety of purposes, such as to provide background on
> the technology at issue, to explain how an invention works, to ensure
> that the court's understanding of the technical aspects of the patent is
> consistent with that of a person of skill in the art, or to establish that

4

> a particular term in the patent or the prior art has a particular meaning
> in the pertinent field.

*Id.* However, "a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Id.* (internal quotation marks omitted). Extrinsic evidence is less significant than the intrinsic record and undue reliance on it may pose a risk of changing the meaning of claims, contrary to the public record contained in the written patent. *Id.* at 1317, 1319.

## III.    CLAIM CONSTRUCTION ANALYSIS

1.    "pre-processing"

| Plaintiff | Web Defendants | Mobile Phone Defendants |
|---|---|---|
| "in preparation for transmission, modifying the underlying data of the media object [digital content] in accordance with the requirements of another device" | "modifying the [media object data / data of the digital content] at the browser before transmitting to a server device" | "modifying the digital content at the client device before transmitting to a server device" |

The parties agree that pre-processing involves modification of the material being pre-processed and that pre-processing occurs prior to transmission of the pre-processed material. However, the parties dispute: (a) what material is pre-processed; (b) where pre-processing occurs; (c) where the pre-processed material is transmitted; and (d) whether pre-processing is done "in accordance with the requirements of another device."

a.    *What material is pre-processed?*

The Plaintiff, the Web Defendants, and the Mobile Phone Defendants offer the following

5

respective suggestions as to what material is pre-processed: (1) "the underlying data of the media object [digital content]"; (2) "the [media object data / data of the digital content]"; and (3) "the digital content."

Relying on the prosecution history, Plaintiff argues that pre-processing occurs to "the underlying data of the media object [digital content]." *See* Pl.'s Opening Br. 9, ECF No. 106. Plaintiff states that, consistent with this construction, the applicants distinguished the Hui prior art by noting that "[t]he image correction process [of Hui] does not modify the underlying image data . . . [but] is designed to add or delete information . . . that is separate from the image data." *See id.* (quoting App. Supp. Pl.'s Opening Br. ('482 Patent, Resp. Office Action of Jan. 22, 2010), at App. 100, ECF No. 113). In this context, Plaintiff also refers to the applicants' response to the written description rejection, which states that "the client device pre-processes digital content." *See id.* (quoting App. Supp. Pl.'s Opening Br. ('482 Patent, Resp. Office Action of Jan. 22, 2010), at App. 95, ECF No. 113). The Web Defendants respond that Plaintiff's use of the term "underlying data" does not resolve the parties' basic dispute over what types of modifications constitute pre-processing. *See* Web Defs.' Opening Br. 14, ECF No. 108. Likewise, the Mobile Phone Defendants criticize the phrase "underlying data" as being a "nebulous concept[]." *See* Mobile Phone Defs.' Responsive Br. 12, ECF No. 118.

The Web Defendants argue that pre-processing requires modifying "the [media object data / data of the digital content]." *See* Web Defs.' Opening Br. 14-15, ECF No. 108. According to the Web Defendants, this construction properly limits pre-processing to modification of the actual image or sound data of a media object, as opposed to associating other data–like a comment, tag, or file name–with the image data. *See id.*

6

The Mobile Phone Defendants argue that pre-processing should be understood as modifying "the digital content," since the prosecution history twice refers to "pre-processing of the media object." *See* Mobile Phone Defs.' Opening Br. 13, ECF No. 115 (quoting App. Supp. Mobile Phone Defs.' Opening Br. ('482 Patent, Resp. Office Action of Feb. 4, 2009), at App. 59-60, ECF No. 116). Plaintiff agrees with the Mobile Phone Defendants that the data being modified during pre-processing "would be actual digital content data and not data separate from the digital content." Pl.'s Resp. to Mobile Phone Defs. 10, ECF No. 122.  Nevertheless, Plaintiff argues that its proposed language, while similar to the Mobile Phone Defendants' proposal, is more precise.  *See id.*

With regard to what material is pre-processed, the parties' only dispute is how best to express their consensus that the actual media object or digital content, as opposed to data merely associated with the media object or digital content, is subject to pre-processing.  During the prosecution history, the applicants repeatedly stated that, in the case of an image, the material subject to pre-processing is the "image data." *See* App. Supp. Pl.'s Opening Br. ('482 Patent, Resp. Office Action of Jan. 22, 2010), at App. 99-100, ECF No. 113.  Replacing the term "image" with the broader terms "media object" and "digital content" as used in the claims, *see, e.g.*, '557 Patent claim 1; '482 Patent claim 1, the Court essentially arrives at the Web Defendants' proposal of "media object data" or "digital content data."  While the applicants consistently used the term "data" in the prosecution history, the applicants apparently struggled with the best way to differentiate "image data" from data merely associated with an image.  Accordingly, the applicants modified "image data" in a variety of ways, as by describing: "raw data for the image"; "the image data itself"; "the image data contained within the . . . file"; "the underlying image data contained within the . . . file"; and "actual image data." *See* App. Supp. Pl.'s Opening Br. (Resp. Office Action of Jan. 22, 2010), at App. 99-100, ECF No. 113.

7

Likewise, the applicants noted that the Hui prior art merely modified "information associated with the image"; "information . . . that is separate from the image"; "separate information that is associated with the image data"; and "information associated with digital content." *See id.* Based on the foregoing, the Court finds it would be helpful to the jury to clarify that the material subject to pre-processing does not include data merely associated with the media object or digital content.

Accordingly, the Court finds that the material subject to pre-processing is "[media object data] / [digital content data], as opposed to data merely associated with the [media object] / [digital content]."

> ### b.    *Where does pre-processing occur?*

Plaintiff's proposed construction is silent as to where pre-processing occurs. By contrast, the Web Defendants argue that pre-processing occurs "at the browser," while the Mobile Phone Defendants suggest that pre-processing occurs "at the client device."

The Web Defendants argue that pre-processing must occur "at the browser" and not on a server. *See* Web Defs.' Opening Br. 11-13, ECF No. 108. In support of this contention, the Web Defendants first argue that the claims of the '557 and '482 Patents require pre-processing to occur at a browser. *See id.* (quoting '557 Patent claims 1, 45 and '482 Patent claim 1). Next, the Web Defendants argue that the specification disavows non-browser based pre-processing by identifying the "browser, or client side intelligence" of the Prepare and Post tools as a "key differentiator" from the prior art. *See id.* (quoting '557 Patent col.4, ll.58-60). Furthermore, the Web Defendants state that the written description demonstrates the scope of the claimed invention by repeatedly and uniformly referring to pre-processing as being web-based and occurring at a browser. *See id.* (quoting '557 Patent col. 2, ll.40-44, 48-51). Moving to the prosecution history, the Web Defendants

argue that the applicants distinguished the Fredlund prior art and their own invention by noting that the former involved server-side processing while the latter required browser-side processing. *See id.* (quoting App. Supp. Web Defs.' Opening Br. ('482 Patent, Resp. Office Action of Feb. 4, 2009), at App. 127-29, ECF No. 114). Based on the foregoing, the Web Defendants claim that pre-processing is properly located "at the browser." *See id.*

In response to the Web Defendants, Plaintiff first argues that locating all pre-processing "at the browser" would nullify important differences between the claims of the '557 Patent and would make the broader claims of the '482 Patent superfluous. *See* Pl.'s Resp. to Web Defs. 4-9, ECF No. 120. Accordingly, Plaintiff states that the applicants knew how and when to inform the reader of a "browser" requirement by using that term in certain claims, including Claims 56 and 71 of the '557 Patent, but not using the term elsewhere in the '557 Patent or in any claim of the '482 Patent. *See* Pl.'s Opening Br. 10-11, ECF No. 106. Next, Plaintiff argues that the Web Defendants' "at the browser" limitation is improper because it takes a description from the preferred web browser embodiment and reads it into the claims of the '557 and '482 Patents. *See* Pl.'s Opening Br. 10-11, ECF No. 106. Here, Plaintiff notes that each of the Web Defendants' citations to the written description is to a discussion of the preferred embodiment, not the invention as a whole. *See* Pl.'s Resp. to Web Defs. 4-9, ECF No. 120. Finally, Plaintiff argues that the prosecution history cited by the Web Defendants nowhere mentions the narrow concept of "browser"-side processing but distinguishes Fredlund on the more general basis of "device"-side processing. *See id.*

For their part, the Mobile Phone Defendants argue that pre-processing occurs "at the client device." *See* Mobile Phone Defs.' Opening Br. 13, ECF No. 115. In support of this proposal, the Mobile Phone Defendants quote the same prosecution history as the Web Defendants, including the

9

applicants' statement that "pre-processing occurs prior to upload at the local device."  *See id.*
(quoting App. Supp. Mobile Phone Defs.' Opening Br. ('482 Patent, Resp. Office Action of Feb. 4,
2009), at App. 59-60, ECF No. 116-4).  Other than offering a proposed construction that is silent as
to the location of pre-processing, Plaintiff offers no response to the Mobile Phone Defendants'
suggestion that pre-processing occurs "at the client device."  *See* Pl.'s Resp. to Mobile Phone Defs.
8-11, ECF No. 122.  As such, the Web Defendants in their responsive briefing state that Plaintiff has
not disputed that pre-processing requires processing on the user's device.  *See* Web Defs.'
Responsive Br. 4, ECF No. 117.

In determining where pre-processing occurs, the Court has started with the language of the
claims.  As Plaintiff concedes, the majority of the claims appearing in the '557 Patent–which discuss
pre-processing by a "media object identifier . . . embedded within a third party web site"–may fairly
be read to require pre-processing in a browser.  *See, e.g.*, '557 Patent claim 1.  Importantly, however,
the "browser" limitation is not supported by every claim of the '557 Patent, such as claims which
recite pre-processing "at the local computer."  *See id.* claim 45.  Furthermore, the language of the
'482 Patent nowhere refers to a browser, but consistently describes pre-processing either "in a client
device" or "in a local device."  *See, e.g.*, '482 Patent claims 1, 11.  Because the claim language is
not limited to pre-processing "at the browser," the Court may impose a browser limitation only if
the specification defines pre-processing to occur at the browser, or if the intrinsic evidence contains
a disavowal of claim scope so as to limit the broadly drafted pre-processing claims to include an "at
the browser" limitation.  *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-68
(Fed. Cir. 2012) (refusing to find "lexicography or disavowal" absent a clearly expressed intent to
redefine a term or limit claim scope, noting that the court does not "read limitations from the

10

specification into claims" and "[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments"). For the reasons argued by Plaintiff, the Court agrees that the intrinsic evidence relied upon by the Web Defendants in support of their "at the browser" limitation is insufficient to constitute a disavowal of claim scope. Specifically, the Court notes that: (1) the portions of the specification that discuss pre-processing within a browser relate to the preferred web site embodiment, and may not be grafted upon the claims as a whole; and (2) the applicants distinguished the Fredlund prior art on the basis of client-side processing, not processing within a browser. Furthermore, the Court finds that the applicants' description of the current invention as a "web-based media submission tool" is not a "clear and unmistakable disclaimer" of pre-processing that occurs outside of a browser. *See id.*

Though the Court finds imposing an "at the browser" limitation would be improper, the Court disagrees with Plaintiff that the definition of pre-processing may be silent as to the location of pre-processing. The claim language refers to pre-processing either: (1) by a "media object identifier"; or (2) at the "local computer," "client device," or "local device." *See* '557 Patent claims 1, 45; '482 Patent claims 1, 11. As to the "media object identifier" recited in certain claims of the '557 Patent, the applicants made clear in the prosecution history that this claim feature enables "client-side pre-processing." *See* App. Supp. Web Defs.' Opening Br. ('557 Patent, Interview Summ. Feb. 27, 2003), at App. 219, ECF No. 114-4. Elsewhere in the prosecution history, the applicants consistently characterized pre-processing as occurring either "at the client device" or "at the local device." *See, e.g., id.* ('482 Patent, Resp. Office Action of Feb. 4, 2009), at App. 127, ECF No. 114-3 ("local device"); *id.* ('482 Patent, Resp. Office Action Jan. 22, 2010), at App. 199, ECF No. 114-4 ("client device").

11

Based on the foregoing, the Court finds that locating pre-processing "at the client or local device" is supported by the claim language and prosecution history, and is sufficiently broad so as to be consistent with each claim of the '557 and '482 Patents. Accordingly, the Court finds that pre-processing must occur "at the client or local device."

>        c.        *Where is the pre-processed material transmitted?*

Plaintiff's proposed construction is silent as to where pre-processed material is ultimately transmitted. For their part, the Web Defendants and the Mobile Phone Defendants both argue that pre-processed material is transmitted "to a server device."

As far as the Court can discern, the Web Defendants generally argue that, because the '557 and '482 Patents claim a web-based invention, pre-processed material must be transmitted "to a server device." *See generally* Web Defs.' Opening Br., ECF No. 108; Web Defs.' Responsive Br., ECF No. 117. More specifically, the Web Defendants point to the preferred embodiment's statement that pre-processing results in transportation "to a second location," which the specification earlier defines as a "server." *See* Web Defs.' Responsive Br. 8, ECF No. 117 (citing '557 Patent col.4 l.67-col.5 l.2). The Web Defendants also direct the Court's attention to the specification and their arguments regarding the meaning of "remote device," which they suggest should be construed as a "web server." *See id.* at 4 n.7, 29-30. The Mobile Phone Defendants do not specifically explain their use of the phrase "to a server device," but quote the prosecution history in general support of their proposed construction. *See* Mobile Phone Defs.' Opening Br. 13, ECF No. 115 (quoting App. Supp. Mobile Phone Defs.' Opening Br. ('482 Patent, Resp. Office Action of Feb. 4, 2009), at App. 59-60, ECF No. 116-4).

Addressing the Defendants' joint position, Plaintiff first argues that a construction requiring

pre-processed material to be transmitted "to a server device" would conflict with the claim language, since certain claims recite transmission to a "remote device," other claims use the narrower term "server device," and Claim 1 uses both terms.  *See* Pl.'s Opening Br. 9, ECF No. 106.  The Mobile Phone Defendants suggest that this argument is irrelevant to their position because the claims in which the term "remote device" is used instead of "server device" are not asserted against the Mobile Phone Defendants.  *See* Mobile Phone Defs.' Responsive Br. 13, ECF No. 118.  Plaintiff replies that such unasserted claims are relevant to claim construction because the term "pre-processing" should be construed in a manner that is consistent throughout the patent, including in the context of unasserted claims.  *See* Pl.'s Resp. to Mobile Phone Defs. 9-10, ECF No. 122 (citing *Eolas Techs., Inc. v. Adobe Sys., Inc.*, 810 F. Supp. 2d 795, 798 (E.D. Tex. 2011).  Next, Plaintiff argues that the Web Defendants improperly refer to pre-processed material being transmitted to a server in the preferred embodiment, because mere disclosure of a single embodiment does not limit the scope of the claims, and the Patents do not otherwise disclose a "server" limitation on pre-processing.  *See id.* at 10.  Finally, Plaintiff responds that the prosecution history cited by the Mobile Phone Defendants is contrary to their proposal, since it uses the term "remote device" rather than "server device."  *See* Pl.'s Resp. to Mobile Phone Defs. 9, ECF No. 122.

The Court begins by noting that the claim language recites transmission of pre-processed material to a "server device" in some claims and to a "remote device" in others.  *See, e.g.*, '482 Patent claim 1 ("server device"); *id.* claim 11 ("remote device").  Accordingly, the claim language does not support Defendants' universal "server limitation."  Furthermore, the Court finds that the applicants nowhere disclaimed pre-processing involving transmission of pre-processed material to a device other than a server device.  *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362,

1365-68 (Fed. Cir. 2012).  As discussed *infra*, the Court also finds that the term "remote device" should not be construed as a "server" or "web server," but should be defined more broadly than the term "server device."  *See infra* Part III.6.  Finally, the Court notes that the intrinsic history, including the portions cited by the Web Defendants, consistently describe the invention as involving pre-processing of material prior to "upload to [a] remote device."  *See, e.g.*, App. Supp. Mobile Phone Defs.' Opening Br. ('482 Patent, Resp. Office Action of Feb. 4, 2009), at App. 59-60, ECF No. 116-4.

Based on the foregoing, the Court finds that the invention pre-processes material in preparation for transmission "to a remote device."  The Court finds that this construction is consistent with each claim of the '557 and '482 Patents and is supported by the intrinsic record.

> d.      Is pre-processing done *"in accordance with the requirements of another device"?*

Finally, the parties dispute Plaintiff's claim that pre-processing is done "in accordance with the requirements of another device."

Plaintiff argues that the specification and prosecution history make clear that pre-processing prepares media for transmission using the specifications of another device.  *See* Pl.'s Opening Br. 8, ECF No. 106.  Specifically, Plaintiff points to language in the specification, which states that the "submission tool is configurable to perform a variable amount of preprocessing on media objects prior to upload."  *See id.* at 8-9 (quoting '557 Patent col.2 ll.11-15).  Plaintiff also notes that the preferred web site embodiment has the benefit of "meet[ing] [a web site partner's] imaging specifications every time," has "the ability to preprocess the media objects any number of ways prior to transporting to a second location," and "will automatically prepare [media] to meet the

14

requirements of the second location." *See id.* (quoting '557 Patent col.3 ll.2-3, col.4 l.67-col.5 l.2, col.5 ll.19-20).   Furthermore, Plaintiff quotes the applicants' response to a written description rejection of "pre-processing," which states: "In general, the client device pre-processes digital content based on pre-processing parameters obtained from another device.  This pre-processing is performed prior to upload to a server device." *See id.* at 9 (quoting App. Supp. Pl.'s Opening Br. ('482 Patent, Resp. Office Action of Jan. 22, 2010), at App. 95, ECF No. 113).

The Web Defendants do not address Plaintiff's claim that pre-processing is done "in accordance with the requirements of another device." *See generally* Web Defs.' Responsive Br. 4-11, ECF No. 117.  For their part, the Mobile Phone Defendants argue that this added limitation was crafted by the applicants to enable them to later distort the claim scope to avoid prior art. *See* Mobile Phone Defs.' Responsive Br. 12, ECF No. 118.  The Mobile Phone Defendants also criticize this phrase as being unclear, and suggest that a clearer limitation would include the language that Plaintiff quoted from the '482 Patent's specification: "[the imaging recipient's] specifications." *See id.* at 12-13.

As always, the Court begins with the claim language.  Here, the Court notes that the claims variously recite "pre-processing . . . for the requirements of the third-party web site" ('557 Patent claim 1); "pre-processing . . . wherein the web page contains parameters used to control the pre-processing" ('557 Patent claim 45); "pre-processing . . . using . . . pre-processing parameters [received from a remote device]" ('482 Patent claim 1); "pre-processing . . . in accordance with one or more pre-processing parameters that are received from a device separate from said client device" ('482 Patent claim 13); and "pre-processing . . . in accordance with one or more pre-processing parameters that are received from a remote device" ('482 Patent claim 35).  As demonstrated, the

15

claim language requires "pre-processing" to be done: (1) for, using, or in accordance with; (2) requirements, parameters, or pre-processing parameters; (3) of a third-party web site, web page, remote device, or device separate from the client device. Plaintiff's proposal attempts to express these various limitations in a single phrase by defining pre-processing as occurring "in accordance with the requirements of another device." *See* Pl.'s Opening Br. 8, ECF No. 106. Importantly, however, the claims do not define pre-processing as occurring "in accordance with the requirements of another device"; instead, the claims recite pre-processing with the additional limitations described above. Likewise, the prosecution history demonstrates that the applicants understood the term "pre-processing" to be sufficiently broad to encompass systems that may or may not involve pre-processing "in accordance with the requirements of another device." So, for example, the applicants distinguished the Narayen prior art on the basis that "[n]one of the preprocessing described in Narayen is done in response to the acquisition of the media object without additional user input as claimed in independent claims 15, 16, 48, and 49. The modifications of the picture album described in Narayen is done in response to user input arranging the picture album." *See* App. Supp. Web Defs.' Opening Br. ('557 Patent, Resp. Office Action Nov. 8 2002), at App. 55, ECF No. 114-2. Likewise, the applicants distinguished the Hui prior art by noting that "Hui does not process digital content using pre-processing parameters received from a remote device." *See id.* ('482 Patent, Resp. Office Action of Jan. 22, 2010), at App. 210, ECF No. 114-4. The applicants did not, as they could have, alter the definition of pre-processing itself, as by claiming that pre-processing, when used in the claims, *means* modifying digital content in accordance with the requirements of another device. Instead, the applicants used the term pre-processing in a broad sense, but limited the scope of their pre-processing claims through the claim language, as quoted above.

16

Based on the foregoing, the Court finds that the applicants have not defined "pre-processing" to require modification "in accordance with the requirements of another device."  *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-68 (Fed. Cir. 2012).  Rather, the applicants have used "pre-processing" in a broad sense, but have consistently limited the claim language in the ways previously described.  Accordingly, the Court declines to include "in accordance with the requirements of another device" in its construction of the term "pre-processing."

### e.   Construction

Based on the foregoing, the Court finds that "pre-processing" means "modifying the [media object data / digital content data], as opposed to data merely associated with the [media object / digital content], at the client or local device in preparation for transmission to a remote device."

### 2.   "pre-processing parameters / parameters used to control the pre-processing"

| Plaintiff | Web Defendants  Mobile Phone Defendants |
|---|---|
| plain meaning, or  "parameters for specifying the modification of the underlying data of the digital content [media object] to meet the requirements of another device" | "values contained in HTML text that are passed to and direct the code that performs the pre-processing" |

Plaintiff argues that the terms "pre-processing parameters" and "parameters used to control the pre-processing" are self-explanatory once the Court construes "pre-processing."  *See* Pl.'s Opening Br. 12, ECF No. 106.  Alternatively, Plaintiff proposes that these terms be construed to mean "parameters for specifying" the pre-processing. *See id.*  For their part, Defendants argue that these terms should be construed to mean "values contained in HTML text that are passed to and direct the code that performs" the pre-processing. *See, e.g.*, Web Defs.' Opening Br. 15, ECF No.

108.  Each side incorporates its proposed definition of pre-processing into its proposed definition

of "pre-processing parameters" and "parameters used to control the pre-processing."

In its opening brief, Plaintiff does not offer any specific support for its proposed construction,

except to argue that it "is true to the intrinsic record of the patents and avoids the errors introduced

by Defendants' proposal."  *See* Pl.'s Opening Br. 12, ECF No. 106.  Defendants respond that

Plaintiff's proposed definition does nothing to resolve the parties' dispute over the term "parameters"

because it incorporates that term without explaining it.  *See* Web Defs.' Responsive Br. 11, ECF No.

117;  Mobile Phone Defs.' Responsive Br. 14, ECF No. 118.  Furthermore, the Web Defendants

argue that the phrase "the requirements of another device" is ambiguous and should be rejected for

the same reasons as discussed in the "pre-processing" context.  *See* Mobile Phone Defs.' Opening

Br. 15, ECF No. 115.  Plaintiff replies that this phrase is not only clear, but is supported by: (1) the

specification, which describes pre-processing "to meet the requirements of the second location"; and

(2) the prosecution history, where the applicants described pre-processing "based on pre-processing

parameters obtained from another device."  *See* Pl.'s Resp. to Mobile Phone Defs. 11, ECF No. 122

(quoting '557 Patent col.5 ll.16-19; App. Supp. Pl.'s Opening Br. ('482 Patent, Resp. Office Action

of Jan. 22, 2010), at App. 95, ECF No. 113).  Plaintiff also argues that the term "another device" is

sufficiently broad to encompass all claims, which recite pre-processing in accordance with the

requirements of different devices, including a "third-party website" and "one or more devices that

are remote from a server device and said client device."  *Id.* at 12 (quoting '557 Patent claim 1; '482

Patent claim 13).

Defendants argue that their proposal of "values contained in HTML text that are passed to

and direct the code that performs the pre-processing" is proper because it "accurately recites the art-

specific meaning of the term 'parameter'" as used in the disputed patents. *See* Web Defs.' Opening Br., ECF No. 108. Citing a range of extrinsic sources, Defendants argue that a person of skill in the art of HyperText Markup Language ("HTML") programming would understand the term "parameters" to refer to values contained in HTML text that are passed to an applet and allow for customization of an applet "without the need to examine and modify the applet's source code used to process the image." *Id.* at 15-16. Defendants argue that the '557 and '482 Patents use this art-specific meaning, as by explaining that "[c]onfigurable parameters" include "DefaultImageWidth" and "DefaultImageHeight" that set the "width and height of the images after they have been compressed for transmission." *Id.* at 16 (quoting '557 Patent, col.5 ll.46-63); *see also* Mobile Phone Defs.' Responsive Br. 15, ECF No. 118 (quoting '482 Patent, col.5 l.7-col.6 l.6, app. A).

Plaintiff responds to Defendants' proposed construction by conceding that "pre-processing" could be fairly defined as "values directing the pre-processing." *See* Pl.'s Opening Br. 12, ECF No. 106. However, Plaintiff argues, the use of the term "HTML" in Defendants' proposal is an attempt to limit the broadly drafted '482 Patent–which by its claim language is not restricted to web sites, web pages, or HTML–to the preferred web site embodiment. *See id.* at 13. In addition, Plaintiff states that although claims 45 and 60 of the '557 Patent–the only claims of the '557 Patent which refer to pre-processing parameters–are web site related, the claims merely allow for pre-processing parameters to be transmitted by HTML but do not require the use of HTML. *See id.*; *see also* Pl.'s Resp. to Web Defs. 9, ECF No. 120. Next, Plaintiff argues that requiring pre-processing parameters to be transferred using HTML would exclude a preferred embodiment, since Figure 4B employs visual basic ("VB Script") rather than HTML. *See* Pl.'s Resp. to Web Defs. 9, ECF No. 120 (citing '557 Patent fig. 4B). Finally, Plaintiff argues that Defendants unduly rely on extrinsic evidence that

is drawn from a web context and contradicts the intrinsic evidence.  *See id.* at 10.

Based on the foregoing, the Court begins with the parties' agreement that "pre-processing parameters" and "parameters used to control the pre-processing" may fairly be construed as "values directing the pre-processing."   The only question remaining before the Court is whether, as Defendants suggest, such values must also be "contained in HTML text."  Looking first to the claim language, the Court finds no support for limiting pre-processing parameters to values contained in HTML text.  In particular, the Court notes that while certain claims recite a "web page" containing "parameters used to control the pre-processing," *see, e.g.*, '557 Patent claim 45, other claims recite the use of parameters transmitted by a "remote device" or "a device separate from said client device," *see, e.g.*, '482 Patent claims 1, 13.  Defendants argue that their definition is proper because a person of ordinary skill in the art of web design and HTML programming at the time of the invention would have understood "parameters" to refer to values contained in HTML text.  This argument pre-supposes that both the '557 Patent and '482 Patent are limited to a web context.  As discussed with regard to the "at the browser" limitation, the Court finds that the written description, including its reference to the invention as a "web-based media submission tool," does not constitute a clear and unmistakable avowal of claim scope, so as to limit "pre-processing parameters" to an HTML context.  *See Thorner*, 669 F.3d at 1366-67.  Likewise, the Court finds that the reference to the use of HTML values in the written description is unavailing to Defendants because those descriptions appear only in the context of the preferred embodiment, not the invention as a whole. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005); *see also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-68 (Fed. Cir. 2012).  As such, the Court finds that the ordinary meaning of "parameters" is broader than "values contained in HTML text," and that the

20

intrinsic evidence does not serve to limit the scope or definition of this term.

Based on the foregoing, the Court finds that the terms "pre-processing parameters" and "parameter used to control the pre-processing" should be given the full breadth of their ordinary meaning as understood by a person of ordinary skill in the art at the time of the invention.  As such, the Court finds that "pre-processing parameters" and "parameters used to control the pre-processing" mean "values directing the pre-processing."

    3.      "pre-processing the media object . . . without [additional] user selection of the pre-processing"

| Plaintiff | Web Defendants |
|---|---|
| "pre-processing the media object using pre-processing parameters obtained from another device and not pre-processing parameters provided by the user" | "pre-processing the media object without the pre-processing being affected by user provided values or selections" |

Plaintiff argues that the phrase "pre-processing the media object . . . without [additional] user selection of the pre-processing" should be construed as "pre-processing the media object using pre-processing parameters obtained from another device and not pre-processing parameters provided by the user."  *See* Pl.'s Opening Br. 13, ECF No. 106.  By contrast, Defendants propose "pre-processing the media object without the pre-processing being affected by user provided values or selections."  *See* Web Defs.' Opening Br. 17, ECF No. 108.  Here, the parties' dispute centers on what is meant by "the pre-processing being done without [additional] user selection of the pre-processing."

Plaintiff argues that its construction should be adopted because it is consistent with the intrinsic evidence.  *See* Pl.'s Opening Br. 14, ECF No. 106.  First, Plaintiff argues that the specification and its discussion of prior art make clear that the type of user selection avoided by the '557 Patent is user selection of image data requiring "technical sophistication," such as the pixel

21

values appropriate for the destination system. *See id.* (citing '557 Patent col.1 ll.16-30, col.2 ll.52-63, col.3 ll.1-3, col.5. ll.16-20). Specifically, Plaintiff argues that the preferred embodiment allows the user to select the number of photos to upload, what text or caption to include with the photos, a desired photo size, and whether to upload one main photo or a series of photos to be presented as an animation. *See id.* at 15 (citing '557 Patent col.4 ll.20-26 and 48-52, col.3 ll.60-66, fig. 2). Accordingly, Plaintiff argues, the '557 Patent does away with user selection of "complicated, technological input of pre-processing parameters" but allows for "simpler user selections." *See id.* Plaintiff also argues that this proposed construction is consistent with the prosecution history, which explains that "media object identifiers . . . acquir[e] media objects; the media objects being *automatically* pre-processed for the requirements of the third-party web site." *See id.* (quoting App. Supp. Pl.'s Opening Br. ('557 Patent, Resp. Office Action of Nov. 8, 2002), at App. 59-60, ECF No. 113) (emphasis added). Based on the foregoing, Plaintiff contends that the '557 Patent requires a third party to supply one or more sets of pre-processing parameters, such that the user need not select them, but allows the user to make selections that ultimately affect which pre-processing parameters are applied. *See id.*

The Web Defendants respond that Plaintiff's proposal conflicts with the intrinsic evidence. *See* Web Defs.' Responsive Br. 14, ECF No. 117. First, the Web Defendants argue that the claim language bars all user selection of pre-processing and makes no exception for "simple" selections. *See id.* at 15. Next, the Web Defendants point to the prosecution history. *See id.* at 15. Here, the Web Defendants argue that the applicants distinguished the Narayen prior art–which they argue allowed a user to "manipulate (edit) album images" through simple selections–by disclaiming "user . . . selection of the pre-processing once the image has been acquired by the media object identifier."

22

*See id.* at 15 (quoting App. Supp. Web Defs.' Opening Br. ('520 Patent, Office Action of Nov. 1, 2002), at App. 239-40, ECF No. 114-5); *see also id.* (quoting App. Supp. Web Defs.' Opening Br. ('520 Patent, Resp. Office Action of Nov. 1, 2002), at App. 55, ECF No. 114-2).  Finally, the Web Defendants argue that the portions of the written description cited by Plaintiff do not support its position because each relates to user selection of information unrelated to how content will be pre-processed.  *See* Web Defs.' Responsive Br. 17, ECF No. 117.  In sum, the Web Defendants criticize Plaintiff for attempting to rewrite the claim language to say "without using pre-processing parameters provided by the user."  *See* Web Defs.' Opening Br. 17, ECF No. 108.

In support of their own proposal prohibiting user selections that "affect[]" pre-processing, the Web Defendants argue that it captures the plain meaning of the claims and is consistent with the prosecution history.  *See* Web Defs.' Opening Br. 20, ECF No. 108.  Contrary to the Web Defendants' position, Plaintiff responds that a person of ordinary skill in the art would conclude that the claim terms allow for user selection that results in the use of one set of pre-processing parameters over another.  *See* Pl.'s Opening Br. 15, ECF No. 106.  Plaintiff also contends that the Web Defendants' proposal is divorced from the specification.  *See* Pl.'s Resp. to Web Defs. 11, ECF No. 120.  Furthermore, Plaintiff argues that the prosecution history cited by the Web Defendants does not clearly and unambiguously disclaim any and all user selection.  *See id.* at 12.  Here, Plaintiff argues that the Examiner allowed the claims at issue because, while the prior art pre-processed for the requirements of the user, the applicants' invention taught pre-processing for the requirements of a third-party website.  *See id.* at 12.  Although the applicants referred to pre-processing "without additional user input," Plaintiff argues, this language was not argued or accepted by the Examiner in allowing the claims that were initially rejected.  *See id.* at 12-13 (citing App. Supp. Pl.'s Resp. to

Web Defs. ('557 Patent, Office Action of June 4, 2003), at App. 141, ECF No. 120-1).

Beginning with the claim language, the Court notes that claims 1 and 28 of the '557 Patent recite, in relevant part: (1) "associating a media object with the media object identifier," and (2) "preprocessing the media object by the media object identifier for the requirements of the third-party web site, the pre-processing being done without [additional] user selection of the pre-processing." *See* '557 Patent claims 1 ("additional user selection"), 28 ("user selection"). In relevant part, claims 45 and 60 of the '557 Patent disclose: (1) "acquiring a media object with a web page," and (2) "preprocessing the media object . . . without user selection of the pre-processing, wherein the web page contains parameters used to control the pre-processing." *See id.* at claims 45, 60. The parties' dispute centers on the meaning of "without [additional] user selection of the pre-processing." Because the Court has, in relevant part, construed "pre-processing" as "modifying the media object data," *see supra* Part III.1, the instant claim term requires the modifying of the media object data to occur "without [additional] user selection" of that modification. The prosecution history clarifies the meaning of the "without [additional] user selection" claim term. In distinguishing the claimed pre-processing from the Narayen prior art, the applicants stated that "[n]one of the pre-processing described in Narayen is done in response to the acquisition of the media object without additional user input as claimed." *See* App. Supp. Web Defs.' Opening Br. ('557 Patent, Resp. Office Action Nov. 8 2002), at App. 55, ECF No. 114-2. Likewise, the applicants stated that "[t]he modifications of the picture album described in Narayen [are] done in response to user input arranging the picture album." *See id.* Immediately prior to these statements, the applicants argued that, in the relevant claims, "the media objects [are] automatically pre-processed for the requirements of" a web site or third-party web site. *See id.*

24

Plaintiff argues that the prosecution history quoted above should not be used to construe the "without [additional] user selection" limitation for two reasons.  First, Plaintiff argues that these statements actually bear on the "requirements" limitation of the claim language.  The Court disagrees.  The prosecution history quoted above explicitly addresses two separate limitations of the claims at issue: (1) the "requirements of the . . . web site" limitation; and (2) the "without [additional] user selection" limitation.  With regard to the second limitation, the prosecution history makes clear that pre-processing occurs "automatically," "in response to the acquisition of the media object," "without additional user input."  *See* App. Supp. Web Defs.' Opening Br. ('557 Patent, Resp. Office Action Nov. 8 2002), at App. 55, ECF No. 114-2.[1]  Next, Plaintiff argues that the Examiner did not adopt the applicants' discussion of the "without [additional] user selection" limitation in allowing the originally rejected claims.  The Court acknowledges that, in allowing then-numbered claims 15, 16, 48, and 49, the Examiner stated that the "prior art of record fails to teach the combination of claim elements," such as "pre-processing the media object . . . for the requirements of the [third-party] web site," but nowhere mentioned the "without [additional] user selection" limitation.  *See* App. Supp. Pl.'s Resp. to Web Defs. ('557 Patent, Office Action of June 4, 2003), at App. 141, ECF No. 120-1.  Importantly, however, the mere fact that the Examiner did not rely on the applicants'

---

[1]  Here, the Court notes that in the same office action response which describes pre-processing as occurring "automatically," "in response to the acquisition of the media object," and "without additional user input," the applicants amended independent claims 15 and 16 from claiming "in response to the associating step, automatically pre-processing . . . without [additional] user input" to "pre-processing . . . without [additional] user selection of the pre-processing."  *See* App. Supp. Web Defs.' Opening Br. ('557 Patent, Resp. Office Action Nov. 8 2002), at App. 39-40, ECF No. 114-2.  At the same time, the applicants added new claims 48 and 49, which also recited "pre-processing . . . without user selection of the pre-processing."  *See id.* at App. 46-47.  Having made these changes and additions, the applicants nevertheless described the pre-processing as claimed by amended claims 15 and 16, and newly added claims 48 and 49, using the very language which had been removed by amendment from claims 15 and 16.  In doing so, the applicants made clear their understanding that the amendments to claims 15 and 16 did not change the ultimate effect of the claim limitations.

25

statements regarding the "without [additional] user selection" limitation does not read those statements out of the intrinsic record. *See Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1325, 1336 (Fed. Cir. 2011). The applicants in this case attempted to distinguish the Narayen prior art by clarifying the scope of the "without [additional] user selection" limitation. By doing so, the applicants became bound by those statements, regardless of whether the Examiner ultimately agreed with or relied upon them. *See id.* Finally, the Court notes that, although the specification may distinguish between complex and simple user selections, the claim language disclaims any and all user selection "of the pre-processing" following acquisition or association of the media object. Likewise, although Plaintiff's proposed construction equates "of the pre-processing" with "of the pre-processing parameters," this construction is negated by the claim language.

Having considered the parties' arguments and the record in this case, and incorporating its definition of "pre-processing," the Court finds that "pre-processing . . . without [additional] user selection of the pre-processing" means "pre-processing . . . without [additional] user input affecting what pre-processing occurs." This construction is consistent with the claim language, the intrinsic record, and addresses each of the arguments made by Plaintiff against the Web Defendants' proposed construction. Specifically, the Court notes that this construction does not, contrary to Plaintiff's concerns, exclude a preferred embodiment as illustrated by Figure 2. As the written description explains, Figure 2 demonstrates a web site embodiment containing "a web page with various sizes of media object identifiers." *See* '557 Patent col.4 ll.25-26. By selecting one media object identifier over another, the user may decide whether to upload a single image or a number of images to be combined into an animated presentation. *See id.* fig. 2. This decision, in turn, may result in the use of one set of pre-processing parameters over another, since each media object identifier may be

26

generated to use different pre-processing parameters.  *See id.*  Importantly, the user selections allowed by this preferred embodiment are limited to the user choosing which and how many media object identifiers to use.  This selection occurs prior to and as part of the association of the media object with the media object identifier, and does not deal directly with the pre-processing to be performed by the chosen media object identifier or the pre-processing step in which user selection of the pre-processing is excluded.  Likewise, Figure 1 demonstrates a web page containing multiple media object identifiers.  *See id.* fig. 1.  As the written description explains, the user: (1) associates an image with a media object identifier; (2) at his option, inserts a caption, chooses a caption from a menu, or supplies identifying information like an MLS listing number; and (3) clicks a "Send" button which causes the images to be uploaded and processed "immediately according to the configuration" of the media object identifier.  *See id.* col.3 l.58-col.4 l.2.  Here, the user makes selections both before and after association of an image with a media object identifier, but the selections that occur after association do not affect the pre-processing itself.  *See id.*  In other words, while "user selection" which affects pre-processing is prohibited *within* the pre-processing step, the claims and specification contemplate user selections *prior to* the pre-processing step that may ultimately affect what pre-processing occurs, such as selection of one media object identifier over another.  The Court's construction is consistent with these concepts.

Based on the foregoing, the Court finds that "pre-processing . . . without [additional] user selection of the pre-processing" means "pre-processing . . . without [additional] user input affecting what pre-processing occurs."

4. "pre-processing the media object . . . for the requirements of the third-party web site"

| Plaintiff | Web Defendants |
|---|---|
| "pre-processing the media into a format specified for the 'third-party web site'" | "pre-processing the media into the standard format required for publication by the 'third-party web site,'" or |
| third-party web site: | "pre-processing the media into the format required for publication, display, or distribution by the 'third-party web site'" |
| plain meaning, or | |
| "a web site that is not stored at or hosted by the user" | third-party web site: |
| | "a web site operated by a party other than the party that authored the media object identifier" |

Plaintiff argues that "pre-processing the media object . . . for the requirements of the third-party web site" means "pre-processing the media into a format specified for the 'third-party web site,'" with a "third-party web site" being given its plain meaning or being construed as "a web site that is not stored at or hosted by the user."   *See* Pl.'s Opening Br. 18, ECF No. 106.  The Web Defendants originally proposed the construction "pre-processing the media into the standard format required for publication by the 'third-party web site,'" and suggested that "third-party web site" is "a web site operated by a party other than the party that authored the media object identifier."  *See* Web Defs.' Opening Br. 20-21, ECF No. 108.  In response to arguments made by Plaintiff, the Web Defendants have modified part of their proposed construction to "pre-processing the media into the format required for publication, display, or distribution by the 'third-party web site.'"  *See* Web Defs.' Responsive Br. 24, ECF No. 117.  Accordingly, the parties currently dispute: (1) whether "requirements" should be defined as a specified format, or the format required for publication, display, or distribution; and (2) whether a "third-party web site" is a web site not stored at or hosted by the user, or a web site operated by someone other than the author of the media object identifier.

28

a.      *"Requirements"*

With regard to the term "requirements," the Web Defendants argue that the '557 Patent does not cover systems in which the third-party web site is required to perform additional processing on a media object prior to publication, display, or distribution.  *See* Web Defs.' Opening Br. 20-21, ECF No. 108.  In support of their position, the Web Defendants note that the written description describes the invention as creating media objects "made to order," without the need for further processing on the server side.  *See id.* at 22-23 (quoting '557 Patent col.3 l.2).  Likewise, the Web Defendants argue, the prosecution history focuses on eliminating the need for server-side processing prior to publication, display, or distribution as an important distinction over the prior art.  *See id.* at 23 (quoting App. Supp. Web Defs.' Opening Br. ('557 Patent, Resp. Office Action of June 5, 2002), at App. 256, ECF No. 114-6; *id.* ('482 Patent, Resp. Office Action of Feb. 4, 2009), at App. 127-29, ECF No. 114-3).

In response, Plaintiff first argues that the Web Defendants' proposal violates the doctrine of claim differentiation.  *See* Pl.'s Opening Br. 18-19, ECF No. 106.  Here, Plaintiff notes that dependent claims 11 and 36, which narrow independent claims 1 and 28 respectively, recite "requirements [that] relate to presentation requirements of the third party web site."  *See id.* (quoting '557 Patent claims 13, 36).  By defining "requirements" as the format required for publication, display, or distribution, Plaintiff argues, the Web Defendants have rendered claims 11 and 36 superfluous.  *See id.*  The Web Defendants reply that the doctrine of claim differentiation is merely a guide and should not be applied in this case, given that the intrinsic evidence nowhere indicates that the applicants invented a system involving server-side processing.  *See* Web Defs.' Responsive Br. 22-23, ECF No. 117.  Next, Plaintiff argues that the Web Defendants are seeking to introduce

29

a publication, display, or distribution requirement into two independent claims that have no such requirement. *See* Pl.'s Opening Br. 18-19, ECF No. 106 (citing '557 Patent claims 1 and 28). So, for example, Plaintiff notes that claim 14, a dependent claim of claim 1, expressly recites pre-processing that "enables the media object to be displayed on the web site." *See id.* (quoting '557 Patent claim 14). Had the applicants wished to impose a publication, display, or distribution requirement on claims 1 and 28, Plaintiff argues, they could have done so. *See id.* In addition, Plaintiff rejects the Web Defendants' suggestion that the '557 Patent disclaims a system involving server-side processing. *See* Pl.'s Resp. to Web Defs. 14-15, ECF No. 120. In this context, Plaintiff argues that the '557 Patent addresses "pre-processing"–processing prior to transmission–but is agnostic as to whether additional processing occurs thereafter. *See id.* Accordingly, Plaintiff notes, the claims use "comprising" language, such that a system may include unclaimed elements–like "post-processing"–and still fall within the scope of the claims. *See id.* Likewise, Plaintiff contends that because the specification and prosecution history use permissive language–like "can," "ability," and "for example"–when describing the "made to order" benefits of the invention, these benefits should not be construed as claim limitations. *See id.*

For the reasons argued by Plaintiff above, the Court finds that "requirements" should be read broadly as "a format specified by the third-party web site" and not narrowly as " the format required for publication, display, or distribution by the third-party web site." In particular, the Court notes that the presence of dependent claims limiting "requirements" to presentation requirements gives rise to a presumption that the term "requirements" itself is broader than presentation requirements. *See Philips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005). Furthermore, the Court agrees that the claims, which address "pre-processing," are agnostic as to whether processing may occur after

transmission of the pre-processed material.  Finally, although the specification describes as a benefit of the preferred embodiment the fact that the tool eliminates the need for server-side processing, the Court finds that this discussion does not constitute a disclaimer of "post-processing," or otherwise define "pre-processing" so as to exclude processing after transmission of the pre-processed material. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-68 (Fed. Cir. 2012).

Based on the foregoing, the Court finds that "requirements" means "a format specified by the third-party web site."  Next, the Court will construe the term "third-party web site."

　　　　*b.　　"Third-party web site"*

Plaintiff does not argue in support of its proposed construction of "third-party web site" as "a web site that is not stored at or hosted by the user," but dedicates its briefing to addressing the Web Defendants' proposed construction of "a web site operated by a party other than the party that authored the media object identifier." *See* Pl.'s Opening Br. 16-18, ECF No. 106; Pl.'s Resp. to Web Defs. 20-21, ECF No. 120.  The Web Defendants argue that their construction properly accounts for the three parties referenced by the claim language "third-party web site": "(1) the user, (2) the author of the applet or media object identifier, and (3) the third-party web site creator who customized the applet using HTML parameters." *See* Web Defs.' Responsive Br. 21-22, ECF No. 117.  The Web Defendants also contend that the specification limits the scope of the claims by consistently using the term "third-party" to mean a "customer" or "partner" of the applet author who can customize the applet by changing parameters in the HTML code. *See id.* (citing '557 Patent col.5 ll.23-27, 42-60; *id.* at col.3 ll.1-11).  Likewise, the Web Defendants argue that the prosecution history, which emphasizes the ability of the invention to allow third-party web site creators to customize HTML code written by an applet author, supports viewing the term "third-party" from the viewpoint of the

31

applet author, not the user. *See id.* (citing App. Supp. Web Defs.' Opening Br. ('557 Patent, Resp. Office Action of June 5, 2002), at App. 254, ECF No. 114-6; *id.* ('557 Patent, Resp. Office Action of Nov. 8, 2002), at App. 53-54, ECF No. 114-2).

In response, Plaintiff argues that the Web Defendants' proposal introduces a party to the claim language that not is required or mentioned by the claims: the media object identifier author. *See* Pl.'s Opening Br. 20-21, ECF No. 106. In addition, Plaintiff argues, the claim language nowhere provides that the web site operator and the media object identifier author must be separate parties, as the Web Defendants suggest. *See id.* According to Plaintiff, the Web Defendants' proposed construction is yet another attempt to read the specification and its preferred web site embodiment onto claim language that embraces a broader scope. *See id.* So, Plaintiff contends, the specification describes a "preferred scenario where a vendor creates the media object identifier as a turnkey offering for web sites"; nevertheless, the claims are sufficiently broad to encompass a situation in which the web site operator creates not only its own website but the media object identifier. *See id.* Furthermore, Plaintiff argues that the prosecution history cited by the Web Defendants draws a distinction not between a "third-party web site" and the author of a media object identifier, but between a "third-party website" and a client or user. *See* Pl.'s Resp. to Web Defs. 18, ECF No. 120 (quoting App. Supp. Pl.'s Opening Br. ('557 Patent, Resp. Office Action of Nov. 8, 2002), at App. 59-60, ECF No. 113).

In construing "third-party web site," the Court begins with the claim language at issue. Claims 1 and 28 of the '557 Patent disclose "accessing . . . the media object identifier . . . embedded within a third-party web site" and "pre-processing . . . by the media object identifier for the requirements of the third-party web site." '557 Patent claims 1, 28. By contrast, claim 15 of the

'557 Patent recites "accessing a web site containing a media object identifier" and "pre-processing . . . by the media object identifier for the requirements of a web site." *Id.* claim 15. Claims 37 also refers to a "web site" rather than a "third-party web site," while claims 45 and 60 use the term "web page." *See id.* claims 37, 45, 60. As Defendants argue, the language chosen by the applicants in claims 1 and 28 expressly indicates the presence of three parties, while Plaintiff's proposed construction contemplates only a user and a non-user web site operator. Certainly, the term "third-party web site" is unclear when read in isolation because the claims name only two parties: the user and the third-party web site. However, the specification and prosecution history clarify the "third-party" structure dictated by the claim language. Accordingly, the applicants argued to the Examiner that the written description disclosed a "customer web site" as an example of a type of "third party web site." *See* App. Supp. Web Defs.' Opening Br. ('557 Patent, Resp. Office Action of Nov. 8, 2002), at App. 53, ECF No. 114-2. Likewise, the applicants distinguished the Narayen prior art on the basis that "Narayen's use of the word 'client' does not imply embedding, or integrating as an integral component of a business partner's web site. Narayen says nothing about integration into third party web pages." *See id.* at App. 56. Plaintiff correctly notes that the prosecution history distinguishes a "third-party web site" from a "client" or user, not a "media object identifier author." In making this distinction, however, the applicants equated a "third party web page" with "a business partner's web site." *See id.* In turn, the specification makes clear that "web sites (customers)" may include media object identifiers as follows: "To include the Prepare and Post tools media object identifiers on a web page, the customer cuts and pastes code snippets . . . from the [HTML] template into the web page." *See* '557 Patent col.5 ll.24-38. Accordingly, the specification clarifies that a "third-party web site" is a "third-party" because it is a party other than the user and the party which

provided the third-party web site operator with the code necessary to include the media object identifier in the third-party web site.

Considering the intrinsic record as a whole, the Court finds that: (1) the claim term "third-party web site" expressly requires the presence of three parties; (2) the claims disclose only two of the required parties, namely the user and the third-party web site; and (3) the written description and prosecution history make clear that the final party required by the claim language is the party which provided the operator of the third-party web site with the code used to include the media object identifier on the third-party web site.

Based on the foregoing, the Court finds that "third-party web site" means "a web site operated by a party other than: (1) the user, or (2) the party which provided the operator of the web site with the code used to include the media object identifier on the web site."

*c.*      *Construction*

Based on the foregoing, the Court finds that the term "pre-processing the media object . . . for the requirements of the third-party web site" means "pre-processing the media . . . into a format specified by a web site, the web site being operated by a party other than: (1) the user, or (2) the party which provided the operator of the web site with the code used to include the media object identifier on the web site."

5.      <u>"placement of . . . digital content into a specified form" or "to place . . . digital content in a specified form"</u>

<u>Plaintiff</u>                               <u>Web Defendants</u>     <u>Mobile Phone Defendants</u>

plain meaning, or

"filling in a field in a webpage with the digital content"

"modifying the underlying data of the digital content to meet certain specifications"

Plaintiff argues that "placement of . . . digital content into a specified form" or "to place . . . digital content in a specified form" should be given its plain meaning or, in the alternative, construed as "modifying the underlying data of the digital content to meet certain specifications." *See* Pl.'s Opening Br. 21-22, ECF No. 106.  Specifically, Plaintiff argues that placing digital content into a "specified form" is the actual act of modifying the digital content to a particular size, file format, or other specification, as directed by the pre-processing parameters.  *See id.* (citing '557 Patent col.4 l.65-col.5 l.14 and '482 Patent claims 14, 15).

The Web Defendants respond that Plaintiff has pointed to nothing in the intrinsic record to support its interpretation of the term "form."  *See* Web Defs.' Responsive Br. 28-29, ECF No. 117.  The Web Defendants also criticize Plaintiff's construction for failure "to account for the requirement that [once modified,] the digital content conform to the format required for publication, display, or distribution by the server device."  *See id.*  Furthermore, the Web Defendants argue that Plaintiff's construction, which requires the pre-processing parameters to control the pre-processing, conflicts with Plaintiff's earlier position that "without user selection of the pre-processing" does not preclude some user selections that affect pre-processing.  *See id.*  Both sets of Defendants criticize Plaintiff's proposal for conflating the terms "form" and "format" by defining to "place . . . in a specified form" as "changing the format" of the data.  *See, e.g.*, Mobile Phone Defs.' Responsive Br. 6, ECF No. 118.  That these terms have different meanings is supported, the Mobile Phone Defendants argue, by their use in the specification and claim language. *See id.* at 7-8 (as to "format," citing '557 Patent claims

11, 24; '482 Patent claims 24, 27; *id.* at col.4 ll.60-67, col.11 ll.48-53, col.12 ll.30-31) (as to "form," citing '482 Patent fig. 1, fig. 2, col.3 ll.15-19, 44-48, col.4 ll.4-10, col.5 ll.54-col.7 l.26). Likewise, the Web Defendants argue that Plaintiff's construction not only reads out the "placement" limitation of the claim language but effectively erases the distinction between "placement . . . into a specified form" and the separately claimed act of "pre-processing." *See id.* at 7-8 (as to "pre-processing," quoting '482 Patent claims 14, 15) (as to "placement" in a "form," quoting '482 Patent claims 1, 13, 38).

In reply, Plaintiff contends that its proposal does not read out the "placement" limitation but merely captures the idea that "the act of 'placement . . . into a specified form' is the act of pre-processing." *See* Pl.'s Resp. to Web Defs. 4-5, ECF No. 120. Plaintiff also argues that using the term "format" in place of "form" does not change the construction of the term at issue, since the real dispute is whether "form" is limited to a web or HTML form. *See id.* at 6.

Supporting their own construction, Defendants argue that "placement of . . . digital content into a specified form" means "filling in a field in a webpage with the digital content." *See, e.g.*, Web Defs.' Opening Br. 27, ECF No. 108. Defendants explain that, in their construction, a "form" is an HTML form and "placement . . . into a specified form" refers to "dragging-and-dropping an image to a specific field." *See id.* Defendants argue that their construction finds support in the specification, which repeatedly and consistently uses "form" to refer to a web page or HTML form with "fields" into which digital content can be "placed." *See, e.g.*, Mobile Phone Defs.' Opening Br. 6-7, ECF No. 115 (quoting '482 Patent col.3 ll.15-17, 40-47, col.4 ll.4-10, 37-45, col.5 l.54-col.6 l.26, col.7). In addition, Defendants emphasize the specification's description of media objects being "placed" in the media object identifier. *See id.* According to Defendants, the specification of the

36

'482 Patent demonstrates that the scope of the invention, referred to as a "web-based media submission tool," is limited to web page forms with "fields" waiting to be filled with digital content. *See id.* at 7-8 (citing '482 Patent figs. 1, 2).   Citing extrinsic evidence, Defendants also argue that their construction is consistent with the ordinary usage of these terms by relevant persons of ordinary skill in the art–web site creators–in the late 1990s.   *See* Mobile Phone Defs.' Opening Br. 8, ECF No. 115 (citing App. Supp. Mobile Phone Defs.' Opening Br., at App. 86-88, ECF No. 116).

Plaintiff responds that Defendants' proposed construction must fail, particularly when read against: (1) the surrounding claim language, and (2) the parties' agreement that pre-processing parameters direct the code that modifies image data. *See* Pl.'s Resp. to Web Defs. 19, ECF No. 120. Using Defendants' construction, Plaintiff argues, the pre-processing parameters only direct placement of media into a field on a web page.   *See id.*   Next, Plaintiff argues that the prosecution history contradicts Defendants' proposal by demonstrating that the applicants in distinguishing prior art equated "placement . . . into a specified form" with making an actual modification of the image, such as "an application of specific coloring."   *See id.* (quoting App. Supp. Pl.'s Opening Br. ('482 Patent, Resp. Office Action of Jan. 22, 2010), at App. 101, ECF No. 113).   Next, Plaintiff reiterates its position that Defendants' construction improperly reads the preferred web site embodiment into the claims of the '482 Patent when neither the claim language nor the invention is limited to a web context.   *See id.* at 20.   Moving to the extrinsic evidence, Plaintiff criticizes Defendants citing extrinsic evidence that contradicts the intrinsic record, and for relying on handpicked HTML references for the proposition that the term "form" refers to an HTML form.   *See id.* at 21.

For the reasons argued by Plaintiff above, the Court agrees that "placement . . . of content into a specified form" and "to place . . . digital content into a specified form" refer to the actual act

of pre-processing to meet certain specifications, such as the form dictated by "pre-processing parameters."  For reasons discussed throughout this order, the Court also declines Defendants' invitation to read the web-based preferred embodiment onto the broadly drafted claims of the '482 Patent.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005); *see also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-68 (Fed. Cir. 2012).

Accordingly, the Court finds that  "placement . . . of content into a specified form" and "to place . . . digital content into a specified form" mean "modifying the digital content data to meet certain specifications."

6. <u>"remote device" or "device separate from said client device"</u>

| Plaintiff | Web Defendants | Mobile Phone Defendants |
|---|---|---|
| <u>remote device</u>: "device not co-located with the client device" | "web server" | "web server that contains the pre-processing parameters" |
| <u>device separate from said client device</u>: "device other than the client device" | | |

Plaintiff argues that "remote device" and "device separate from said client device" should be given their plain meaning definitions of "device not co-located with the client device" and "device other than the client device" respectively.  *See* Pl.'s Opening Br. 27-29, ECF No. 106.  The Web Defendants suggest "web server" as a construction for these terms, while the Mobile Phone Defendants posit the definition "web server that contains the pre-processing parameters."  *See*  Web Defs.' Opening Br. 29, ECF No. 108; Mobile Phone Defs.' Opening Br. 16, ECF No. 115.

Plaintiff argues that its construction should be adopted because it properly gives distinct meaning to the terms "remote," "separate," and "server" as used in the claims.  *See* Pl.'s Opening Br. 27-29, ECF No. 106.  So, for instance, Plaintiff argues that claim 24 of the '482 Patent

38

purposefully refers to a "remote device" and a "device separate from said client device," while claim 1 uses the separate term "server device." *See id.* Because the claims use these various terms in different ways, Plaintiff argues, they are presumed to have different meanings as conveyed by Plaintiff's proposed construction. *See id.* Next, Plaintiff criticizes Defendants' proposals for confusing terms, like "remote," which identify the location of devices but do not limit their functionality. *See id.* Plaintiff also argues that Defendants' proposals should be rejected because they both attempt to limit the '482 Patent to its preferred web site embodiment. *See id.* For example, Plaintiff notes that each portion of the specification cited by Defendants in support of their proposed construction relates to the preferred embodiment or a piece of prior art rather than the present invention. *See id.*; *see also* Pl.'s Resp. to Web Defs. 29, ECF No. 120. In sum, Plaintiff argues, the specification does not convey a clear intention to limit the claims such that the web-based embodiment may be read onto the broader claims of the '482 Patent. *See id.* at 29-30.

The Mobile Phone Defendants counter that the prosecution history consistently: (1) uses the term "remote" to describe the functionality, rather than the mere location, of a device, and (2) equates the term "remote device" with the only device mentioned in the '482 Patent's specification that is remote or separate from the client device, i.e. a web server containing the pre-processing parameters that are transferred to the client device. *See, e.g.*, Mobile Phone Defs.' Responsive Br. 16-18, ECF No. 118 (quoting App. Supp. Mobile Phone Defs.' Opening Br. ('482 Patent, Resp. Office Action of Feb. 4, 2009), at App. 59, ECF No. 116); *see also* Mobile Phone Defs.' Opening Br. 16-17, ECF No. 115 (quoting '482 Patent col.1 ll.10-14, 51-56, col.2 ll.1-4, col.6 ll.43-48). Accordingly, the Mobile Phone Defendants argue, the context of the claims of the '482 Patent dictates that the terms "remote device" and "device separate from said client device" be understood

as a "web server." *See* Mobile Phone Defs.' Responsive Br. 16-18, ECF No. 118.  Furthermore, the

Mobile Phone Defendants allege that it would be illogical for such servers not to "contain the pre-

processing parameters," since the client device receives the pre-processing parameters from the

server device.  *See id.*  The Web Defendants' arguments are similar to those of the Mobile Phone

Defendants, except that the Web Defendants do not argue that the "web server" must "contain the

pre-processing parameters."  *See* Web Defs.' Responsive Br. 29-30, ECF No. 117.

Looking first to the claim language, the Court agrees with Plaintiff that the terms "remote

device," "device separate from said client device," and "server device" are presumed to have

different meanings because these distinct phrases are used differently in the same claims and across

the claims of the Patents at issue.  *See Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324,

1336 (Fed. Cir. 2011).  In addition, the Court agrees with Plaintiff that the plain meaning of "remote

device" is a "device not co-located with the client device," while a "device separate from said client

device" is a "device other than the client device."  Accordingly, the issue before the Court is whether

the intrinsic record, through a limiting definition or a disavowal of claim scope, narrows the plain

meaning of these terms to include only "web servers."  Here, the Court notes that the portions of the

specification which Defendants cite for demonstrating that a remote device or device separate from

a client device is a web server relate to the preferred web site embodiment, and may not be grafted

upon the claims as a whole.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005).

Furthermore, the Court finds that the applicants' description of the current invention as a "web-based

media submission tool" is not a "clear and unmistakable disclaimer" so as to limit the meaning of

"remote device" or "device separate from said client device" to a "web server."  *See Thorner v. Sony

Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-68 (Fed. Cir. 2012).

Based on the foregoing, the Court finds that the terms "remote device" and "device separate from said client device" mean "device not co-located with the client device" and "device other than said client device" respectively.

7.    "information that enables identification of a user" or "user identifier" or "user information"

Plaintiff                                    Mobile Phone Defendants

"information related to a person"     "information related to a person, as opposed to a device"

According to Plaintiff, the parties agree that "information that enables identification of a user," "user identifier," and "user information" are synonymous and should be construed to mean at least "information related to a person." *See, e.g.*, Pl.'s Opening Br. 26, ECF No. 106. For their part, the Mobile Phone Defendants reject the idea that these terms are synonymous and state that the only part of these claims in dispute is the term "information," which they define as "information related to a person, as opposed to a device." *See* Mobile Phone Defs.' Responsive Br. 26, ECF No. 118. The remaining claim language, the Mobile Phone Defendants assert, is different and has never been disputed. *See id.*

Plaintiff offers no specific support for its proposed construction. *See* Pl.'s Opening Br. 26, ECF No. 106. For their part, the Mobile Phone Defendants dedicate their briefing to arguing that "mere device-identifying information" is not sufficient under the claims, such that their construction should be adopted. *See* Mobile Phone Defs.' Opening Br. 27, ECF No. 115. Accordingly, the Mobile Phone Defendants assert that Plaintiff should not be permitted to rewrite the claim language to cover "mere device-identifying information" by equating a "user" with a "device." *See id.* This construction, the Mobile Phone Defendants argue, leads to the result in dependent claim 19 of the

'482 Patent that the client device must retrieve information regarding itself in a manner transparent to itself. *See id.* (quoting '482 Patent claims 13, 19). Furthermore, the fact that numerous claims of the '482 Patent are directed to specific types of information, while never referring to mere device information, indicates that "user information" cannot refer to mere device information. *See id.* (quoting '482 Patent claims 13, 19-20, 46-50). The Mobile Phone Defendants further argue the user ID and password referred to in the specification are sufficient to identify a user, but not a device, and therefore support Defendants' construction. *See id.* at 27-28. Moving to the prosecution history, the Mobile Phone Defendants next argue that because the applicants argued that information disclosed in the Hui prior art–"information relating to creation and/or capture of the image, such as the type of hardware device used to capture the image and/or settings on the device"–was not "user-identifying information," Plaintiff cannot now argue that such "device-identifying information" falls within the scope of "user information." *See id.* at 28. Finally, the Mobile Phone Defendants criticize Plaintiff's proposed construction because it has the potential to envelop "persons" other than the user, such as the person who manufactured the client device. *See* Mobile Phone Defs.' Responsive Br. 25, ECF No. 118. In sum, the Mobile Phone Defendants argue that the Court should adopt its proposed construction because the "as opposed to a device" language enforces the distinction between user information and mere device information. *See id.*

Plaintiff responds that Defendants' proposed language should be rejected because it introduces an "opposed to a device" limitation that is not supported by the intrinsic record and excludes a preferred embodiment. *See, e.g.*, Pl.'s Opening Br. 26, ECF No. 106. In particular, Plaintiff argues that a preferred embodiment of the '482 Patent contemplates "broad information" being used in connection with images, including information that is "image-specific, user-specific,

or both." *See id.* (quoting '482 Patent col.4 ll.31-32, 42-45). So, for instance, Plaintiff notes that a common piece of information referenced in the specification, a user ID and password, may relate to both a user and a device. *See id.* Likewise, Plaintiff notes that a cell phone number may be used to identify the user of a cell phone who is billed by the cell phone company as well as the device that rings when the number is called. *See* Pl.'s Resp. to Mobile Phone Defs. 27, ECF No. 122. Because Defendants' proposed construction would exclude data that relates both to a user and a device from the term "user information," Plaintiff argues, it should be rejected. *See id.* The Mobile Phone Defendants reply that the '482 Patent's specification nowhere discloses a preferred embodiment that uses mere device information to enable identification of a user. *See* Mobile Phone Defs.' Responsive Br. 25-26, ECF No. 118.

The Court begins by noting that, although the Mobile Phone Defendants accuse Plaintiff of proposing a construction that encompasses mere device information, the parties' proposals both communicate the idea that the "information" required by the disputed claim terms must be related to a user, or person. Accordingly, Plaintiff's proposed construction requires "information related to a person," while the Mobile Phone Defendants suggest the additional limitation "as opposed to a device." The Mobile Phone Defendants also seem to suggest that, when Plaintiff's proposed construction is inserted into the "user-identifying claim limitations," those claims may encompass "mere device-identifying information." The Court disagrees. Using the agreed-upon "information related to a person" language in each of the disputed claim terms, the Court arrives at the following constructions: (1) "information that enables identification of a user" and "user identifier" mean "information related to a person that enables identification of that person"; and (2) "user information" means "information related to a person." Contrary to the Mobile Phone Defendants'

suggestion, the former constructions are not sufficiently broad to encompass information that only enables identification of a device, since they expressly require the information related to a person to enable identification of that person.  By contrast, the mere "user information" term–which the Mobile Phone Defendants concede is broader than the user-identifying information terms–may encompass information which enables identification of a device, rather than a person, so long as the information relates to a person.  The Court finds that these constructions are required by the plain meaning of the claim terms and are consistent with the parties' positions regarding "user information" and mere "device information."

Accordingly, the Court finds that  "information that enables identification of a user" and "user identifier" mean "information related to a person that enables identification of that person," while "user information" means "information related to a person."

8.      "publishing" or "publication"

| Plaintiff | Mobile Phone Defendants |
| --- | --- |
| plain meaning, or | "making the digital content publicly available (e.g. posting the digital content on a web page)" |
| "sharing" | |

Plaintiff argues that the terms "publishing" and "publication" have their plain meaning and do not require construction.  *See* Pl.'s Opening Br. 27, ECF No. 106.  In the alternative, Plaintiff offers "sharing" as a definition for these terms.  *See id.*  Plaintiff simply argues that this construction best represents the meanings of "publication" and "publishing."  *See id.*

The Mobile Phone Defendants argue that "publishing and "publication" mean "making the digital content publicly available (e.g. posting the digital content on a web page)."  *See* Mobile Phone Defs.' Opening Br. 10, ECF No. 115.  In support of their construction, the Mobile Phone Defendants

44

first argue that publishing is different than transportation or transmission, a point which Plaintiff

concedes. *See id.*; *see also* Pl.'s Resp. to Mobile Phone Defs. 6, ECF No. 122. Citing claim 36 of

the '482 Patent, the Mobile Phone Defendants then argue that publication is also distinct from mere

distribution. *See* Mobile Phone Defs.' Opening Br. 10, ECF No. 115. While the claim language

and the prosecution history of amendments to the claim language indicate that transportation,

transmission, and distribution refer to making digital content available to select devices, the Mobile

Phone Defendants argue, publishing and publication refer to making digital content available to the

broader public. *See id.* at 11 (citing App. Supp. Mobile Phone Defs.' Opening Br. ('482 Patent,

Resp. Office Action of July 10, 2009), at App. 97, ECF No. 116-12). The Mobile Phone Defendants

further support their construction by pointing to dictionary definitions of "publish" and

"publication." *See id.* at 11-12.

     Plaintiff argues that Defendants' construction must be rejected because it: (1) excludes

preferred and claimed embodiments, (2) is inconsistent with the use of the terms in other claims, and

(3) improperly limits the '482 Patent to web-based embodiments. *See* Pl.'s Opening Br. 27-28, ECF

No. 106. First, Plaintiff argues that a preferred embodiment described in the specification is a realty

web site associated with an MLS number. *See id.* Plaintiff states, without support, that it was

common at the time of the invention for MLS web sites to restrict access to property information to

registered Realtors, such that images were "published" not to the public at large but to a small

community of users with access to a restricted service. *See id.* Second, Plaintiff argues that other

claims demonstrate the non-public nature of the term "publishing" as used in the '557 and '482

Patents. *See id.* For example, Plaintiff points to claim 36 of the '482 Patent, which claims a

"computer implemented method of publishing digital content . . . comprising . . . distributing . . . to

one or more devices." *See id.* Finally, Plaintiff argues that Defendants have improperly attempted to limit the '482 Patent to a web-based embodiment by suggesting "posting to a web page" as an example of "publication." *See id.*

The Mobile Phone Defendants respond that the '482 Patent does not disclose an embodiment demonstrating "private" publication, since every reference in the '482 Patent is to a publicly accessible real estate web site. *See* Mobile Phone Defs.' Responsive Br. 9-10, ECF No. 118. The Mobile Phone Defendants also argue that even if a "private" embodiment were disclosed, such an embodiment would not read onto claims that expressly claim "publishing." *See id.* Second, the Mobile Phone Defendants argue that the use of the different terms "publishing" and "distributing" in claim 36 of the '482 Patent indicates that the terms should be given different meanings. *See id.* Lastly, the Mobile Phone Defendants counter that the example included within their definition is proper because it would be helpful to the jury and is consistent with the specification of the '482 Patent. *See id.* In reply, Plaintiff emphasizes that the claim language and specification of the '482 Patent make clear that "publishing" need not be to the general public but may involve making information available "to one or more devices." *See* Pl.'s Resp. to Mobile Phone Defs. 6, ECF No. 122 (quoting '482 Patent claim 51). Plaintiff also criticizes the Mobile Phone Defendants' reliance on extrinsic dictionary definitions that are divorced from the context of the claims, and directs the Court to extrinsic evidence from the Facebook website to support its own construction. *See id.* at 7.

Here, the Court agrees with the Mobile Phone Defendants that the plain, ordinary meaning of the term "publication" is "making publicly available." This construction finds support in the multiple sources cited by the Mobile Phone Defendants and in the case law. *See, e.g., Kyocera*

46

*Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed Cir. 2008) (defining "publication," in the context of printed publication constituting prior art, to require "public accessibility"). Plaintiff has cited no evidence in support of its suggestion that the term publication, as used in the '482 Patent, is different from this ordinary meaning, and has cited no evidence to support its claim that the preferred embodiment conflicts with the Mobile Phone Defendants' proposed definition. As an alternative to the plain meaning, Plaintiff suggests "sharing" as a definition for the publication terms. Here, the Court notes that the specification expressly discusses "sharing," such that the applicants knew how to claim sharing. *See* '482 Patent col.1 ll.23-24; *id.* col.1 ll.39-40. The concept of sharing is also more consistent with the claim term "distribution," which is used in place of "publication" in certain claims. *See* '482 Patent claims 26, 38. Because the '482 Patent uses the separate terms "publication" and "distribution" throughout the claims, and uses both terms in claim 38, the Court presumes that these terms have different meaning and scope. *See Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011). Applying Plaintiff's "sharing" definition to "publication," the Court can find no basis on which to distinguish mere "distribution" from "publication," such that the "publication" limitation would be superfluous. *See id.* (quoting *Comark Comm'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant."). If "publication" is understood not only as sharing, but as sharing with the public, this problem is avoided. The Court acknowledges that defining "publication" to mean "making publicly available" leads to the result that the claims disclose "making [digital content]

publicly available to one or more devices."  Plaintiff argues that this consequence of the "publicly available" requirement demonstrates that "publication" must be defined otherwise, because digital content may not be made publicly available if a single device is on the receiving end.  *See* Pl.'s Resp. to Mobile Phone Defs. 6, ECF No. 122 (quoting '482 Patent claim 51).  The Court disagrees. Certainly, making content publicly available through "publication" is simpler and more intuitive when multiple devices are involved as recipients.  Importantly, however, it is neither illogical nor impossible to envision a scenario in which "publication" of digital content to a single device results in the content being made publicly available by virtue of the public's ability to access that single device.

Based on the foregoing, the Court finds that "publishing" and "publication" mean "making publicly available."

9.   "a computer implemented method of pre-processing digital content in a client device for subsequent electronic [publishing / distribution]"

| Plaintiff | Mobile Phone Defendants |
| --- | --- |
| no construction necessary | "the steps of the claim performed on the client device are performed during the execution of one computer program" |

Plaintiff argues that "a computer implemented method of pre-processing digital content in a client device for subsequent electronic publishing" and similar terms do not require construction because they are merely preambles and are not unclear.  *See* Pl.'s Opening Br. 28, ECF No. 106. Plaintiff also argues the Mobile Phone Defendants' construction is incorrect.  *See id.*

The Mobile Phone Defendants argue that these terms should be construed to mean "the steps of the claim performed on the client device are performed during the execution of one computer

48

program." *See* Mobile Phone Defs.' Opening Br. 20, ECF No. 115.  First, the Mobile Phone

Defendants argue that the preambles are subject to claim construction as claim limitations because

(1) the preambles breathe life into the claims by providing an antecedent basis for claim terms, such

as "said client device"; (2) the preambles were extensively amended and relied upon by the

applicants in distinguishing the purported invention from the prior art; and (3) the preambles are

necessary to understanding the relationship between each of the recited claim steps, such as the

fact–argued by the applicants in distinguishing the '983 Patent–that the transmitting step of claim

1 is performed by a client device, despite such a requirement not being mentioned in the transmitting

step.  *See id.* at 20-22.  As to the prior art, the Mobile Phone Defendants argue that the only novelty

of the current invention identified in the specification is the fact that, unlike prior tools, it integrates

the claimed process into a single computer program, as stated in the preamble.  *See id.* at 23.

Plaintiff first responds that the preambles need not be construed as claim limitations because

they merely provide an introduction to the subsequent claim language, and are not needed to give

life, meaning, or vitality to the claims.  *See* Pl.'s Opening Br. 28, ECF No. 106.  First, Plaintiff

argues that merely providing an antecedent basis for later-used claim terms does not make the

preamble limiting.  *See* Pl.'s Resp. to Mobile Phone Defs. 19, ECF No. 122.  Here, Plaintiff

distinguishes the cases cited by the Mobile Phone Defendants on the grounds that the preambles do

not limit the nature of a "client device" in ways omitted from the claim language–as by describing

a "battery-powered client device" where the claims mention only "said client device."  *See id.*  Next,

Plaintiff attacks the Mobile Phone Defendants' claim that the preambles were repeatedly amended

for purposes of patentability, noting that each of the referenced amendments either: (1) cancelled

entire claims and replaced them with new ones; or (2) amended the preambles only as necessary to

conform with changes made in the body of the claims.  *See id.*  In sum, Plaintiff argues that the claim language sets forth a complete system, such that the preambles introduce the purpose of the claims and are not necessary to an understanding of the invention.  *See id.*

Moving to the Mobile Phone Defendants' proposed construction, Plaintiff argues that even if the preambles must be construed, the "one computer program" is incorrect for a number of reasons.  *See* Pl.'s Resp. to Mobile Phone Defs. 22, ECF No. 122.  First, Plaintiff argues that the Mobile Phone Defendants have conflated the terms "computer implemented method" and "computer program," where the Federal Circuit has recognized these concepts as distinct.  *See id.* at 22-23 (citing *In re Gelnovatch*, 595 F.2d 32, 37 (C.C.P.A. 1979)).  Next, Plaintiff argues that the "one computer program" limitation violates the "one or more rule," which states as a general rule that "a" can mean "one or more" unless the intrinsic record requires otherwise.  *See id.* at 23 (quoting *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008)).  Here, Plaintiff asserts that nothing in the intrinsic record supports limiting the "computer implemented method" to being executed in a single computer program.  *See id.*  Rather, Plaintiff argues that the Mobile Phone Defendants' position is contradicted by the web site embodiment, which involves client-side activity in multiple programs, including a web browser and a plug-in program like a Java applet.  *See id.* (citing '482 Patent col.6 ll.33-40).  Similarly, Plaintiff argues, the separate steps of the claims would be understood as involving different programs, such that "pre-processing" involves a Java applet in the web embodiment; "retrieving" may involve an applet, the browser, and the memory functions of the operating system; and the transmitting step would involve networking components of an operating system.  *See id.*  Addressing the Mobile Phone Defendants' use of the prosecution history, Plaintiff next argues that the applicants distinguished the prior art on the basis that it was "daunting"

50

and complex, but nowhere described their invention as being simpler by virtue of involving only one computer program. *See id.* In sum, Plaintiff criticizes the Mobile Phone Defendants for rewriting the preambles to describe a "computer implemented, one-program method." *See id.* at 29.

Replying to Plaintiff's argument based on the preferred web site embodiment, the Mobile Phone Defendants assert that the multiple "programs" identified by Plaintiff are, in reality, a variety of resources called upon during the execution of a single computer program, the browser. *See* Mobile Phone Defs.' Responsive Br. 22-23, ECF No. 118. Accordingly, the Mobile Phone Defendants argue, their "one computer program" limitation does not exclude a preferred embodiment and should be adopted. *See id.*

Here, the Court must first determine whether the disputed preamble language must be construed as a claim limitation. As the Mobile Phone Defendants have argued, a preamble may be treated as a claim limitation when "patentability depends on limitations stated in the preamble . . . when the preamble contributes to the definition of the claimed invention . . . [or when] the preamble provides antecedents for ensuing claim terms and limits the claim terms accordingly." *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998). First, the Court agrees with Plaintiff that, although the applicants repeatedly amended the language of the preambles, these amendments were made to conform the language of the preambles to similar amendments made in the claims themselves; the preambles were not amended in isolation to obtain issuance of the '482 Patent. Second, the Court finds that the preambles do not contribute to the definition of the claimed invention. Here, the Court has considered whether the preamble "recites essential structure that is important to the invention or necessary to give meaning to the claim." *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006); *see also Boehringer Ingelheim Vetmedica, Inc. v. Schering-*

*Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003) (finding that the "growing" and "isolating" limitations from the preamble were the essence of the claimed invention and were omitted from the claim language, such that the preamble served as a claim limitation).  The Court finds that the preamble is not necessary to an understanding of the claimed invention because each of its limitations–including a "computer implemented method," "of pre-processing digital content in a client device" and "for subsequent electronic publishing"–is expressly or implicitly disclosed by the claim language.  As such, the claims recite "pre-processing" using pre-processing parameters controlling a client device, and transmission "for subsequent publishing."  *See, e.g.*, '482 Patent claim 1.  As to the "computer implemented method" limitation, the Court acknowledges that the claims do not expressly recite pre-processing by a computer implemented method.  Nevertheless, the Court finds–and no Defendant has disputed–that a person of ordinary skill in the art reading the claims of the '482 Patent would understand that a method for pre-processing digital content by a client device in preparation for transmission to another device would be a computer implemented method.  The Court also recognizes that the "receiving" and "transmitting" steps of the claims at issue do not recite receipt or transmission by a client device, though the prosecution history indicates that these steps must be performed by the client device.  The Mobile Phone Defendants suggest that this separation between the claim language and the prosecution history may be resolved by reference to the preamble, such that the preamble must be read as a claim limitation.  The Court disagrees.  Though the preamble recites "pre-processing digital content in a client device," the preamble is silent as to the location of the "receiving" and "transmitting" steps.  Because the preamble adds nothing to the reader's understanding of the "receiving" and "transmitting" steps, the alleged deficiencies in these claim steps cannot be used to justify treating the preamble as limiting the claim.

Finally, the Court finds that the preamble is not a claim limitation merely because its reference to "a client device" provides an antecedent basis for the claim term "said client device." Unlike the cases cited by the Mobile Phone Defendants, this is not a situation in which the claim language refers the reader to a term first used in the preamble to supply a limitation not otherwise present in the claim. *See,e.g.*, *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 n.2 (Fed. Cir. 2004) (construing preamble as claim limitation, where the preamble recited "intracellular marker substance" and the claim recited only "said marker substance"). *Accord Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 621 (Fed. Cir. 1995) (construing a preamble which recited a "packet . . . said packet including a source address and destination address" as a claim limitation where the claim recited only "said packet," without regard to whether the packet included "a source address and destination address"). As such, while the preamble provides an antecedent basis for subsequent claim terms, it does not thereby "limit[] the claim terms." *See C.R. Bard, Inc.*, 157 F.3d at 1350.

Based on the foregoing, the Court finds that the preamble language "a computer implemented method of pre-processing digital content in a client device for subsequent electronic publishing" is not subject to construction as a claim limitation.

10.   "receiving . . . from a remote device" or "received from a device separate from a client device" or "provided to said client device by a device separate from said client device"

| Plaintiff | Mobile Phone Defendants |
| --- | --- |
| no construction necessary | "the 'pre-processing parameters' are received by the client as part of the 'computer implemented method of preprocessing digital content in a client device'" |

Plaintiff argues that the phrases "receiving . . . from a remote device," "received from a

device separate from a client device," and "provided to said client device by a device separate from said client device" do not require separate construction, particularly since the Court has been asked to construe the terms "remote device" and "device separate from said client device."  *See* Pl.'s Opening Br. 30, ECF No. 106.  For their part, the Mobile Phone Defendants propose the definition "the 'pre-processing parameters' are received by the client as part of the 'computer implemented method of preprocessing digital content in a client device.'" *See* Mobile Phone Defs.' Opening Br. 24, ECF No. 115.

Here, the Mobile Phone Defendants essentially argue that the language of the preamble–which recites a "computer implemented method of pre-processing digital content in a client device"–should be included as a part of the definition of the "receiving," "received," and "provided to" phrases in claims 1, 13, and 38 of the '482 Patent.  *See generally id.*  The Court has already determined that the language of the preamble is not subject to construction as a claim limitation, and thus should not be imported onto the claim language.  *See supra* Part III.9.  In addition, the Court finds no other support for imposing this language as a limitation on the claim terms at issue.  Accordingly, the Court declines to construe the "receiving," "received," and "provided to" phrases as "part of the 'computer implemented method of pre-processing digital content in a client device.'"  Furthermore, the Court agrees with Plaintiff that these phrases do not require additional construction, since their component parts–with the exception of the straightforward terms "receiving," "received," and "provided to"–have already been construed. Here, the Court notes that the Mobile Phone Defendants' proposed construction, while attempting to incorporate the "computer implemented method" limitation, did nothing to define the terms "receiving," "received," or "provided to," such that the meaning of these terms has not been placed

in dispute.  *See* Mobile Phone Defs.' Opening Br. 24, ECF No. 115.

Based on the foregoing, and incorporating its construction of "remote device" and "device separate from a client device," the Court finds that: "receiving . . . from a remote device" means "receiving from a device not co-located with the client device"; "received from a device separate from a client device" means "received from a device other than the client device"; and "provided to said client device by a device separate from said client device" means "provided to said client device by a device other than said client device."

        11.    <u>"displaying a preview image of said selected digital content"</u>

| <u>Plaintiff</u> | <u>Web Defendants</u> |
|---|---|
| plain meaning, or | "displaying a preview image after the digital content has been selected for uploading" |
| "displaying a preview image of the selected digital content" | |

Plaintiff simply argues that "displaying a preview image of said selected digital content" is a straightforward phrase that should be given its plain meaning or construed as "displaying a preview image of the selected digital content."  *See* Pl.'s Resp. to Web Defs. 27, ECF No. 120.  The Web Defendants critique Plaintiff's proposed construction for leaving open the possibility that a preview image will be displayed before an image is selected.  *See* Web Defs.' Opening Br. 28-29, ECF No. 108.

The Web Defendants argue that their proposal of "displaying a preview image after the digital content has been selected for uploading" is required by the plain claim language and the specification, which describes the invention as allowing the user to "confirm [a] submission, for example by generating a thumb nail image of an image file that *has been* dragged and dropped."  *See*

*id.* (quoting '557 Patent, abstract, col.4 ll.7-13) (emphasis added).   Here, the Web Defendants emphasize that a preview image of the digital content is not displayed until after the content has been selected.   *See id.*   Plaintiff responds that the Web Defendants' proposed construction adds sequencing requirements and a "for upload" limitation that are not supported by the claim language. *See* Pl.'s Resp. to Web Defs. 27, ECF No. 120.

The Court begins by noting that claim 35 of the '482 Patent, the only claim at issue, recites in relevant part: (1) "receiving a command . . . said received command enabling selection of digital content"; (2) "pre-processing said selected digital content"; (3) "displaying a preview of said selected digital content"; and (4) "transmitting a message that includes said pre-processed digital content." *See* '482 Patent claim 35.   As the Web Defendants argue, this claim language indicates that a "preview of . . . digital content" may be displayed only after the digital content is "selected." Importantly, however, the claim language does not support the further limitation of "for upload." Rather, the claims indicate that the "selection" which occurs in the first step is selection of the digital content to be pre-processed in the second step, a concept clearly described in the claim language itself.   The portions of the written description cited by the Web Defendants support this construction.

Based on the foregoing, the Court finds that "displaying a preview image of said selected digital content" means "displaying a preview image of the digital content after the digital content has been selected."

12.     "pre-processing in accordance with one or more pre-processing parameters that have been stored in memory of said client device" and similar terms

| Plaintiff | Web Defendants | Mobile Phone Defendants |
|---|---|---|
| | | |

| plain meaning, incorporating claim terms as construed by the Court | "'pre-processing' the identified digital content at the client device, the 'pre-processing' being controlled by the received 'pre-processing parameters,' and not by the user, during the interaction of the client and 'remote device'" | "the 'remote device' directs the 'pre-processing' during interaction with the client device, based on the 'pre-processing parameters'" |
|---|---|---|

Finally, the parties dispute the meaning of "pre-processing in accordance with one or more pre-processing parameters that have been stored in memory of said client device" and a number of similar terms. *See, e.g.*, Pl.'s Opening Br. 22, ECF No. 106. Plaintiff argues that each of these terms has unique meaning and does not require construction in light of the Court's construction of the underlying phrases used therein. *See id.* For their part, the Web Defendants suggest that these terms be construed as "'pre-processing' the identified digital content at the client device, the 'pre-processing' being controlled by the received 'pre-processing parameters,' and not by the user, during the interaction of the client and 'remote device.'" *See* Web Defs.' Opening Br. 23, ECF No. 108. The Mobile Phone Defendants, by contrast, suggest a construction of "the 'remote device' directs the 'pre-processing' during interaction with the client device, based on the 'pre-processing parameters.'" *See* Mobile Phone Defs.' Opening Br. 18, ECF No. 115.

Plaintiff argues that it is not necessary to construe these terms because their main components–such as "pre-processing" and "pre-processing parameters"–have already been construed, while the remaining words–such as "in," "accordance," and "with"–are simple and can be given their plain, ordinary meaning. *See* Pl.'s Opening Br. 23, ECF No. 106. The Web Defendants criticize Plaintiff for suggesting a word-by-word definition of the disputed terms, rather than an overall construction which considers the context of the claim terms. *See* Web Defs.' Responsive Br. 24-25, ECF No. 117. Here, the Web Defendants argue that the claims, while using

slightly different language, all convey the claim limitation that the pre-processing is controlled by pre-processing parameters, not the user. *See id.* at 25. Next, the Web Defendants argue that their proposed construction was merely intended to highlight the commonalities between the disputed terms, but not to erase elements which differ between the claims. *See id.* at 25. Accordingly, the Web Defendants' response brief contains a chart demonstrating how their proposed construction may be supplemented by the unique terms of each disputed claim. *See id.* at 26-27. For their part, the Mobile Phone Defendants argue that Plaintiff's concern about imposing a single construction on multiple terms with different claim language does not apply in their case, since the Mobile Phone Defendants only seek construction of two nearly identical claim terms. *See* Mobile Phone Defs.' Responsive Br. 18, ECF No. 118. The Mobile Phone Defendants also criticize Plaintiff's opening brief for failing to address the meaning of the phrase "controlling said client device." *See id.* at 19. Finally, the Mobile Phone Defendants contend that Plaintiff's construction is circular, impossible for a jury to understand or apply, and disregards the impact of statements made by the applicant in the prosecution history. *See* Mobile Phone Defs.' Opening Br. 20, ECF No. 115.

In support of their construction, the Web Defendants argue that the parties' dispute, as in the "without user selection context," is "whether the asserted claims cover systems in which user selections control what pre-processing occurs." *See* Web Defs.' Opening Br. 23-24, ECF No. 108. The Web Defendants argue that the claim language, such as "said received pre-processing parameters *controlling* said client device," demonstrates that pre-processing is controlled not by the user but by the pre-processing parameters. *See id.* at 24. According to the Web Defendants, the prosecution history also supports this view, given that the applicants distinguished the Hui prior art on the basis that "Hui does not describe a remote device directing an application of specific coloring to an image.

Instead, the user controls the specific coloring using the correction process tools made available to the user." *See id.* at 25-26 (quoting App. Supp. Web Defs.' Opening Br. ('482 Patent, Resp. Office Action of Jan. 22, 2010), at App. 204-05, ECF No. 114-4).   The Web Defendants argue that this statement disclaims any system in which a user selects the pre-processing parameters or uses "'tools made available to the user' with parameters pre-programmed into the tool to make selections." *See id.*   Referring to their proposal that "pre-processing parameters" are stored in HTML text, the Web Defendants further argue that pre-processing "using" or "in accordance with" such parameters occurs "during the interaction" between the user's device and the remote web server, and not at times when the two devices are not interacting.  *See id.* at 26.

Plaintiff responds that the Web Defendants' proposed construction is improper because it ignores the presumption that claims which use different words or phrases have different meanings and scope.  *See* Pl.'s Opening Br. 24, ECF No. 106; *see also* Pl.'s Resp. to Web Defs. 22-23, ECF No. 120.  So, for example, Plaintiff argues that Defendants' construction ignores key differences between claims of the '482 Patent, such as claim 16–which requires pre-processing parameters to "have been stored in memory"–and claim 18–which states that pre-processing parameters are "downloaded to" the client device.  *See* Pl.'s Opening Br. 24, ECF No. 106 (quoting '482 Patent claims 16, 18).  Plaintiff also criticizes the Web Defendants' "and not by the user limitation," by arguing that: (1) while the claims of the '482 Patent state that the pre-processing parameters "control" the client device in conducting pre-processing, the claims do not preclude any and all selection by the user; and (2) this limitation does nothing to define the disputed term "controlled." *See* Pl.'s Resp. to Web Defs. 23, ECF No. 120.  Next, Plaintiff argues that the Web Defendants misread the prosecution history.  *See id.*  According to Plaintiff, the applicants distinguished Hui not

59

on the basis of user selection but on the grounds that: (1) Hui does not modify the underlying image data, and (2) Hui does not use pre-processing parameters from a remote device, as opposed to stand-alone software on a user's computer.  *See id.* at 24-25 (quoting App. Supp. Pl.'s Opening Br. ('482 Patent, Resp. Office Action of Jan. 22, 2010), at App. 99-100, ECF No. 113).  In sum, Plaintiff argues that the prosecution history did not disclaim any user selection that affects pre-processing, but disclaimed a system in which the user–as opposed to a remote device–has total control over the pre-processing parameters.  *See id.*  Finally, Plaintiff rejects the Web Defendants' "during the interaction" limitation as being unclear and unsupported by the claim language.  *See id.* at 26-27.

The Mobile Phone Defendants' opening brief, like that of the Web Defendants, focuses on the term "controlling."  *See* Mobile Phone Defs.' Opening Br. 18-20, ECF No. 115.  Citing the prosecution history, the Web Defendants note that Plaintiff distinguished the Hui prior art on the basis that it:

> [D]oes not process digital content using pre-processing parameters received from a remote device, the pre-processing parameters controlling a placement of the digital content in a specified form for publication . . . . Control is not effected by a remote device.  For example, Hui does not describe a remote device directing [pre-processing of digital content].

*See id.* (quoting App. Supp. Mobile Phone Defs.' Opening Br. ('482 Patent, Resp. Office Action of Jan. 22, 2010), at App. 43-44, ECF No. 116-4).  According to the Web Defendants, this prosecution history shows that "control[]" of the client device must be "effected by a remote device" while the remote device is "directing" the pre-processing, such that "control" must occur during the interaction between the remote device and the client device.  *See id.* at 19.  The Web Defendants contend that

the Patent Office also understood the current invention to be limited to pre-processing "during communications with [the] server." *See id.* (quoting App. Supp. Mobile Phone Defs.' Opening Br. ('482 Patent, Office Action of Apr. 19, 2009), at App. 62-63, ECF No. 116-4).

In response to the Mobile Phone Defendants, Plaintiff rejects the suggestion that a remote device may control a client device in conducting pre-processing only if the pre-processing occurs during the interaction of the two devices. *See* Pl.'s Resp. to Mobile Phone Defs. 16-19, ECF No. 122. According to Plaintiff, this construction is contradicted by a common sense reading of the claim language and the prosecution history. *See id.* So, for instance, Plaintiff notes that the claims require the remote device to direct and control pre-processing, but argues that such control may be effectuated after the client device receives the pre-processing parameters and without regard to whether the client device and remote device are still "interacting." *See id.* Plaintiff also argues that the "during the interaction" limitation conflicts with claims 16, 17, and 18 of the '482 Patent, which describe the use of pre-processing parameters that were "previously downloaded to said client device," "downloaded to said client device," and "stored in memory of said client device" respectively. *See id.* (quoting '482 Patent claim 16). Next, Plaintiff criticizes the Mobile Phone Defendants' reference to the Examiner's use of the language "during communication with [the] server]," noting that: (1) the Examiner was describing the prior art, not the current invention, and (2) the applicants distinguished their invention from the prior art without limiting their invention to pre-processing "during communication with [the] server." *See id.* (quoting App. Supp. Pl.'s Resp. to Mobile Phone Defs. ('482 Patent, Resp. Office Action July 10, 2009), at App. 180-81, ECF No. 122-2).

The Court begins with the claim language at issue. As demonstrated by the chart of claims

61

included in the Web Defendants' briefing, the disputed claims contain a wide variety of claim limitations. *See* Web Defs.' Responsive Br. 26-27, ECF No. 117.  Accordingly, the claims recite pre-processing either "using" or "in accordance with" pre-processing parameters, while only some claims recite the additional limitation of the pre-processing parameters "controlling" the client device. *See id.*  Likewise, the claims describe a number of ways in which the client device obtains the pre-processing parameters, including that the pre-processing parameters "have been previously downloaded," "have been downloaded to said client device prior to said identification," "have been stored in memory of said client device prior to said identification," "are received," "were provided," "have been provided," or "being provided."  In essence, the Web Defendants argue that all of the claims at issue should be construed to include three limitations: (1) pre-processing "being controlled" by the pre-processing parameters, (2) the client device obtaining the pre-processing parameters "during the interaction of the client device and the remote device," and (3) pre-processing "not being controlled by the user."  *See id.*  The Mobile Phone Defendants join in proposing the second limitation.  For the reasons discussed below, the Court rejects each of these proposed limitations as lacking support in the language of the claims or the intrinsic record.  In addition, the Court essentially agrees with Plaintiff that the disputed claim phrases do not need construction because they may be understood by reference to the Court's construction of their constituent claims and to the plain and ordinary meaning of the remaining terms.  Importantly, however, given the Web Defendants' contention that the remaining claim terms include within their scope the three proposed limitations described above, the Court finds it necessary to address the proposed limitations and to construe some of the remaining claim terms in order to resolve the parties' dispute over the scope of these claims.  *See  O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361

(Fed. Cir. 2008).

Before analyzing the Web Defendants' proposed limitations, the Court begins by construing the term "controlling." The Mobile Phone Defendants have attempted to define the "controlling" limitation to mean that "the 'remote device' directs" the pre-processing. The Court agrees with the basic concept that "controlling" means "directing," but disagrees that the claim term should be defined to require "directing" by the remote device. In the prosecution history cited by the Mobile Phone Defendants, the applicants explained that–in a claim reciting "controlling"–the remote device directs the pre-processing because it furnishes the pre-processing parameters which, in turn, control the client device in conducting the pre-processing. *See* App. Supp. Mobile Phone Defs.' Opening Br. ('482 Patent, Resp. Office Action of Jan. 22, 2010), at App. 43-44, ECF No. 116-4. The applicants expressed this concept in the "controlling" claims by claiming "pre-processing . . . using . . . pre-processing parameters , said . . . pre-processing parameters controlling said client device." *See, e.g.*, 482 Patent claim 1. Based on the foregoing, the Court adopts the Mobile Phone Defendants' suggestion that "controlling" means "directing," but rejects the further "the remote device" limitation. *See, e.g.*, Oxford English Dictionary, www.oed.com ("control").

Moving to the Web Defendants' proposed limitation, the Court begins with the first and third limitations proposed by the Web Defendants. The Court disagrees that the prosecution history requires imposing either a "controlling" limitation on claims that do not recite "controlling" or a limitation that requires control to be "not by the user." In the prosecution history cited by the Web Defendants, the applicants distinguished its "controlling" claims from the Hui prior art on the basis that Hui involved modifications "directed solely by the user" where "[c]ontrol is not effected by a remote device." *See* App. Supp. Web Defs.' Opening Br. ('482 Patent, Resp. Office Action of Jan.

22, 2010), at App. 204-05, ECF No. 114-4 (emphasis added). While emphasizing that control is effected by a remote device in its "controlling" claims, the applicants did not discuss the concept of "control" in the context of claims that recite pre-processing merely "using" or "in accordance with" pre-processing parameters." *See generally id.* Based on the foregoing, the Court finds no support in the claim language or the prosecution history for imposing the "controlling" limitation onto claims that do not recite this limitation. Accordingly, the Court rejects the Web Defendants suggestion that "using" and "in accordance with" should be effectively equated with "controlling." Employing the plain and ordinary meaning of the former terms, the Court finds that "using" and "in accordance with" mean "employing" and "to conform to" respectively. *See, e.g.*, Oxford English Dictionary, www.oed.com ("use," "accordance," and "in accordance with"). In the context of the controlling claims, the Web Defendants also suggest a "not by the user" limitation. As discussed above, the applicants distinguished the Hui prior art on the basis that it involved control directed "solely" by a user where, in the present invention, control was "effected" by a remote device. While this statement explicitly disavows user-only direction of the pre-processing, the Court finds it does not rise to the level of a clear and unmistakable disavowal of any user participation, since it leaves open the possibility that control is effected both by the user and the remote device. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-68 (Fed. Cir. 2012). Based on the foregoing, the Court finds that the "controlling" terms merely require that the pre-processing parameters "direct" the pre-processing, but should not include a further "not by the user" limitation.

Finally, the Court considers the Defendants' joint proposal of a "during the interaction" limitation. The Web Defendants argue that, because the pre-processing parameters are delivered in HTML code, these parameters can be employed to control the pre-processing only during the

interaction of the client and the remote device. *See* Web Defs.' Opening Br. 26, ECF No. 108. As discussed previously, the Court has rejected the Web Defendants' attempt to define the pre-processing parameters as values contained in HTML text, and has otherwise refused to read the preferred web site embodiment onto the broadly drafted claims of the '482 Patent. *See, e.g.*, *supra* Part III.3. Furthermore, the Court finds that the broad language of the claims contradicts the "during the interaction" proposal. As Plaintiff points out, claim 16 of the '482 Patent states that pre-processing parameters "received" in claim 13 must have been "previously downloaded," such that pre-processing may occur at any time after the pre-processing parameters have been obtained, regardless of whether the local device is still interacting with the remote device. *See* '482 Patent claims 13, 16. Based on the foregoing, the Court refuses to adopt Defendants' proposed "during the interaction" limitation.

With regard to the disputed claim terms, the Court finds that "controlling" means "directing"; "using" means "employing"; and "in accordance with" means "to conform to." As to the remaining claim terms, the plain and ordinary meaning governs unless the Court has specifically construed a term or phrase elsewhere in this Order.

## IV. CONCLUSION

In summary, the Court construes the disputed terms from the '557 and '482 patents as follows:

(1) "pre-processing" means "modifying the [media object data / digital content data], as opposed to data merely associated with the [media object / digital content], at the client or local device in preparation for transmission to a remote device";

(2) "pre-processing parameters" and "parameters used to control the pre-processing" mean

"values directing the pre-processing";

(3) "pre-processing the media object by the media object identifier for the requirements of the third-party website, the pre-processing being done without [additional] user selection of the pre-processing" means "pre-processing . . . without [additional] user input affecting what pre-processing occurs";

(4) "pre-processing the media object . . . for the requirements of the third-party web site" means "pre-processing the media . . . into a format specified by a web site, the web site being operated by a party other than: (1) the user, or (2) the party which provided the operator of the web site with the code used to include the media object identifier on the web site";

(5) "placement of . . . digital content into a specified form" or "to place . . . digital content in a specified form" means "modifying the digital content data to meet certain specifications";

(6) "remote device" means "device not co-located with the client device," and "device separate from said client device"  means "device other than said client device";

(7) "information that enables identification of a user" and "user identifier" mean "information related to a person that enables identification of that person," while "user information" means "information related to a person";

(8) "publishing" and "publication" mean "making publicly available";

(9) "a computer implemented method of pre-processing digital content in a client device for subsequent electronic [publishing / distribution]" is not subject to construction as a claim limitation;

(10) "receiving . . . from a remote device" means "receiving from a device not co-located with the client device"; "received from a device separate from a client device" means "received from a device other than the client device"; and "provided to said client device by a device separate from

66

said client device" means "provided to said client device by a device other than said client device";

(11) "displaying a preview image of said selected digital content" means "displaying a preview image of the digital content after the digital content has been selected"; and

(12) in "pre-processing in accordance with one or more pre-processing parameters that have been stored in memory of said client device" and similar terms, "controlling" means "directing"; "using" means "employing"; and "in accordance with" means "to conform to"; as to the remaining claim terms, the plain and ordinary meaning governs unless the Court has specifically construed a term or phrase elsewhere in this Order.

In addition, the parties have agreed on the construction of two claim terms, as follows:

(13) "combining (including stitching) of multiple media objects" means "combining media objects into one media object, not simply associating one media object with another media object"; and

(14) "adding text or other annotation to the media object" means "modifying the media object data to include text or other annotation, not simply associating separate text or other annotation with the media object."

**SO ORDERED** on this **21st day** of **May, 2012.**

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

67